# EXHIBIT A

```
               U.S. DISTRICT COURT FOR THE

        EASTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION


BUSCH MARINE GROUP, INC.,

A Michigan Corporation,

               Plaintiff,

          and                Case No. 1:20-cv-11427-LVP-PTM

                             Hon. Linda V. Parker

GREGORY J. BUSCH,            Mag. Patricia T. Morris

A Michigan resident,

          Plaintiffs/

          Counter-Defendants,



          vs.



CALUMET RIVER FLEETING, INC.,

A Wisconsin Corporation,

          Defendant/

          Counter-Plaintiff,

          and



GREAT AMERICAN INSURANCE COMPANY,

an Ohio Corporation,

          Defendant.
_____/
```

Gregory Busch
August 24, 2021

Page 2

```
 1
 2          The Deposition of GREGORY J. BUSCH,
 3      APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN,
 4      Commencing at 1:03 p.m.,
 5      Tuesday, August 24, 2021,
 6      Before Kathryn M. Standal, CSR-2966,
 7      APPEARING REMOTELY FROM OAKLAND COUNTY, MICHIGAN.
 8
 9  REMOTE APPEARANCES:
10
11  DON W. BLEVINS
12  Blevins Sanborn Jezdimir Zack, P.L.C.
13  1842 Michigan Avenue
14  Detroit, Michigan 48126
15  (313) 338-9500
16  dblevins@bsjzlaw.com
17      Appearing on behalf of the Plaintiffs.
18
19
20
21
22
23
24
25
```

Page 3

```
 1  PATRICK J. CULLINAN
 2  Cassiday Schade, L.L.P.
 3  222 West Adams Street
 4  Suite 2900
 5  Chicago, Illinois, 60606
 6  (312) 641-3100
 7  pcullinan@cassiday.com
 8      Appearing on behalf of the
 9      Defendant/Counter-Plaintiff, Calumet River
10      Fleeting, Inc.
11
12  MICHAEL J. LIDDANE
13  Foster, Swift, Collins & Smith, P.C.
14  28411 Northwestern Highway
15  Suite 500
16  Southfield, Michigan 48034
17  (313) 539-9900
18  mliddane@fosterswift.com
19      Appearing on behalf of the Defendant, Great American
20      Insurance Company.
21
22
23
24
25
```

Page 4

```
                    WITNESS, DATE
 1                  TABLE OF CONTENTS
 2
 3  WITNESS                         PAGE
 4  GREGORY J. BUSCH
 5
 6  EXAMINATION BY MR. CULLINAN:       6
 7  EXAMINATION BY MR. LIDDANE:      161
 8
 9                  EXHIBITS
10
11  EXHIBIT                        PAGE
12  (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  RECORDED REMOTELY FROM OAKLAND COUNTY, MICHIGAN
 2  Tuesday, August 24, 2021
 3  1:03 p.m.
 4
 5          COURT REPORTER:  The attorneys
 6  participating in this deposition acknowledge that I am
 7  not physically present in the deposition room and that
 8  I will be reporting this deposition remotely.  They
 9  further acknowledge that in lieu of an oath
10  administered in person, the witness will verbally
11  declare his testimony in this matter is under
12  penalty of perjury.  The parties and their counsel
13  consent to this arrangement and waive any objectionsto
14  this manner of reporting.
15          Please indicate your agreement by stating
16  your name and your agreement on the record.
17          MR. BLEVINS:  Don Blevins, agreed.
18          MR. CULLINAN:  Patrick Cullinan on behalf
19  of Calumet River Fleeting, Inc., agreed.
20          MR. LIDDANE:  Michael Liddane for Great
21  American, agreed.
22          THE WITNESS:  Gregory Busch, agreed.
23          COURT REPORTER:  Will the witness kindly
24  present his government-issued identification by
25  holding it up to the camera for verification?
```

Gregory Busch
August 24, 2021

Page 6

1              (Witness presents government-issued
2              identification and identity verified.)
3              COURT REPORTER:  Thank you, sir.
4              GREGORY J. BUSCH,
5    was thereupon called as a witness herein, and after
6    having first been duly sworn to testify to the truth,
7    the whole truth and nothing but the truth, was
8    examined and testified as follows:
9              COURT REPORTER:  Thank you.  Please
10   proceed.
11             EXAMINATION
12   BY MR. CULLINAN:
13   Q.  Good afternoon, Mr. Busch, my name is Patrick
14       Cullinan, I'm one of the attorneys that represents
15       Calumet River Fleeting, Inc.  Can you please once
16       again state your full name and spell your last name,
17       please?
18   A.  Excuse me.  Turn this off.  Excuse me for a moment.
19             My name is Gregory James Busch.
20   Q.  Spell your last name, please?
21   A.  B-U-S-C-H.
22             MR. CULLINAN:  Let the record reflect this
23       is the deposition of Gregory Busch being taken
24       pursuant to notice, pursuant to the Federal Rules of
25       Civil Procedure and any applicable local rules of the

Page 7

1    Eastern District of Michigan.
2    BY MR. CULLINAN:
3    Q.  Mr. Busch, again, my name is Pat Cullinan, I'm one of
4        the attorneys that represents Calumet River Fleeting.
5        Let me start by asking you if you've ever given a
6        deposition before?
7    A.  Yes.
8    Q.  On how many occasions?
9    A.  Like really don't know.  I'd say maybe three or four.
10   Q.  All right.  I'm going to go over and couple ground
11       rules.  You're probably familiar with them, but it
12       will hopefully keep us both on the same page.  I'm
13       going to have the opportunity to ask you a number of
14       questions.  My questions and your answers to those
15       questions are going to need to be in verbal word form
16       because Kathryn, our court reporter, is taking down
17       everything that we say, so she cannot take down nods
18       and shrugs and uh-huhs and uh-uhs and incomplete
19       words.  So if you could do your best to make sure
20       answers are in word form that would be helpful.
21             Also, she can only take down one of us
22       speaking at a time, so even though -- as is the case
23       of normal conversation you may know where my
24       question's going, if you could do your best to hold
25       off answering until I've got the entire question out

Page 8

1    that would be helpful.  I will likewise try to do the
2    same and not to ask you again another question until
3    you're done answering.
4              As far as my questions are concerned, if
5    you have any problem with them in terms of not hearing
6    me or not understanding the question or some other
7    problem with the form of the question, can you please
8    let me know and I will try and rephrase the question
9    in a way that you understand it or correct any other
10   deficiency that might allow you to answer it?  If you
11   do go ahead and answer the question I will assume
12   you've understood the question.  Is that fair?
13   A.  Yes.
14   Q.  And if you need to take a break for any reason let us
15       know, we'll certainly accommodate you.  The only
16       caveat is if there is a question we'll ask you to
17       provide us with an answer to the question, okay?
18   A.  All right.
19   Q.  Can you give me your date of birth, please?
20   A.  3-7-52.
21   Q.  What's your current residence address?
22   A.  7049 Midland Road, Freeland, Michigan  48623.
23   Q.  Do you live with anyone at that address?
24   A.  Not currently, no.
25   Q.  What's your educational background?

Page 9

1    A.  Well, high school, University of Michigan and bachelor
2        of science degree in engineering and oceanography.
3    Q.  I'm sorry.  I heard the bachelor of science in
4        engineering and then --
5    A.  Oceanography.
6    Q.  When did you receive those degrees?
7    A.  19 -- well, the '70s.  1974 is when I graduated.
8    Q.  Are you currently employed?
9    A.  Yes.
10   Q.  By whom?
11   A.  Self-employed, Busch Marine.
12   Q.  Is Busch Marine a separate legal entity?
13   A.  Yes.
14   Q.  Corporation?
15   A.  Yes.
16   Q.  Is that your sole form of employment?
17   A.  No.
18   Q.  Where else are you employed?
19   A.  I have another company called Busch Machine & Tool.
20   Q.  Do they work out of the same location?
21   A.  Yes.
22   Q.  What's that address?
23   A.  It's 7251 Midland Road, Freeland, Michigan.
24   Q.  What's the nature of the business of Busch Marine,
25       Inc.?

Gregory Busch
August 24, 2021

Page 10

1    A.   Well, Busch Marine does dredging, we rent barges and
2         we have tugs.
3    Q.   The first two -- I'm sorry, I didn't catch it all.
4         With regard to -- I heard you had tugs and barges?
5    A.   Yes, dredging.
6    Q.   Is one or more of those things the main function of
7         the business?
8    A.   Currently dredging.
9    Q.   How long has that been the case?
10   A.   Since about 1984.
11   Q.   And the other aspects of the business, are there any
12        other aspects of the business that you mentioned with
13        Busch Marine, Inc. is currently carrying on?
14   A.   We do surveys, bathymetric.
15              COURT REPORTER:  I'm sorry, what kind of
16        surveys?
17              THE WITNESS:  Bathymetric.
18   BY MR. CULLINAN:
19   Q.   What is that?
20   A.   That's measuring water depths.
21   Q.   Do you do the dredging operation at any particular
22        area?
23   A.   Primarily Michigan, but we go to other states.
24   Q.   How many employees does Busch Marine have?
25   A.   Right now just myself.

Page 11

1    Q.   When is the last dredging project that Busch Marine
2         undertook?
3    A.   Oh, it would have been 2019.
4    Q.   And Busch Marine -- I'm sorry, Busch Machine Tool, is
5         that a corporation as well?
6    A.   I think it's an L.L.C., if I'm not mistaken.
7    Q.   Are you the sole owner of Busch Marine, Inc.?
8    A.   Yes.
9    Q.   Has there ever been any other owners?
10   A.   No.
11   Q.   How about Busch Marine (sic) Tool, are you the sole
12        member?
13   A.   Busch Machine Tool.
14   Q.   Yeah, Busch Machine Tool.
15   A.   Yes, same thing.
16   Q.   Are there any employees other than yourself with Busch
17        Marine Tool?
18   A.   One.
19   Q.   I'm sorry?
20   A.   There's one.
21   Q.   Who would that be?
22   A.   His name is Dennis Terrance.  He is a new hire about
23        two weeks ago.
24   Q.   And what is he doing for Busch Marine Tool?
25   A.   He is general labor.

Page 12

1    Q.   What sort of -- what's the nature of Busch Marine
2         Tool -- I'm sorry, Busch Machine Tool's business?
3    A.   We're what you would call a job shop.  We do whatever
4         comes in the door, water jack cutting, speedsty
5         (phonetic) machining.
6    Q.   Does Busch Marine, Inc. currently own any vessels?
7    A.   Yes.
8    Q.   How many?
9    A.   Let's see.  There's three tug boats, one deck barge
10        and about five sectional barges and three dredges.
11   Q.   Who operates the equipment when it's utilized?
12   A.   I do.
13   Q.   When you have a dredging project say in the last three
14        years, do you hire employees to work with you?
15   A.   For the dredging temporary.  It takes a day to set up,
16        a day to tear down, and then after that I can pretty
17        much do the project on my own.
18   Q.   The three tugs that you mentioned, can you tell me
19        their names and the size of them?
20   A.   Yeah, there's the Gregory J. Busch, 143 by 27; the
21        Edwin C. Busch is 42 by 12; and the Barbara Mary
22        Busch, which is permanently up, that's 89 by, I'm not
23        sure, 25 probably.
24   Q.   The one deck barge that you own, do you have the name
25        or ID number of that barge?

Page 13

1    A.   Yes.  BMT4 is the name of it.
2    Q.   And how about the five or six other barges?
3    A.   They're numbered BMT5 through 8 or whatever it is,
4         sir.
5    Q.   The three tugs, how long have you owned those?
6    A.   Gregory J. Busch I've owned since 1977.  The Edwin C.
7         Busch was 2007 or 2008, somewhere around there.
8         Barbara Mary Busch was about 2007 -- or no, I'm sorry,
9         that one was -- yeah, about 2007 or 2008, somewhere
10        around that.
11   Q.   In mentioning those vessels and barges that you --
12        that Busch Marine, Inc. -- strike that.
13              Just so I'm clear, those various vessels,
14        are those owned by Busch Marine, Inc. or by you
15        personally or by some other person or entity?
16   A.   Some of both.  I own the Gregory J. Busch personally
17        and some of the others are owned by the company.
18              COURT REPORTER:  I'm sorry, sir, some of
19        the others, what?
20              THE WITNESS:  Are owned by the company,
21        Busch Marine.
22   BY MR. CULLINAN:
23   Q.   A lot of what we have to do -- talk about today will
24        involve a barge called the STC2004.  Are you familiar
25        with that barge?

Gregory Busch
August 24, 2021

Page 14

1   A.   Yes.
2   Q.   Is that included in any of those barges that you
3        previously mentioned today?
4   A.   No.
5   Q.   Do you not consider yourself owning that barge?
6   A.   I don't own it.
7   Q.   Who does own it?
8   A.   Calumet River Fleeting.
9   Q.   Is the business of Busch Marine, Inc., does it
10       typically involve the sale of equipment?
11  A.   No.
12  Q.   How about Busch Marine Tool -- Busch Machine Tool?  I
13       have trouble getting that right.
14  A.   No.
15  Q.   At the time there was at least negotiations between
16       you and -- well, strike that.
17            Did either you or Busch Marine, Inc.
18       previously in your mind own the STC2004?
19  A.   Yes.
20  Q.   And which one of you, or Busch Marine, Inc., owned it
21       as of early 2019?
22  A.   Yes.
23  Q.   I asked that poorly.  Did you own it or did Busch
24       Marine, Inc. own it?
25  A.   I'm not sure.

Page 15

1   Q.   And at some point that barge was put up for sale?
2   A.   Yes.
3   Q.   Had Busch Marine, Inc. ever previously sold any barges
4        of any sort?
5   A.   Over what time frame?
6   Q.   Any time frame.
7   A.   Yeah, there were two barges that were sold previously
8        back in the '80s I believe, early '80s.
9   Q.   Were those barges owned by Busch Marine, Inc.?
10  A.   No.  One I owned jointly with my father and the other
11       one I don't remember who actually owned it.
12  Q.   Were they sold, both of those barges, to individuals
13       or entities with whom you were familiar?
14  A.   No, they weren't.
15  Q.   How -- can you tell me how you went about selling each
16       of those barges?
17  A.   Put an ad in the publication called Post & Harbors.
18  Q.   Did you use --utilize the services of a broker in
19       doing --
20  A.   No.
21  Q.   Aside from the dredging, any other aspects of the
22       business of Busch Marine, Inc., what types of
23       customers do you deal with?
24            MR. BLEVINS:  Objection to form.
25  BY MR. CULLINAN:

Page 16

1   Q.   I mean, are they in any particular sorts of
2        businesses?
3   A.   Well, what time frame are we speaking about?
4   Q.   Say in the last 20 years.
5   A.   Well, business changed substantially over 20 years.
6   Q.   Okay.  Can you tell me the pathway of the business
7        since about 2000?
8   A.   Traditionally we will hold cargo, deck cargo barge,
9        and our customers were generally stone docks, bear
10       (phonetic) companies, pulp wood companies.
11  Q.   And when was there a change over from basically doing
12       the hauling of cargo?
13  A.   Probably about 2013.
14  Q.   Prior to 2013 were you doing dredging?
15  A.   Occasionally, but it wasn't our main focus.
16  Q.   After 2013 were you still hauling cargo?
17  A.   No.  We went to -- we had a two-year charter and it
18       took up our resources for 2014 and '15, and 2016
19       we had for our company a large dredging job.
20  Q.   The charter that you referred to in 2014 and '15, what
21       was the nature of that?
22  A.   There was a company that was building a pipe line in
23       Lake Huron for water intake.
24  Q.   And specifically what was Busch Marine, Inc. doing as
25       part of that project?

Page 17

1   A.   We provided a tug and a barge.  They put their people
2        onboard.  We would transport that out to the site and
3        they would perform their work, and then we would bring
4        everything back in again.
5   Q.   Was that a bareboat charter to the entity that was
6        working on the project?
7   A.   I'm not sure what -- how to characterize that
8        particular term.  We were operating a vessel, so it
9        was not a strict bareboat.
10  Q.   Other than operating the vessels, were you providing
11       any other manpower for the project?
12  A.   No.
13  Q.   What barge was involved in that project?
14  A.   O, it was the STC2004.
15            COURT REPORTER:  I'm sorry, say that again,
16       sir?  It was the what?
17            THE WITNESS:  It was the STC2004.
18  BY MR. CULLINAN:
19  Q.   Was that the last project that that barge was used on?
20  A.   No.
21  Q.   What has it been used on while it was still owned by
22       either you or Busch Marine, Inc. since you did that
23       two-year charter?
24  A.   Yeah.  2016 we dredged Tawas Harbor.
25  Q.   So Busch Marine, Inc. was also using the STC barge for

Gregory Busch
August 24, 2021

Page 18

1    some of its -- I'm sorry, dredging operations?
2  A.  Yes.
3  Q.  Other than the Tawas Harbor since 2014, was the
4      STC2004 utilized at all by you or Busch Marine, Inc.?
5          MR. BLEVINS:  Objection.  (Inaudible.)
6          COURT REPORTER:  I'm sorry, if you're
7      objecting I can't hear you.
8          MR. BLEVINS:  I'm very sorry.  Objection,
9      that misrepresents his testimony.  I think he said --
10         COURT REPORTER:  I can't hear you.  I can
11     hear you talking but I can't hear what you're saying.
12         MR. BLEVINS:  Okay.  Let me try to make it
13     better for you.
14         COURT REPORTER:  That's better.  That's
15     better.
16         MR. BLEVINS:  Okay.  I believe he said that
17     the Tawas project was in 2016.
18  BY MR. CULLINAN:
19  Q.  Okay.  I meant to say that, but if I didn't I
20     apologize.  But other than the 2016 Tawas project,
21     have either you or Busch Marine, Inc. utilized the
22     STC2004 in any other project since 2014?
23  A.  No projects.  We used it to take my research submarine
24     out to the Tawas Bay in 2017 for about four days to do
25     some test dives.

Page 19

1  Q.  I'm sorry, to do what?
2  A.  Some training and test dives for our research
3     submarine.
4  Q.  And can you be a little more specific in what way the
5     barge was utilized with regard to that?
6  A.  We used it as a platform anchored in Tawas Bay to
7     launch the submersible sub.
8  Q.  And what's the size of the submersible?
9  A.  It's about 23 feet long and about 8 feet wide.
10  Q.  What sort of weight?
11  A.  8 tons.
12  Q.  Since 2014 -- strike that.
13         Aside from any dealings with Calumet River
14     Fleeting, since 2014 have you ever chartered the
15     STC2004?
16  A.  I believe I already answered that.
17  Q.  Well, can you go ahead and answer it again?
18  A.  Well, we had -- you used the date of 2014.  We had the
19     two-year charter on the pipeline project in 2014 and
20     2015.  Other than that there were no other charters.
21  Q.  Prior to that project had you ever chartered the barge
22     before?
23  A.  Again, what time frame?  I mean, this is going back a
24     long ways here.
25  Q.  Well, I'll just ask generally and we'll work from

Page 20

1      there.  Have you ever chartered it before?
2  A.  Yes, we have.  I don't remember those specific times
3      or places, but there were previous charters.
4  Q.  Do you know if you ever chartered it subsequent to
5      2000, before the 2014 project?
6  A.  I'm not sure what date you're -- prior to 2014?
7  Q.  No, subsequent to 2014 but -- I'm sorry, subsequent to
8      2000, but prior to 2014.
9  A.  I don't recall.  It's possible we had charters in that
10     time period.
11  Q.  Did you ever advertise the barge as being available
12     for lease or charter?
13  A.  No.
14  Q.  Prior to -- well, strike that.
15         At some point you -- the STC 2014 was made
16     available for sale, correct?
17  A.  Not formally.
18  Q.  Was it made available for sale informally?
19  A.  No, I received two offers to buy the barge prior to
20     2014.
21  Q.  Who were those offers from?
22  A.  One was from Lake Michigan car ferry people, and the
23     other one was from a trucking company that was one of
24     our customers.
25  Q.  Did it ever get past the stage of them simply making

Page 21

1      an offer?
2  A.  No, because I wasn't interested in selling at that
3      point.
4  Q.  At some point after that did you decide to make the
5      barge available for sale?
6  A.  It was 2018.
7  Q.  At what point in 2018?
8  A.  I don't know.  It was when I listed it with Sun
9      Machinery.
10  Q.  Who was Sun Machinery?
11  A.  They're a broker.
12  Q.  Prior to your listing that barge with Sun Machinery
13     had you ever done business with Sun Machinery before?
14  A.  No.
15  Q.  Where is Sun Machinery located?
16  A.  New York.
17  Q.  How did you become familiar with Sun Machinery?
18  A.  They sent advertising fliers.  They're on the
19     Internet.
20  Q.  What did they advertise themselves as doing?
21  A.  Vessel brokers.
22  Q.  Were you looking for a vessel broker when you came
23     across their name?
24  A.  No.  I received their brochure and I, you know, was
25     interested in retirement, and the idea kind of grew on

Gregory Busch
August 24, 2021

Page 22

1    me and finally made a decision to list it with them.
2  Q.  At that time did you contemplate listing any of your
3      other vessels or barges for sale?
4  A.  No.
5  Q.  What was there about this particular barge that led
6      you to consider putting it up for sale as opposed to
7      any of your other vessels?
8  A.  Well, I knew -- it was -- the story was a little more
9      complicated.  It was my biggest asset, and my business
10     focus was changing from tugs and barges.  As I trained
11     as an oceanographer I wanted to get back into what I
12     called the science field and was interested in
13     chartering my submersible, and I had time with a
14     pipeline operator in the Great Lakes and they
15     expressed interest in having a support vessel that
16     would have the submersible on it and could also point
17     it as a response vessel, and my -- probably about 60
18     to 70 percent of my motivation for selling the barge
19     is I needed to raise capital to buy the type of vessel
20     that they were looking for.
21  Q.  And did anything come of that?
22  A.  Well, Sun Machinery listed the barge.  They informed
23     me that they had a buyer.  I put a purchase agreement
24     against a utility vessel that I was looking for in the
25     Gulf of Mexico, and which I later was forced to

Page 23

1    default on, and the barge sale was not paid for, so I
2    didn't have the funds to proceed with the plan with
3    the utility vessel.
4  Q.  I'm trying to save myself a little breath here and I
5      know we talked about who might have owned the barge in
6      early 2018, the STC2004, and whether it was Busch
7      Marine or you.  Just so I'm clear, do you have an
8      understanding as you sit here who owned the barge in
9      January of 2019?
10  A.  January of '19?  Just on the document, which you have
11     been provided with.  I don't know if it was me
12     personally, which I think it was, but I don't know
13     that for a fact, but possibly been Busch Marine, one
14     or the other.
15  Q.  Prior to whoever owned it then, do you know if it was
16     ever owned by anyone else?
17  A.  Yes.  My father purchased the barge in -- from Paul
18     Towing back in 1984 or '85.
19  Q.  Was his name on the title to the barge?
20  A.  At that time, yes.
21  Q.  Was anyone else's name on it?
22  A.  I don't know if my mother's name was on it or not.
23  Q.  At some point in time did your mother's name go on the
24     barge, the title to the barge?
25  A.  Well, they had a cross, and my understanding was that

Page 24

1    when my father died it would revert to my mother.
2  Q.  Did you ever do anything to confirm that?
3  A.  Well, actually, yes, when we tried to close the sale.
4  Q.  Tried to close the sale with Calumet?
5  A.  Yes.
6  Q.  And what did you learn at that point?
7  A.  I'm sorry, what's that?
8  Q.  What did you learn at that point?
9  A.  Well, I purchased the barge my father paid for back in
10     like somewhere around 1995, and my understanding was
11     he had cleared his name on the barge and cleared the
12     paperwork with the Coast Guard, and when we pulled the
13     abstract for the sale with Calumet River Fleeting I
14     found out that they had never been done, and so I had
15     to go to -- what do you call it -- Probate Court, and
16     because both my mother and father were deceased and
17     get the title cleared.
18  Q.  And at some point you obtained a satisfaction of
19     mortgage, correct?
20  A.  That's correct.
21  Q.  And you attempted to record that will or register with
22     the Coast Guard as is necessary to clear the title?
23  A.  It was registered, yes.
24  Q.  At what point in time was it registered?
25  A.  I believe the date was June 4th.

Page 25

1  Q.  Was it not rejected because it contained the wrong
2      signatures or the wrong identities?
3  A.  No, not that I know of.  There was an initial -- there
4      was a gentleman name of Haynes that's a documentation
5      of some of the (inaudible) --
6           COURT REPORTER:  I'm sorry, sir, I didn't
7      understand it.  There was a -- can you repeat that?
8           THE WITNESS:  Yeah.  His name was Haynes
9      International, and he originally submitted the
10     paperwork, and that paperwork was rejected, and then
11     it was resubmitted and accepted.
12  BY MR. CULLINAN:
13  Q.  And it was that not accepted until at least sometime
14     after June 24th of 2019, correct?
15  A.  No, it was accepted June 4.
16  Q.  Accepted by the Coast Guard?
17  A.  Yes.
18  Q.  And (inaudible) where I wanted --
19           COURT REPORTER:  I'm sorry, when you turn
20     your face I can't understand you.
21  BY MR. CULLINAN:
22  Q.  I said it puts me a little ahead of where I wanted to
23     go, but as long as we're talking about it --
24  A.  Just lost the picture.
25  Q.  Yeah, I'm trying to put up a document.

Page 26

1  A.  Oh.
2  Q.  Are you seeing a document on your screen?
3  A.  No.
4        MR. BLEVINS:  We are seeing a folder that
5     includes a number of documents, and I see that you
6     have highlighted one, it starts 21.E -- okay, it just
7     came up.
8        MR. CULLINAN:  Okay.  Sorry.  It usually
9     takes me a little while to refresh myself how this
10    operates.
11       MR. BLEVINS:  No problem.
12 BY MR. CULLINAN:
13 Q.  I'm going to show you a document and it's been marked,
14    previously produced by you as document number P252 or
15    253, and it is a letter from the United States Coast
16    Guard to you dated June 24, 2019.  I'll scroll down a
17    little bit.  Do you remember receiving this document?
18 A.  I have not seen this one before, no.
19 Q.  Well, it was produced by you in the case, correct?
20 A.  Not me personally.
21       MR. BLEVINS:  We'll stipulate that that's
22    our Bates number.  It is difficult I'm afraid -- we
23    see segments of the document, but of course we don't
24    see every page, but we don't need to see, you know, a
25    full.  I know technology is a little different.

Page 27

1  BY MR. CULLINAN:
2  Q.  But please let me know if you feel like you need to
3     see any other portion of the letter.  So just to let
4     you know, Mr. Busch, we received this document from
5     your counsel as being produced by you in response to
6     documents we requested, and in the fourth paragraph of
7     the letter the Coast Guard sent to you on June 24,
8     2019 it says the satisfaction of mortgage presented is
9     not eligible for recording as the entity executing the
10    instrument is not the mortgagee of record.  The
11    mortgagees of record are Edwin and Ruth Busch.  Do you
12    see that?
13 A.  Yes.
14 Q.  Does that refresh your recollection as to the mortgage
15    not having been cleared or the satisfaction accepted
16    by the Coast Guard until sometime after June 24, 2019?
17 A.  No, I'm not familiar with this document at all.  I'm
18    familiar with a document that I received as official
19    stamp of the Coast Guard that says June 4th as being a
20    recording date.
21 Q.  I have not received that in your production.  Can you
22    tell me what that document is or produce it to me?
23 A.  Yeah, I'll have to dig through and find it.
24 Q.  Have you looked yourself for all the documents we
25    requested in this case?

Page 28

1  A.  Well, I had basically a tote full of documents I gave
2     my attorney and I think that document should be in
3     that collection.
4  Q.  Did you ever question the Coast Guard when you
5     received this document dated June 24, 2019 that says
6     the satisfaction of mortgage that you presented was
7     not eligible for recording?
8        MR. BLEVINS:  Objection, I think the
9     witness testified that he didn't recall receiving this
10    document.  You know, I don't know if you can e-mail to
11    us and give us some time on it?
12       MR. CULLINAN:  Well, how about this?  I'll
13    tell you it's page 252 and 253 of your own production.
14       MR. BLEVINS:  Well, you want to give me
15    time to look it up?  I think it would be faster for
16    you to e-mail.  We can take a break and I can go
17    through our production and try to find it.
18 BY MR. CULLINAN:
19 Q.  So far as you know as you sitting here right now you
20    didn't question the Coast Guard when this document was
21    delivered to Busch Marine, Inc.?
22       MR. BLEVINS:  Objection, form and
23    foundation.
24 BY MR. CULLINAN:
25 Q.  Is that what you're telling me?

Page 29

1        MR. BLEVINS:  Same objection.
2  BY MR. CULLINAN:
3  Q.  Go ahead.  You can answer.
4        MR. BLEVINS:  Answer it if you can.
5  A.  Yeah, we had Mr. Haynes from Haynes International
6     handling all the documentation for this, and so the
7     letter may have gone to him and he may not have
8     forwarded it on to me.
9  BY MR. CULLINAN:
10 Q.  Okay.  It does not appear to be addressed or copied to
11    anybody at Haynes International.
12 A.  Well, there were other documents that had my name on
13    it, that's the way the Coast Guard does it, that went
14    to Haynes directly, because he did a lot personally
15    where he went to their office and handed documents and
16    received documents across the counter.
17 Q.  Can you tell me more specifically what documents you
18    are referring to that were addressed to you but were
19    not delivered to you but were delivered to Haynes
20    International instead?
21 A.  No, I can't, because there were quite a few things
22    that went back and forth.
23 Q.  Okay.  Was any of that document -- any of that
24    documentation related to the STC2004?
25 A.  Yes, all of them, because he handled that thoroughly.

Page 30

```
 1   Q.   Okay.  No such documents have been produced by you in
 2        this case.  Is there anything that -- is there any
 3        source or place where you keep documents that might be
 4        related to this case or that barge that you haven't
 5        produced?
 6              MR. BLEVINS:  Objection (inaudible).
 7              MR. CULLINAN:  I'm just asking.
 8              THE WITNESS:  I don't know.
 9   BY MR. CULLINAN:
10   Q.   Did you specifically pull any documents for production
11        in this case?
12   A.   Personally, no.
13   Q.   Did any employee of Busch Marine, Inc. pull any
14        documentation specifically for this case?
15   A.   No.
16              MR. BLEVINS:  I just have a question of
17        clarification.  I do not want to interfere with your
18        question, but when you say pull documents for this
19        case, do you mean gather documents for production in
20        this case?
21              MR. CULLINAN:  Gather them, go through them
22        and produce -- look for what is relevant and look for
23        what has been asked for.  I mean, I understand he's
24        saying he gave his counsel documents, but did he
25        himself look for in all places where documents might
```

Page 31

```
 1        be?
 2              THE WITNESS:  Yes.
 3   BY MR. CULLINAN:
 4   Q.   Okay.  And as far as -- as best as you know you have
 5        produced everything that's been requested?
 6   A.   Well, personally all I know is that I gave everything
 7        that I had to Mr. Blevins, and what his office
 8        (inaudible) I don't know.
 9   Q.   Do you know whether you have a satisfaction of
10        mortgage that is stamped by the Coast Guard as
11        received and registered?
12   A.   I think we do, don't we?
13   Q.   I'm going to ask you to not be asking the counsel to
14        answer the questions for you.  Either you know or you
15        don't, please.
16   A.   I don't know.
17   Q.   As of April of 2019 describe the STC2004 for me.
18   A.   It's a deck cargo barge.  It's 250 feet long, 50 feet
19        wide.  (Inaudible).
20              COURT REPORTER:  I'm sorry, I didn't hear
21        the last part of that.  250 feet wide, 250 feet long?
22              THE WITNESS:  No, 200 -- yeah, 250 feet
23        long, 50 feet wide, 12'6" deep.
24              COURT REPORTER:  Thank you.
25   BY MR. CULLINAN:
```

Page 32

```
 1   Q.   Was it still being used as a cargo barge as of Apri of
 2        2019?
 3   A.   No.
 4   Q.   When you say cargo barge, can you describe for us and
 5        ultimately for the jury what that is?
 6   A.   That's a vessel that holds cargo on deck.
 7   Q.   At any point in time did it previously transport cargo
 8        in any other way other than on the deck?
 9   A.   Yes.  It was originally just an item (inaudible) river
10        tank barge.
11   Q.   And what sort of cargo did it haul as a tank barge?
12   A.   I have no idea.  It wasn't part of my owning it.
13   Q.   Did you convert it from a tank barge to a deck barge?
14   A.   You know, it was partially converted when my father
15        bought it.
16   Q.   And when we say a tank barge generally what are we
17        referring to?
18   A.   Well, a tank barge is a vessel that carries liquid
19        cargo inside the barge.
20   Q.   Are there various compartments in the tank barges
21        generally?
22   A.   Yes.
23   Q.   And with regards to the STC 2004, even though it was
24        converted from a deck barge -- I'm sorry, from a tank
25        barge to a deck barge, did it continue to have
```

Page 33

```
 1        compartments that were formally utilized as tank
 2        compartments?
 3   A.   Yes.
 4   Q.   And how many such compartments did it have as of April
 5        of 2019?
 6   A.   14.
 7   Q.   And were -- can you tell us where they were located?
 8   A.   Well, there's a four-piece brake compartment in the
 9        front, two 50-foot-long main compartments, coffered to
10        him in the center -- or no, I'm sorry, there's the
11        right compartment, two 50-foot-long compartments, a
12        cofferdam, two 50-foot aft compartments, an aft wing
13        tank, two weight tanks.
14   Q.   So how many tank compartments total would there have
15        been?
16   A.   I didn't add them up.  There's 14 in that barge.
17   Q.   Would half of them have been on the starboard side,
18        half on the port side, or a lesser amount on either?
19   A.   Well, the cofferdam goes all the way across.  The aft
20        peak tank goes all the way across.  The other ones are
21        port and starboard, and a forward rake goes all the
22        way across.
23   Q.   So there would be at least four tanks on the starboard
24        side and at least four tanks on the port side?
25   A.   Close to two weight tanks, yes.
```

Gregory Busch
August 24, 2021

Page 34

1  Q.  Were those -- the four on the starboard side, not
2      including the weight tanks, the four on the port side,
3      were those all four of equal size?
4  A.  Yes.
5  Q.  When it was converted from the tank barge to a deck
6      barge, that was a matter of basically putting a deck
7      over the tank compartments, correct?
8  A.  No.
9  Q.  Okay.  Can you explain what sort of change would be?
10 A.  It would be the previous owner had removed the pumps
11     and the piping system, and my father obtained it with
12     my help, we obtained the ABS load line for it, and the
13     way that process works is you submit a drawing to ABS
14     and they return with recommended changes, and I recall
15     initially the recommended changes were that we
16     installed four-foot high bulwarks on both sides of the
17     barge to increase the moment of inertia of the barge,
18     and there were some other minor changes to install
19     what we call filler plates that went in every other
20     bay in the transverse channel on the bottom.
21 Q.  You mentioned the length of the barge as being
22     250 feet?
23 A.  Yeah, originally it was 240 feet.  I modified it in
24     about 2000 and made it 49'11".
25 Q.  At any point in the existence of the barge was the

Page 35

1      barge every shortened in length?
2  A.  Yes.
3  Q.  When did that occur?
4  A.  It was about 1987 I think, '86, somewhere around
5      there.  '87 or '88.
6  Q.  Okay.  To what extent was the barge shortened?
7  A.  It originally had a long very narrow rake on the front
8      and which was not a good idea structurally, and we
9      shortened it 14 feet and put a double angle on the
10     forward rig.
11 Q.  And then when you mentioned more recently having
12     lengthened the barge how did you go about doing that?
13 A.  Same process.  I submitted drawings to ABS.  The
14     purpose of the lengthening was we added a notch and
15     connection system to the barge, and we rebuilt the aft
16     peak tank and we added the two aft what we call wing
17     tanks.
18 Q.  And I'm sorry, you mentioned what year that was, but
19     when did that occur?
20 A.  That was about 2000.
21 Q.  Were any modifications over time ever made to the hull
22     of the barge?
23 A.  Well, there were repairs made to the hull, and I
24     replaced the deck for compartments 2, 3 and part of 4
25     and part of the ones.  Those -- that was about

Page 36

1      the same time, 2001 I think.
2  Q.  And what sort of changes or modifications were made to
3      it then?
4  A.  Well, for the deck the -- we put in the center
5      16 feet, it was 3/4 inch and 5/8 steel plating to
6      replace 5/16 thick deck plating which was originally
7      there, and we put on 3 1/2 by 6 by 3/8 angle irons for
8      longitudinals instead of the 3 by 4 by 1/4 inch angles
9      for under the deck.  We modified -- we put in 12-inch
10     channels cut to fit to the deck for the transverses
11     and we had additional burden staunches diagonal for
12     the internal framing.
13 Q.  And how about the -- any modifications made at that
14     time to the hull?
15 A.  Well, that is the hull.  The hull is kind of the
16     entire vessel.  What specifically are you referring
17     to?
18 Q.  Well, the underside of the vessel.
19 A.  Yeah, there were bilge radius replacements made at
20     various times on dry dock.  In 2004 the forward half
21     of the barge was replated with heavier plating.  There
22     was an extension that went under the center bulkhead.
23     (Inaudible).
24         COURT REPORTER:  I'm sorry, there was an
25     extension?

Page 37

1          THE WITNESS:  Yeah, the bottom plate, I
2      don't remember how wide it was.  It was fairly
3      substantial.  It was under the bulkhead through all
4      the way back to the midship point, which was
5      cofferdam, and then the plating underneath the
6      cofferdam was replaced with heavier plating.  And I
7      think most of the bilge radius on the port side, if I
8      recall correctly, was replaced.  And then 2013 there
9      was quite a bit of substantial plating replaced under
10     the 3 and 4 compartments.
11 BY MR. CULLINAN:
12 Q.  What was the thickness of the plating on the bottom
13     side of the hull originally; do you know?
14 A.  It was 3/8.
15 Q.  Throughout the entirety?
16 A.  Yes.
17 Q.  And at various times, although different items of
18     repair or replacement that you mentioned, at any
19     particular time was the entire underside modified to
20     the same extent at one time?
21 A.  No.  We replaced as needed as directed by ABS.
22 Q.  And with regard to some of the hull, it simply
23     deteriorates over time?
24 A.  Again, you're speaking of the bottom?
25 Q.  Yeah.

Gregory Busch
August 24, 2021

Page 38

1   A.   The hull bottom?  Yes, there is deterioration that
2        goes on with any vessel.
3   Q.   All right.  And some of the other repairs were made as
4        a result of damage to the barge?
5   A.   Yes.
6   Q.   All right.  And specifically the 2013 repairs, were
7        those -- were those made in response to the barge
8        having been damaged?
9   A.   Yes.  We had been dredging a place called Bay City
10       Jack Ball in the Saginaw River, and there's a coal
11       dock, Consumers Power, across the river, and a
12       1,000-foot ship, the American Mariner -- anyways,
13       American steamship tried to leave the dock, they lost
14       control, they hit the barge, they pushed it over.
15       They had about 30 pilings in it up onto a rocky
16       rudiment and ground the vessel and sheared the spuds
17       off and did some other damage along the port side of
18       the barge.
19  Q.   And as a result of that there had to be some
20       modifications to the bottom of the hull?
21  A.   Well, there were replacements, yes.  I mean, it was
22       kind of a major impact, that big of a ship.
23  Q.   But only portions of the bottom of the hull were
24       replaced at that time, correct?
25  A.   Yeah.  That's to the discretion of ABS.  You dry dock

Page 39

1        it.  They tell you what to replace.  All that work was
2        done.
3   Q.   The materials that was used originally to construct
4        the bottom of the hull of the barge, what would that
5        have been?
6   A.   I don't understand the question.  You want the grade
7        of steel or --
8   Q.   Yeah, I mean, it's steel, right?  Do you know the
9        grade of steel?
10  A.   I would assume it was A36 steel because that's what's
11       required.
12  Q.   And was that the type steel used whenever there were
13       modifications to the bottom of the hull made?
14  A.   Yes.  You have to -- have to have a certificate from
15       the steel mill.
16  Q.   And you mentioned obtaining a load line?
17  A.   Yes.
18  Q.   Can you describe for us what that is?
19  A.   Well, a load line is a statutory requirement that
20       ensures the structural and seaworthiness of the
21       vessel, and the Coast Guard is delegated the authority
22       to exercise that regulation to the American Bureau of
23       Shipping.
24  Q.   Do you know if that's the exact wording in terms of
25       ensuring the seaworthiness of the vessel?

Page 40

1   A.   No, well, I don't know if that's the exact wording in
2        the statute of regulation, I'm not an attorney, but
3        that's the effective result of that.
4   Q.   Is a load line certification required to operate a
5        barge such as the STC2004?
6   A.   Yes.  Anything over 150-gross tons or 89 feet in
7        length that goes on open waters.  Not required for
8        rivers.
9   Q.   So to use it, for example, on the Great Lakes would
10       require load line certifications?
11  A.   Yes.
12  Q.   And you mentioned -- strike that.
13            Is it the Coast Guard that actually issues
14       the load line certification?
15  A.   Indirectly through ABS.
16  Q.   And ABS is the American Bureau of Shipping, correct?
17  A.   Yes.
18  Q.   And that's who essentially performs the mechanics of
19       determining whether a certificate will be issued?
20  A.   Correct.
21  Q.   How long is a load line certification required?
22  A.   It's always required, but I think your question is
23       there's an annual inspection and a five-year dry dock
24       inspection.
25  Q.   All right.  In other words, it's got to be renewed

Page 41

1        annually, but the inspections are different for annual
2        inspections versus five-year inspections?
3   A.   Well, there's actually three types -- there's four
4        types of inspections.
5   Q.   Can you tell us what those are?
6   A.   Yeah, the annual inspection is a -- severe
7        problems.  Looks the vessel over.  They have the
8        option of course to do whatever they like as far as
9        inspection goes.  They generally do one or two
10       compartments, and if they're satisfied they will leave
11       it that on the annual.  They check paperwork for the
12       vessel, make sure that's current.
13            For five-year inspection the vessel has to
14       be dry docked.  They examine it on dry dock.  Audio
15       gauges are taken, and it's a more detailed type of
16       inspection.
17            And you can also get a one-year extension
18       at the end of five years and that's a more extensive
19       inspection than an annual inspection.  They go along
20       in all the compartments at the discretion of the
21       surveyor.  If there's any discrepancies they will --
22       they will pull your certificate.
23  Q.   Okay.  Then did you -- you mentioned a fourth one.
24       We've got annual --
25  A.   Oh, yeah, the fourth one is a damage survey.  If there

Gregory Busch
August 24, 2021

Page 42

1   is damage to the barge you are supposed to call ABS
2   before you proceed and go back out on the lake.  The
3   surveyor will come, he'll ascertain the extent of the
4   damages and he'll either give you a nose to proceed or
5   he'll tell you no, you have to make repairs and he'll
6   specify what the repairs are before the vessel leaves.
7   Q.  And you mentioned with regard to obtaining one-year
8       extension that the -- surveyor can go where they'd
9       like into all areas of the barge.  Can they also not
10      go into areas?  I mean, is it basically to their
11      discretion?
12  A.  Yes, it is.  They generally go in about half the
13      compartments in my experience.  They are required to
14      go in the fore peak and the aft end of the barge.
15      That part is specified.  Beyond that it's their
16      discretion.
17  Q.  Has the STC2004 -- did it have a load line
18      certification throughout the entirety of the time that
19      you or Busch Marine owned it?
20  A.  Yes.
21  Q.  And it would have gone through a number of five-year
22      inspections?
23  A.  Yes.
24  Q.  Dating back to when?
25  A.  We initially (inaudible) 1985.

Page 43

1             COURT REPORTER:  I'm sorry, you initially
2       what?
3             THE WITNESS:  1985.  We initially load
4       lined it in 1985.
5             COURT REPORTER:  Load lined it.
6   BY MR. CULLINAN:
7   Q.  So there would have been probably five or six during
8       the time period leading up to 2018, five or six
9       surveys?
10  A.  Yes.
11  Q.  And all of those were done in dry dock?
12  A.  Yes.
13  Q.  Can you tell me essentially a little more detail about
14      the five-year survey?  First of all, were they all --
15      those five or six that the barge underwent while you
16      or BMI owned it, or was there ever -- did there come a
17      time when the nature of the five-year survey changed?
18  A.  What was the last part of your question?
19  Q.  Yeah.  Alternatively did there come a time since 1985
20      when the nature of those five-year surveys changed?
21  A.  Well, there's been probably about five or six
22      different surveyors and, you know, each surveyor
23      obviously is a little different how they conduct their
24      survey.  There is a book that ABS has, I think it's
25      called Rules for Classing and -- or Construction and

Page 44

1   Classing of Sealed Vessels, and that book outlines the
2   general procedure, and they always follow that
3   procedure, but they also can extend that.
4   Q.  Every time the barge came up for a five-year survey
5       when either you or Busch Marine owned it did you
6       always as a matter of course seek a one-year extension
7       prior to having the five-year survey done?
8   A.  I don't remember.  Generally I did the extension.
9   Q.  You did or did not?
10  A.  I did generally.
11  Q.  Do you have to make any particular sort of showing to
12      obtain that one-year extension?
13  A.  Yeah, you had to send a letter to the ABS requesting
14      the extension, first of all.  Then ABS applies to the
15      Coast Guard.  The Coast Guard reviews the files and
16      documents that ABS has on a vessel, and they will
17      either approve or disapprove allowing the extension
18      subject to positive results of the survey.
19  Q.  But was there any particular item that would have to
20      be raised by the owner seeking this one-year extension
21      or can they just say I'm just requesting an extension?
22  A.  No.  Basically just request an extension, right.
23  Q.  Are they at least in your experience given as a matter
24      of course?
25  A.  Never had a problem getting one, no.

Page 45

1   Q.  And in the five-year survey I think you mentioned
2       gauging of the vessel?
3   A.  I'm sorry, what was the last part?
4   Q.  I think when you referred to the five-year survey of
5       inspections done for the load line certification you
6       mentioned the taking of audio gauging?
7   A.  Yeah, they always do audio gauges.
8   Q.  And what are audio gauges?
9   A.  It's an ultrasonic unit that measures material
10      thickness.
11  Q.  And what specifically would be measured during the
12      five-year surveys, what sort of materials would be
13      measured?
14  A.  Well, the plating thickness of the hull.
15  Q.  Who would do that?
16  A.  ABS required to witness the audio gauges.  The person
17      actually doing the measurements could be owner, could
18      be a shipyard worker, or an outside consultant who was
19      hired to do it.
20  Q.  Have you ever done those --
21  A.  Yes.
22  Q.  -- for a five-year survey?
23  A.  Yes.
24  Q.  How many times have you done that?
25  A.  I'm not sure.  Between my two ABS vessels probably

Gregory Busch
August 24, 2021

Page 46

1    four or five times.
2  Q.  When would the first time have been?
3  A.  I don't know.  I'm going to say somewhere around 2000.
4  Q.  Did you have to have any sort of certification to do
5       that?
6  A.  Yeah.  I had a -- because of machine shop I had a NGT
7       certificate.
8  Q.  When did you obtain?
9  A.  About the same time, 2000.
10 Q.  Did that certificate have to be renewed in any way?
11 A.  That was actually (inaudible), there wasn't any
12      expiration date on it.
13 Q.  Was the certification required to do the audio gauges
14      for your various vessels, is it the same certification
15      or was there a different certification required for
16      certain of the vessels?
17 A.  Well, it changed over time.  For a while ABS required
18      that audio gauges had to be done by somebody certified
19      by ABS, and that was met with a lot of resistance from
20      the shipyards and people in the industry, so they
21      dropped that requirement for a number of years, and
22      then about, oh, I'm not sure, I think in the last
23      couple years here I kind of lost interest because I'm
24      not doing those things anymore, but they have a new
25      requirement now, and there's almost no one that's

Page 47

1    certified now to do audio gauges.
2  Q.  Had you ever done the audio gauges for the STC2004
3       other than in the year 2013?
4  A.  I think I did the six years prior to that.
5  Q.  And that was under the -- strike that.
6            Was that with an ABS surveyor present when
7       you did those?
8  A.  Yeah.  The ABS surveyor stands right there and watches
9       you do every one of them.
10 Q.  Does the surveyor give any instruction or direction as
11      to where the gauges are supposed to be done?
12 A.  Yes.
13 Q.  Is that with regard to all the gaugings that are done,
14      they're all basically done at the direct examination
15      of the ABS surveyor?
16 A.  Yeah, they're -- generally they do a three belts.
17      They do one belt forward, one belt midship and one
18      belt aft, and then any areas that the surveyor is
19      interested in.
20 Q.  I'm sorry, you said one belt?
21 A.  Yeah.  It's where you go all the way around the deck,
22      down the sides, across the bottom and up the other
23      side and across the deck again, it's called a belt.
24 Q.  And your prior experience with regards to doing the
25      audio gauging for the bottom of the hull for a barge

Page 48

1    like the STC2004, how many readings in total would you
2       do?
3  A.  Well, it depends on the size of the vessel, you know,
4       and what the ABS surveyor requires, but I guess like
5       on STC there would be in excess of 100.
6  Q.  Would the ABS surveyor also go to areas of the barge
7       where they deemed or might have visualized corrosion
8       or things like that and specifically requested in
9       those areas that readings be taken?
10 A.  Absolutely.
11 Q.  So was a survey done in 2013 for the STC2004, correct?
12 A.  Yes.
13 Q.  And was that a five-year survey or a damage survey or
14      both?
15 A.  Both.
16 Q.  Was it all done as one, or did -- was there different
17      aspects of both surveys?
18 A.  No, I'm not sure how to answer that because, I mean,
19      it all falls together.  Whatever repairs went under
20      damage or they're just corrosion related ABS saw
21      basically goes through the shipyard.  You walk through
22      with an ABS surveyor and a shipyard personnel and
23      everybody takes notes, and I -- the ABS surveyor tells
24      shipyard what repairs to make, and there's not really
25      a clear yeah, this is damage, this is repair.

Page 49

1  Q.  Was there in 2013 the aspect of a five-year survey in
2       addition to whatever was required of the damage
3       survey?
4  A.  I'm not sure I understand your question.
5  Q.  For example, were the audio gaugings required in the
6       similar way as they were had there not been a damage
7       survey being done?
8  A.  Well, 2013 we did the full five-year and audio gauges
9       and the five-year inspection, and in addition to that,
10      you know, ABS surveyor stipulated what repairs had to
11      be made from the damage.
12 Q.  Okay.  Do you know who the ABS surveyor was?
13 A.  Yeah, she was out of Toledo.  Trying to think of what
14      her name was.
15 Q.  Jessica Ward?
16 A.  Yeah, Jessica Ward, yeah.
17 Q.  Had she previously done any surveys for the STC2004?
18 A.  Yeah, she had done my tug and she had done STC
19      numerous times.
20 Q.  Do you know how far back she went in terms of doing
21      surveys for you or Busch Marine?
22 A.  I'm trying to think here.  She came on probably about
23      2011 or '12, somewhere around in there.
24 Q.  Would all of your -- all of your or Busch Marine
25      barges have received load line certification?

Gregory Busch
August 24, 2021

Page 50

1   A.   Just the STC and the tug Gregory J. Busch.
2   Q.   For how long have you had the Gregory J. Busch?
3   A.   Since 1977.
4   Q.   How often would that have to be, same?
5   A.   It's same -- it's the same for any vessel.
6   Q.   Okay.  Do you know if the five-year surveys were being
7        done on the Gregory J. Busch in the same years as for
8        the STC2004?
9   A.   No, they're scattered.
10  Q.   As far as the 2013 survey, were you present for the --
11       while it was being done?
12  A.   Yes.
13  Q.   For the entirety of it?
14  A.   Yes.
15  Q.   Was there anyone else from Busch Marine present?
16  A.   No, not really.
17  Q.   And Jessica Ward was present?
18  A.   Yes.
19  Q.   Was she present for the entirety of it?
20  A.   No.  The ABS surveyor comes first day of dry dock.
21       She is here usually for that day and they generally
22       have to pressure wash the bottom of the vessel and she
23       will come back and do a bottom inspection at that
24       point, and she would -- not her, but ABS surveyor will
25       come back, look at the inside of the vessel, and then

Page 51

1        if -- when the repairs are started and they cut out
2        the pieces and they fit in the new pieces before
3        they're allowed to do the welding, she will come back
4        and check the fit up to make sure that they don't
5        have, you know, a bad setup up for the welding or big
6        gaps between the two pieces of new weld and so on.  So
7        the surveyor is generally in quite a few times, and
8        then they can also drop in any time at their leisure.
9   Q.   Is there anyone else present during the survey setting
10       aside repair personnel?
11  A.   Nah, generally not, no.
12            MR. BLEVINS:  Is this a convenient time to
13       take a short break?
14            MR. CULLINAN:  I'm sorry?
15            MR. BLEVINS:  I'm sorry.  At a convenient
16       time could we take a short break?
17            MR. CULLINAN:  Oh, absolutely.  I'm sorry.
18       Yeah, Mr. Busch, if you need to take a break at any
19       time let me know.
20            THE WITNESS:  Sure.
21            MR. CULLINAN:  Yeah, that's fine.  Want to
22       take ten minutes?
23            MR. BLEVINS:  Okay.  Thank you.
24            MR. CULLINAN:  Thank you.
25            (Recess taken at 2:15 p.m.)

Page 52

1                 (Back on the record at 2:25 p.m.)
2   BY MR. CULLINAN:
3   Q.   Again, Mr. Busch, the audio gauge readings that we
4        have been talking about that are taken as part of the
5        five-year survey, those are to determine the thickness
6        of the hull?
7   A.   Is there a question there?
8   Q.   Yeah, am I correct about that?
9   A.   Yes.
10  Q.   And consistent with that it's also to determine
11       whether and to what extent there has been
12       deterioration of the steel of the hull, correct?
13  A.   Yes.
14  Q.   Is there a maximum allowable deterioration from the
15       hull or from its original condition that will be
16       allowed for a load line certification issued without
17       any repairs needing to be made?
18  A.   It's somewhat discretionary with the surveyor.
19  Q.   All right.  Is there a -- any rule of thumb that you
20       are aware of that if X amount of deterioration is
21       determined that repairs will be required?
22  A.   I don't know what the number is and what the surveyor
23       criteria is, no.
24  Q.   Do you recall specifically the areas that you took
25       readings in as part of that 2013 survey?

Page 53

1   A.   Well, there were three belts, one forward, one
2        midship, one aft, and then there were readings up in
3        the forward rake.  There were some readings in the
4        repair areas, and beyond that that's about all I
5        recall.
6   Q.   And what specifically did you then do with those gauge
7        readings?
8   A.   They were recorded on a -- basically a drawing of the
9        vessel.
10  Q.   And then what happens with them?
11  A.   Well, they're submitted to ABS, and I believe they
12       submit them for review somewhere else and probably at
13       their office and the come back either approved or
14       disapproved.
15  Q.   Do you hand that information to the surveyor who's
16       standing right there with you as they're taken?
17  A.   No.  It takes a while to record, you know, the
18       document.
19  Q.   While those readings are taken is the surveyor
20       checking the instrument that you're using to make sure
21       the readings are accurate?
22  A.   Yes.  Scale operated periodically during the survey.
23  Q.   And the surveyor is doing that?
24  A.   Usually the audio gauge operator, but the surveyor
25       watches when you do it.  It's a simple procedure.

Gregory Busch
August 24, 2021

Page 54

1  Q.  Do you know if there were any specific areas involving
2      corrosion or anything like that that the ABS surveyor,
3      Jessica Ward, asked you to take readings of during the
4      2013 survey?
5  A.  Well, any areas that didn't meet her satisfaction were
6      repaired.
7  Q.  Okay.  But do you recall any instances where she said
8      I need you to take specifically a survey or a gauge
9      reading in a particular area?
10 A.  Yeah, I said that earlier.  Forward rake and some
11     other -- or areas of (inaudible).
12          COURT REPORTER:  I'm sorry, areas of what?
13     I'm sorry, forward break and what?
14          THE WITNESS:  Areas of repair.
15 BY MR. CULLINAN:
16 Q.  Would it be accurate that 100 percent of the gauge
17     readings you -- that you took were at the direction
18     of -- the location of those readings were at the
19     direction of Ms. Ward?
20 A.  Yes.
21 Q.  Did the amount of gauge readings that you took, was
22     that approximately the same amounts that you had taken
23     in the past of that barge?
24 A.  It was slightly more than usual.
25 Q.  And what sort of instrument were you using?

Page 55

1  A.  I don't remember the brand name or the model.
2  Q.  Were you the one charged with calibrating it?
3  A.  I believe I answered that.
4  Q.  Okay.  What's the answer?
5  A.  Yes, I calibrated it.
6  Q.  And Surveyor Ward confirmed the calibration?
7  A.  Yes.
8  Q.  How did she go about that?
9  A.  She watched the calibration procedure.
10 Q.  Was she present the entire time you took the gauge
11     reading?
12 A.  I don't recall, you know.  I would have to say yes.
13     You know, there were a lot of things going on in the
14     dry dock.  She might have been, you know, missing for
15     a few minutes at a time, but not much.
16 Q.  And you took those on May 18, 2013?
17 A.  I don't know.  I don't recall the date, no.
18 Q.  Do you see the document that I just put up?
19 A.  No.
20          MR. BLEVINS:  It may just take a while.
21          MR. CULLINAN:  How about now?
22          MR. BLEVINS:  Yes.  We can see it, a small
23     portion of it.
24 BY MR. CULLINAN:
25 Q.  Unfortunately I'm going to have to scroll down for

Page 56

1      you.  I'm showing you a document, a multi-page
2      document, that was again produced by you in this case
3      that is Bates number P224 through P233, and I'm going
4      to start with just page 1.  It says barge STC2004
5      ultrasonic thickness survey 18 May 2013, owned by
6      Busch Marine, Inc., and it gives some information
7      regarding the barge itself.  Starting with this page
8      are you familiar with this document?
9  A.  Yes.
10 Q.  All right.  And I will generally scroll down it to the
11     second page.  Says gauging is taken at Toledo
12     Shipyard, Toledo, Ohio 18 May 2013 for American Bureau
13     of Shipping.  Would you have produced that document or
14     prepared it?
15 A.  Yes.
16 Q.  And is that where the 2013 survey was done, at the
17     Toledo Shipyard?
18 A.  I don't recall.
19 Q.  It says gaugings taken with 2000 BUTG ultrasonic
20     thickness gauge calibrated and checked frequently
21     during use.  Is that something that -- that's what you
22     would have written in this document?
23 A.  Yes.
24 Q.  And it says gaugings were taken under the direction of
25     the ABS surveyor and owner's representative.

Page 57

1  A.  Yes.
2  Q.  That's also -- that's also what you would have
3      written?
4  A.  Yes.
5  Q.  And the ABS surveyor that you're referring to was
6      Jessica Ward?
7  A.  Yes.
8  Q.  And then there are various pages that have drawings
9      and handwritten measurements related to certain areas
10     of the barge; is that correct?
11 A.  Yes.
12 Q.  And after each page of drawings then there is sort of
13     a same information but contained in chart form?
14 A.  Yes.
15 Q.  And this is a document that -- well, strike that.
16          Do you know if you did the build in --
17     strike that again.  I'm sorry.
18          The information on the charts, the diagrams
19     that have the handwritten information, is all of that
20     your handwriting?
21 A.  Yes.
22 Q.  And would you have done that contemporaneously with
23     when you were taking the measurements?
24 A.  I don't recall.  I could have.
25 Q.  And how about the chart then that corresponds with the

Gregory Busch
August 24, 2021

Page 58

1  diagram and the handwritten information, when would
2  that have been prepared?
3  A.  It would have been after.
4  Q.  I'm sorry, after what?
5  A.  It would have been done after the measurements were
6  taken.
7  Q.  Would those measurements in any form have been given
8  to Surveyor Ward that day?
9  A.  I don't recall.  Possible.
10 Q.  And I'm scrolling down trying to do it somewhat
11 slowly, but if you need me to do it more slowly please
12 tell me.  I'm going to go up just a little bit, and
13 the first drawing that we see is page 226, and it says
14 by location starboard 2 aft end looking aft.  Do you
15 see that?
16 A.  Right.  Yes.
17 Q.  Would that starboard 2 be referring to number 2 tank
18 on the starboard side?
19 A.  Yes.
20 Q.  And is that number 2 tank out of the four tanks on the
21 starboard side?
22 A.  Yes.
23 Q.  All right.  And then it looks like again the typed-out
24 information on the next page seems to correspond to
25 that with starboard 2 aft end?

Page 59

1  A.  Correct.
2  Q.  All right.  The next drawing says location port 2 aft
3  end looking forward.  Do you see that?
4  A.  Yes.
5  Q.  So that would be the number 2 tank on the port side?
6  A.  Yes.
7  Q.  And then likewise, the next typewritten page seems to
8  correspond to that, says midship port 2 aft, correct?
9  A.  Yes.
10 Q.  The next page after that says random side shell
11 measurements.  Where on the barge would that be, those
12 measurements relate to?
13 A.  Well, it's shown on the drawing.
14 Q.  But those are the sides of the barge and not the
15 bottom of the hull?
16 A.  The drawing segues -- I'm trying to read it.  Yeah, it
17 shows the side of the barge, not the bottom.
18 Q.  Then there is again the corresponding typed
19 information that would be information in the drawing,
20 correct?
21 A.  Yes.
22 Q.  Then there are the page with the drawing and
23 handwritten numbers, random bottom plate measurements,
24 correct?
25 A.  Yes.

Page 60

1  Q.  And on that it looks like there's five -- ten
2  measurements that were done, correct, five on each
3  side?
4  A.  Yes.
5  Q.  And then there is the corresponding typed-out
6  document, correct?
7  A.  Yes.
8  Q.  And that's the end of the document.  Is that the
9  complete set of audio gauge readings that you took?
10 A.  No.  There were some that -- I'll take one here, and
11 if it was a good reading, you know, it wasn't recorded
12 and she -- there were probably two dozen of those.
13 Q.  So there were readings you took that were not recorded
14 and they're not part of this package, correct?
15 A.  That's correct.
16 Q.  Why were not those not included?
17 A.  That was, you know, her decision.  Well, you don't
18 have to write that one down, it's good.
19 Q.  On -- setting aside the random pages, is the other two
20 drawings that we talked about were of the port number
21 2 aft tank and the starboard number 2 aft tank,
22 correct?
23 A.  Yes.
24 Q.  Were there no readings taken of the other three tanks
25 on the starboard side and the other three tanks on the

Page 61

1  port side?
2  A.  Well, as I said before, the procedure, the requirement
3  was three belts, and those -- what's in the report
4  requested three belts plus a few other ones.
5  Q.  Is that requirement written somewhere?
6  A.  I don't know, but I assume it is, because every five
7  year I've ever done that's the way they're done.
8  Q.  But I'm correct there were no readings taken of the
9  other three starboard tanks and the other three port
10 tanks?
11 A.  I'm thinking here.  Yeah, what's in the report is what
12 was officially recognized as survey.
13 Q.  Okay.  But my question is were there gauge readings
14 taken of the starboard tanks 1, 3 and 4, and were
15 there gauge readings taken of the port tanks 1, 3 and
16 4?
17 A.  Well, a midship belt was in port starboard 3.
18 Q.  And where is that recorded here?
19 A.  Well, I had half of a drawing on here.  I can't tell
20 where they're at in the document.  It's in the report.
21      MR. BLEVINS:  Let me just (inaudible).
22      COURT REPORTER:  I can't hear you, Mr.
23 Blevins.
24      MR. BLEVINS:  I'm sorry.  I believe
25 everybody here is doing the best we can to go through

Gregory Busch
August 24, 2021

Page 62

1  documents under these technological information, but
2  it really is the case sometimes we'll see about a
3  third of the page, and I think the witness is trying
4  to make sense, but there may be times when there are
5  things that he doesn't see or doesn't know that he
6  doesn't see.
7         MR. CULLINAN:  All he has to do is tell me.
8         MR. BLEVINS:  Well, he can't tell you --
9  then the answer is, you know, to make this as
10  confident and we need to be -- we need to have the
11  full document and he needs to be able to inspect the
12  full document as he would at a normal deposition.  But
13  I recognize these are difficult times and we are doing
14  the best we can with this technology, but there are
15  times when he only sees -- he's looking at a drawing
16  and he only sees a fraction of the drawing.
17         MR. CULLINAN:  I understand it.  I'm going
18  to go as slow as I need to go so he can answer that
19  question about whether there were gauge readings taken
20  in those six other tanks that aren't included here.
21         MR. BLEVINS:  And I think -- may I see if I
22  can help you under the view menu there?  Is it
23  possible for you to click on view and reduce the size
24  of the document and then rotate the pages so that he
25  can see --

Page 63

1         MR. CULLINAN:  Yeah, yeah.  Please, any
2  time you think there is something I can do to make
3  this easier --
4         MR. BLEVINS:  I know you're doing -- I know
5  you're doing your best and we are doing our best too,
6  so -- and then if you can rotate that?  Yes.
7         MR. CULLINAN:  Wrong way.
8         THE WITNESS:  Yeah, it's upside down now.
9         MR. CULLINAN:  Yep.
10         MR. BLEVINS:  Okay.  Now I think we could
11  maybe increase the size a little bit to make it a
12  little bit more readable.  Thank you.
13         MR. CULLINAN:  Sure.
14  BY MR. CULLINAN:
15  Q.  ALL right.  So this is the first drawing.  This is
16      page 226, and I believe other than the Bate stamp what
17      you're seeing is the entirety of the page.  And again,
18      where it says location starboard 2 aft end, is this
19      entire diagram just of the starboard number 2 tank?
20  A.  That's correct.
21  Q.  Okay.  Then scrolling down slowly as we discussed
22      before, the written information is of what was
23      contained on the prior page, correct?  I'll rotate it
24      if you need it.
25  A.  Yes, there were 2 aft on there.  We're trying to read

Page 64

1      this sideways.
2  Q.  All right.  I'm happy to rotate it for you.  So that
3      was the page following the diagram that we just
4      discussed?
5  A.  Yes.
6  Q.  Okay.  Again, that's just the starboard 2 tank,
7      correct?
8  A.  Yes.
9  Q.  Okay.  Then the next page is again a diagram.  When it
10      says location it says port 2 aft end, correct?
11  A.  Yes.
12  Q.  So that is just number 2 tank on the port side,
13      correct?
14  A.  Yes.
15  Q.  All right.  And the information on the next page is
16      the typewritten version of that same information,
17      correct?
18  A.  Yes.
19  Q.  Then the next page is the drawing with the random side
20      shell measurements, correct?
21  A.  Yes.
22  Q.  And that indicates the midship belt where it's at on
23      the vessel, correct?
24  A.  Yes.  It's not the midship belt.  It was random side
25      shell measurements.

Page 65

1         COURT REPORTER:  I'm sorry, can you repeat
2  that, sir?  It was what?
3         THE WITNESS:  It is not the midship belt.
4  It's just random measurements.
5  BY MR. CULLINAN:
6  Q.  Then the next page is the typed-out version of that
7      same information regarding the random side shell
8      measurements, correct?
9  A.  Yes.
10  Q.  And the next page?
11  A.  Yeah, random bottom plate measurements.
12  Q.  Correct.  And those measurements are there -- there is
13      a total of ten measurements there, correct?
14  A.  Yes.
15  Q.  And are there measurements from all eight of the port
16      and starboard tanks there?
17  A.  There is two in the forward rake, two in the number
18      1s, two in the number 2s, two in number 3s, two in the
19      number 4s, yes.
20  Q.  And with regard to these random item-placed
21      measurements, do you know who decided to take these
22      and where?
23  A.  Jesse Ward would have.
24  Q.  Okay.  Now, the bottom numbers on all of these ten
25      measurements are the same, correct, 375?

Gregory Busch
August 24, 2021

Page 66

1   A.   That was the original thickness, yes.
2   Q.   And then I see that seven of the ten, the top number
3        is bigger than 375, correct?
4   A.   Those are areas that we had replaced bottom plating.
5   Q.   Okay.  So the ten -- seven of the ten random
6        measurements were of areas that had the bottom plating
7        replaced, correct?
8   A.   Yes.
9   Q.   And the other three measurements were areas -- some
10       areas that did not have it replaced, correct?
11  A.   Yes.
12  Q.   Were there other areas of the bottom plating that were
13       not replaced that were not measured?
14  A.   Yes.
15  Q.   And then the final page of this document is again the
16       typewritten version of those, of the information in
17       the diagram with regard to the ten random, correct?
18  A.   Yes.
19  Q.   So that's the last page of the document, so --
20            MR. BLEVINS:  It's the last page of the
21       document that you have shown us.
22  BY MR. CULLINAN:
23  Q.   It's the last page of the document that you produced.
24            MR. BLEVINS:  So we can -- so I hear what
25       you're saying, but we can't agree to that, you know.

Page 67

1        We just hear what you're saying.
2   BY MR. CULLINAN:
3   Q.   Okay.  What I'm going to ask you again is are there
4        measurements of tanks 1, 3 and 4 on the starboard side
5        and measurements of tanks 1, 3, 4 on the port side
6        that were not taken -- I'm sorry, that were taken that
7        are not included in this documents?
8   A.   I have to think, because I remember gauging them in
9        the front end of port and starboard compartment 3.
10  Q.   Okay.  But for some reason that information was not
11       included in this document given to ABS?
12  A.   Well, ABS is got a complete report.  I don't think
13       this document is complete.
14  Q.   Do you have a complete document somewhere?
15  A.   We should, yes.
16  Q.   A this date is correct, May 18, 2013, correct?
17  A.   As far as I know.
18  Q.   And again, to be absolutely certain, these gauge
19       readings were done with Jessica Ward present?
20  A.   Yes.
21  Q.   Other than your surveyor and having done surveys of
22       the barge, do you know Ms. Ward outside of that role?
23       In other words, do you have any friendship with her or
24       anything like that?
25  A.   No.

Page 68

1   Q.   When those audio gauge readings are submitted to ABS
2        are they in the form that we just looked at or some
3        other form?
4   A.   No, that form.
5   Q.   I think briefly we talked about at some point in early
6        2019 you or Busch Marine, Inc. decided to try to sell
7        the STC2004?
8   A.   Yes.
9   Q.   Was the very first thing you did in regard to that
10       retain a broker?
11  A.   Yes.
12  Q.   Was there a particular broker you worked with on this?
13  A.   Yeah, Tony Iorio.
14  Q.   You want to spell his last name as best you can?
15  A.   I was hoping you wouldn't ask that.  I think it's
16       I-O-R-I-O.
17  Q.   And you had never worked with Tony or with Sun Marine
18       (sic) on anything before?
19  A.   I don't think so, no.
20  Q.   Can you tell me to the extent of your knowledge what
21       Sun Machine (sic) did to try and find a buyer for the
22       barge?
23  A.   They have a website.  Other than that I don't know
24       what he does.
25  Q.   While Sun Machinery was doing whatever you were doing

Page 69

1        were you also doing anything to try and market the
2        barge?
3   A.   No.
4   Q.   Do you know whether you or Sun Machinery advised the
5        sale of the barge anywhere?
6   A.   I did not.  I don't know if Sun Machinery did.
7   Q.   Do you know if Sun Machinery ever provided you with
8        any marketing materials that they were using to try
9        and sell the barge?
10  A.   No, they did not.
11  Q.   Did you make any attempt to contact anybody in the
12       construction business or the marine towing industry or
13       anyone like that about their interest in the purchase
14       of the barge?
15  A.   No.
16  Q.   Over the entire time that the barge was being offered
17       for sale did any persons or entities come to do an
18       inspection of the barge?
19  A.   No.
20  Q.   Did anyone come to look at the barge?
21  A.   No.
22  Q.   Did anyone from Calumet come to look at the barge?
23  A.   Yes, Terry Hoeckendorff.
24  Q.   Do you know who Bob Ojala is?
25  A.   Yes, he is a surveyor.

Gregory Busch
August 24, 2021

Page 70

1    Q.   Do you know whether he ever came on behalf of anybody
2         to look at the barge?
3    A.   Yeah, let me back up here a little bit.  Bob Ojala and
4         Greg Belleville (phonetic), I think his name is, from
5         Great Lakes Towing came to look at the barge the
6         previous November.  That was prior to it really being
7         for sale.
8    Q.   That would have been November of 2018?
9    A.   Yes.
10   Q.   I'm sorry, the name of that person was who, Greg what?
11   A.   He's the president of Great Lakes Towing.  It's Greg
12        Dabil (phonetic).  Don't ask me to spell that one.
13   Q.   And he came to look at the barge with Bob Ojala?
14   A.   Yes.
15   Q.   Have you ever had any contact from Greg from Great
16        Lakes Towing or Bob with regard to the sale of the
17        barge before looking at it?
18   A.   I think Greg stopped by once and he was mainly
19        interested in discussing, because Great Lakes Towing
20        has a shipyard and he was trying to sell me on hiring
21        them to do (inaudible) --
22             COURT REPORTER:  I'm sorry, sir, he was
23        trying to sell you on what?
24             THE WITNESS:  Subchapter on a sea
25        regulation for tugs.

Page 71

1    BY MR. CULLINAN:
2    Q.   Was Great Lakes Towing someone that you or Busch
3         Marine, Inc. had previously worked with in the past?
4    A.   Over the past four years I have hired one of their
5         tugs twice.
6    Q.   Were you present when Greg and Bob Ojala came to look
7         at the STC2004 in November of 1990 -- 2018?
8    A.   Yes.
9    Q.   What sort of -- can you tell me what they did while
10        they were there in terms of when you observed them?
11   A.   What was the last part of your question?
12   Q.   As far as what you observed them doing can you tell me
13        what that was?
14   A.   Yeah, they walked through the tug, looked at that, and
15        they also went in the compartments on the barge.
16   Q.   Did you have any conversation with them about what
17        they had observed?
18   A.   Yes.
19   Q.   And can you tell me the extent of the conversation you
20        had?
21   A.   Greg said that he had -- both barges were in good
22        condition and that they would possibly be interested
23        in buying both as a package.
24   Q.   Did Bob Ojala say anything?
25   A.   Not that I recall.  He was pretty silent.

Page 72

1    Q.   Were there any -- strike that.
2             After that day did anybody from Great Lakes
3         Towing or on behalf of the Great Lakes Towing come
4         back and look at the barge again?
5    A.   No.
6    Q.   Were there any further conversations between you or
7         anyone on behalf of Busch Marine, Inc. and anyone from
8         Great Lakes Towing regarding the purchase of the
9         barge?
10   A.   Yes.
11   Q.   When did those occur and between whom?
12   A.   I don't recall the dates obviously, but I think Greg
13        called and discussed questions at various times, and I
14        think in February I called and asked him if they were
15        interested or not, and he said that they were having
16        discussions with their board members, and I didn't
17        hear anything, and then I contacted Bob Ojala, who was
18        at the time in Aruba, and I asked Bob if there was
19        further interest in the part of Great Lakes Towing,
20        and he said he did not know and that he would check
21        and get back to me.  He never got back to me.  And a
22        couple weeks later I did get ahold of Greg again and
23        he said that the barge and tug did not meet Great
24        Lakes Towing business model.
25   Q.   Was there ever any documentation exchanged between you

Page 73

1         and Great Lakes Towing with regard to the potential
2         purchase of the barge?
3    A.   There may have been some e-mails that went back and
4         forth.
5    Q.   Had you known Bob Ojala before that?
6    A.   Once -- I think he did an insurance survey.  I don't
7         remember when.  It was a long, long time ago.  25, 30
8         years ago, and he had some friction on that.
9    Q.   He did an insurance survey on a vessel you owned?
10   A.   Yeah, both -- I think both barges and tug.
11   Q.   Is that the only time you've ever -- strike that.
12             Who was he acting on behalf of you or the
13        insurance company at that time?
14   A.   I'm sorry, what's that?
15   Q.   Who was he acting on behalf of at that time, you or
16        the insurance company?
17   A.   The insurance company generally hired the surveyors.
18   Q.   Had you ever hired him as a surveyor?
19   A.   No.
20   Q.   Other than that instance that you just mentioned, has
21        he ever surveyed anything of yours or Busch Marine?
22   A.   No.
23   Q.   Do you know anything about his qualifications?
24   A.   A little bit.  He claims to be a naval architect, at
25        least not a practicing one.

Gregory Busch
August 24, 2021

Page 74

```
 1              COURT REPORTER:  I'm sorry, he claims to be
 2    a what?
 3              THE WITNESS:  A naval architect, but not a
 4    practicing one.
 5    BY MR. CULLINAN:
 6    Q.  Have you ever looked into his qualification?
 7    A.  Personally, no.
 8    Q.  Do you have the information that you just told us
 9        about?  Where did you get that information?
10    A.  From Northeast Central Engineers.
11    Q.  When you say he is not a practicing architect what do
12        you mean?  Practicing naval architect, what do you
13        mean by that?
14    A.  Well, he -- I was told by Northeast that he may have a
15        degree in the naval architecture but he's never
16        functioned in that, and that's kind of what I was
17        told.
18    Q.  Would it be fair to say that you do not have any
19        personal knowledge with regard to his background and
20        qualifications?
21    A.  No.
22    Q.  It would not be fair to say that?
23    A.  Oh, yeah.  No, I don't have any personal knowledge of
24        Bob Ojala.
25    Q.  Okay.  Thank you.  That wasn't a great question.  All
```

Page 75

```
 1        right.  Let's -- as long as we are on surveyors, do
 2        you know who is Randal Wilke, W-I-L-K-I-E?
 3    A.  No, I have never heard of him before.
 4    Q.  And you are familiar with the entity called Calumet
 5        River Fleeting?
 6    A.  Yes.
 7    Q.  Aside from negotiations and signing documents
 8        regarding the possible purchase of the STC2004 and the
 9        charter of the barge in June of 2019, did you ever
10        have any business dealings with Calumet or anyone
11        employed by Calumet?
12    A.  Well, back in 1984, '85 I anchored a barge off of
13        Sturgeon Bay, Wisconsin, and this is when John Seluck
14        and the Seluck family owned, and they towed that barge
15        to Muskegon and they stole my anchor and I never got
16        it back.
17              COURT REPORTER:  I'm sorry, and they did
18        what to the barge?
19              THE WITNESS:  They towed the barge to
20        Muskegon for the owner and they essentially stold my
21        anchor and wouldn't return it, and that's about the
22        only direct dealing I have with Saluck.
23    BY MR. CULLINAN:
24    Q.  All right.  Anybody else from Calumet that you ever
25        had any dealings with prior to the situation with the
```

Page 76

```
 1    STC2004?
 2    A.  I'm sorry, can you rephrase that again?
 3    Q.  Yeah.  Do you know whether you had any other dealings
 4        with anyone aside from the anyone having to do with
 5        Calumet River Fleeting other than with the STC2004?
 6    A.  No, I don't think so.
 7    Q.  Before the spring of 2019 had you ever meet Terry
 8        Hoeckendorff?
 9    A.  No.
10    Q.  Were all of your dealings in terms of negotiations of
11        the contract for sale for the barge or for the charter
12        of the barge between you and Calumet River Fleeting
13        were they all with Terry Hoeckendorff?
14    A.  My only contact with CRF was with Terry Hoeckendorff.
15    Q.  And how was it that you and Terry first communicated
16        with one another regarding the STC2004?
17    A.  Sun Machinery informed me that they had a potential
18        buyer, and he told me who this Terry from Sun, and he
19        said the buyer wanted to come make an inspection and
20        told me the name of the company, and I don't recall
21        exact details, but I think Terry Hoeckendorff called
22        me and we set up a date and time for him to come and
23        do an inspection.
24    Q.  Was that communication between Sun and you in writing
25        or was it spoken?
```

Page 77

```
 1    A.  I'm not sure.  Either phone or e-mail.
 2    Q.  What sort of deal did you have with Sun Machinery in
 3        terms of their acting as a broker?  What was the --
 4        what were they to do and how were they to be
 5        compensated?
 6    A.  Well, they -- there was a brokerage agreement and they
 7        got X number of dollars, which I think it was 10,000,
 8        you know, 5,000 initially, and then the sale
 9        commenced, then the other 5,000 when the barge is paid
10        for.
11    Q.  And that would be paid regardless of whether they
12        found the buyer or you did?
13    A.  Well, it was listed pretty much exclusively with them
14        and I really was not doing anything else, so it was a
15        moot point.
16    Q.  And you mentioned a brokerage agreement.  Was that in
17        writing?
18    A.  Yes.
19    Q.  I have not seen that.  We asked for that kind of
20        documentation.  Do you have that available?
21    A.  Yes.
22    Q.  I'd ask that that be produced.  Do you have any other
23        documents, correspondence, anything like that with Sun
24        Machinery regarding this barge?
25    A.  Well, we had to sue them, but no, that's -- no.
```

Gregory Busch
August 24, 2021

Page 78

1    Q.   You had to sue them for what?
2    A.   To get the deposit.
3    Q.   And what happened in regard to that?
4    A.   We got a default judgment.
5    Q.   None of the documents related to that lawsuit have
6         been produced to us, and I'm sure that we've asked for
7         everything related to Busch Machine and Sun Machinery.
8         Do you have any explanation why you haven't produced
9         any of that?
10   A.   I don't.
11            MR. BLEVINS:  Object to the (inaudible.)
12            COURT REPORTER:  I can't hear you, Mr.
13   Blevins.
14            MR. BLEVINS:  I object to counsel's
15   representation that (inaudible) --
16            COURT REPORTER:  I'm sorry, I can't hear
17   you.  Can you go closer to the microphone?  I object
18   to counsel's representation, that's all I heard.
19            MR. BLEVINS:  If there is a specific
20   discovery request that you believe we have not
21   responded to I'd be delighted to look into that and
22   address that, but, you know, we can't take a
23   representation -- this witness can't take your
24   representation that something specifically was
25   requested and was not produced.

Page 79

1            MR. CULLINAN:  All right.  Well, I'm going
2    to reserve the right to re-depose Mr. Busch if I need
3    to if I obtain from you documents that should have
4    been produced to me before if they were requested.  Is
5    that fair?
6            MR. BLEVINS:  Well, I think you -- by your
7    nature as counsel, you're reserving your right until
8    you've waived them, so I think this is a conversation
9    between you and me, and, you know, this witness can't
10   stipulate to anything like that.  He's here to give
11   you honest testimony to your questions of fact.
12           MR. CULLINAN:  Well, I certainly have a
13   right to ask him where he has looked for
14   documentation, whether he has looked for
15   documentation.  Just the fact that he didn't produce
16   things if he wasn't told to by his counsel has great
17   significance to me.
18           MR. BLEVINS:  Absolutely you have a right
19   to, and I think you've been over that testimony with
20   him to ask him whether he's looked for documents and
21   whether, you know, he produced them to his counsel.
22   You have that right.  We -- I was referring to your
23   earlier statement that a document was requested and
24   was not produced.  Those are two things that I think,
25   you know, we -- you and I should work out.

Page 80

1            But again, you reserve your right.  You
2    don't have to say that.  I know you do.  So let's move
3    on.
4            MR. CULLINAN:  All right.  But I'm just not
5    sure that I have covered documents regarding Sun
6    Machinery -- the relationship between he and Sun
7    Machinery, any of that.  I need to know whether he has
8    looked for any of that documentation.  That will save
9    us a step, because if I later found out that was
10   asked --
11           MR. BLEVINS:  Yeah, absolutely.  Again, you
12   have a right to ask those questions.  I'm not asking
13   you to stop this line of questioning.  It was a
14   specific comment by you that I was objecting to.
15   Absolutely go forward with your deposition as you see
16   fit.
17           MR. CULLINAN:  All right.  Thank you.
18   BY MR. CULLINAN:
19   Q.   Mr. Busch, have you looked for documents related to
20        anything having to do with Sun Machinery to be
21        produced in this case?
22   A.   Yes, I have.
23   Q.   Have you produced everything related to Sun Machinery
24        and your relationship with that entity in regard to
25        the sale of the STC2004?

Page 81

1    A.   All documents related to this and/or barge sale were
2         given to my counsel.
3    Q.   Did you look for any and all documentation regarding
4         any lawsuit that you or Busch Marine filed against Sun
5         Machinery to apparently obtain the deposit for the
6         barge?
7    A.   Yes.
8    Q.   You have looked for that?  Did you find any of it?
9    A.   Well, Mr. Blevins, he has those documents.
10   Q.   When did you get the deposit from Sun Machinery?
11   A.   Just recently.  I think it was, I don't know, March,
12        April, somewhere around there this year.
13   Q.   Do you know if Calumet River Fleeting was made a party
14        to whatever lawsuit you're referring to?
15   A.   I don't know.
16   Q.   Do you know if Calumet River Fleeting was ever given
17        notice of that lawsuit --
18   A.   I don't know.
19   Q.   I'm sorry?
20   A.   I don't know.
21   Q.   Other than phone call with Terry Hoeckendorff setting
22        up a meeting prior to meeting him face to face, did
23        you have any other conversations with him?
24   A.   I think there was a phone call, but the phone call was
25        basically just to set the meeting up.

Gregory Busch
August 24, 2021

Page 82

1  Q.  And then after that the next time you spoke with him
2      would be in person?
3  A.  Yes.
4  Q.  Where did that take place?
5  A.  At my dock.
6  Q.  Where?
7  A.  Carrolton, Michigan.
8  Q.  Was anyone else present other than you and Terry?
9  A.  No.
10 Q.  When did that meeting take place?
11 A.  I don't know the date.  It was, oh, probably April,
12     sometime in April of 2019.
13 Q.  How long did the meeting last?
14 A.  We conversed for maybe 20, 30 minutes and then he went
15     on the barge by himself and spent an hour and-a-half,
16     maybe two hours doing his inspection.
17 Q.  And were you with him at any time while he was on the
18     barge?
19 A.  No.  I intentionally stayed on shore because I didn't
20     want to interfere with his inspection.
21 Q.  What did you discuss during the 20 to 30 minutes?
22 A.  Oh, there were a number of topics.  I guess mainly
23     chitchatted about marine people we knew and nothing
24     actually related to the barge sale.
25 Q.  There was no conversation whatsoever in the 20 to

Page 83

1      30 minutes regarding the barge itself or the condition
2      of the barge?
3  A.  Nothing on the condition.  I don't know he asked me
4      why I wanted to sell it and I told him I was looking
5      for a different kind of vessel and we discussed that a
6      little bit and that was about it.  We weren't at the
7      barge yet, so there was no reason to have a discussion
8      about the barge itself.
9  Q.  Did he express to you in any way why he or Calumet
10     River Fleeting were interested in the barge?
11 A.  Well, I assume they were interested in picking up the
12     type of business I did with them, which is hauling
13     cargo, and there was some discussion on that.
14 Q.  And was there any discussion in terms of whether the
15     barge was capable of serving that purpose?
16 A.  No.
17 Q.  Did you make any representation to him whatsoever as
18     to whether the barge was capable of doing anything
19     that he suggested he might use it for?
20 A.  No.  He just -- I just made the assumption that he was
21     going to haul cargo with it.
22 Q.  And with regard to that did you make any
23     representation whatsoever of the capabilities of the
24     barge to do that?
25 A.  No.

Page 84

1  Q.  Did you make any representation to him that the barge
2      was generally seaworthy?
3  A.  No.
4  Q.  Did you make any representations to him with regards
5      to whether the barge had any leaks in it?
6  A.  No, because it didn't have one.
7  Q.  Where specifically was the barge?  I know you
8      mentioned the dock, but was it in the water?
9  A.  Oh, yes, of course.
10 Q.  With it being in the water it would not be possible
11     for him to inspect the underside of the hull; would
12     that be accurate?
13 A.  Yeah, that's true.
14 Q.  At the time that he was there -- well, strike that.
15         Was there just the one in-person visit with
16     him before Calumet took delivery of the barge?
17 A.  No, he came two times.
18 Q.  When was the second time in relation to the first
19     time?
20 A.  It was about two or three weeks later.
21 Q.  Anybody else present other than you and he?
22 A.  No.
23 Q.  And was there conversation?
24 A.  Yes.
25 Q.  What was the conversation about and what else, if

Page 85

1      anything, transpired?
2  A.  Well, he told me that he thought the barge was in good
3      condition, and he said the reason for his second visit
4      was to make a list of any needed repairs, and he said
5      he had made arrangements with Chicago dry dock, dry
6      dock the barge and make the repairs.  He was trying to
7      get a handle on what it would cost to make the
8      repairs, and there was some decking at the starboard
9      one, and there was a little bit of a negotiation that
10     went on, and I agreed to give him two or three steel
11     sheets with framing on it to repair the deck with and
12     he agreed to that.
13 Q.  Did he do any walk-through of the barge at that second
14     visit?
15 A.  Yes, he did.  He spent -- he had a yellow note pad
16     with him and he walked through the barge, and again, I
17     stayed on shore.  He made notes and he was probably on
18     there for maybe an hour, hour and-a-half.
19 Q.  And then your understanding was that second visit was
20     the one he's walking around to see what repairs were
21     made -- or needed to be made?
22 A.  Yeah, I mean, that's my opinion or assumption.  I
23     don't know what he was thinking or what his purpose
24     was.
25 Q.  At the time of -- I'm going to say with both of those

Gregory Busch
August 24, 2021

Page 86

1     visits, was there water in the tanks of any of the
2     tanks on the barge?
3  A.  No.  Most the tanks were dry.  There may have been a
4     little bit of water in the corners or something.
5  Q.  Did you agree -- oh, I'm sorry.  In either of those
6     visits when Terry was there did you have any
7     conversation with him about the nature of any water in
8     any of the tanks, how it came to be there, why it was
9     there?
10 A.  No, that's -- you know, trace water in barges is
11    expected.  He didn't mention it, I didn't mention it.
12 Q.  And specifically did you say anything to him that the
13    presence of water in any of those tanks were there not
14    as a result of the problem with the hull but instead
15    was due to problems with the deck?
16 A.  I may have, because the deck cracks are not unusual in
17    a deck cargo barge.
18          COURT REPORTER:  I'm sorry, say that again.
19    I may have because?
20          THE WITNESS:  Deck cracks were common in
21    deck cargo barges.
22 BY MR. CULLINAN:
23 Q.  Did the deck of the barge have cracks?
24 A.  I don't know of any specific, because we walked
25    through it 2018 and made repairs on anything we could

Page 87

1     find.  I mean, there's a possibility there might have
2     been some, yes.
3  Q.  Was the entirety of the barge in the water at that
4     time or was any of it up on the shore of the bank?
5  A.  No, it was floating.
6  Q.  When was the next time you talked to Terry after
7     that -- well, strike that.
8          In between those two visits did you and
9     Terry talk at all other than setting up a second
10    visit?
11 A.  Yeah.  He -- if I recall he called and asked for
12    certain things.  He wanted a copy of the load line.
13    I'm not sure if this was between the visit and the
14    second.  Copy of the load line.  He wanted the
15    stability calculations and the stability letter copy.
16    He wanted the latest audio gauges, and I think that
17    was it.  I sent all that to him.
18 Q.  You sent that via mail or e-mail, or how did you send
19    it?
20 A.  I scanned it and e-mailed it.
21 Q.  Do you have any copies of any of the correspondence
22    that went with that?
23 A.  Yeah, I had the e-mails.
24 Q.  I've not seen any of those.  I'd ask that those be
25    produced.  Is it possible that you gave him any

Page 88

1     documentation in person such as the audio gauge
2     readings?
3  A.  No.  None of those in person.  It was all scanned and
4     e-mailed.
5  Q.  And he asked for all this or you offered it to him?
6  A.  What's that?
7  Q.  Did he ask for that documentation or did you offer it
8     to him without --
9  A.  He -- he asked for it I think.
10 Q.  You say you think.  Are you not certain of that?
11 A.  Well, I'm like 99 percent certain that he asked for
12    it.
13 Q.  And the latest audio gauge readings were the 2013
14    readings that you took?
15 A.  Yes.
16 Q.  And I take it you only sent him what you had -- what
17    we looked at earlier in terms of the ones you had sent
18    to ABS, correct?
19 A.  Well, yeah, a copy of it.
20 Q.  Well, what we looked at would have been the complete
21    copy, right?
22 A.  I'm sure that it is.  I'd like after we're done here
23    to review that document, see if there's any pages
24    missing.
25 Q.  You mentioned earlier that there were audio gauge

Page 89

1     readings taken in 2013 that did not get recorded in
2     that document.  Did you tell him about any of those
3     gauge readings and what information were garnered
4     through them?
5  A.  No, because they didn't seem irrelevant.
6  Q.  This is April of 2019, correct?
7  A.  What was your --
8  Q.  Approximately?
9  A.  What was the question there?
10 Q.  It was about April of 2019 when you're meeting with
11    Terry, give or take a couple weeks?
12 A.  Yeah, I think so.  Yeah, it was about that time frame.
13 Q.  Was the barge coming up for a renewal five-year
14    survey?
15 A.  Yes.
16 Q.  You had already obtained a one-year extension back in
17    2018?
18 A.  Right.
19 Q.  Why did you seek that extension?
20 A.  Why?
21 Q.  Right.  In 2018.
22 A.  Well, as I said before, historically I've always
23    gotten the one-year extensions.
24 Q.  Okay.  And do you recall specifically the -- any
25    survey that was done by the ABS during the -- for the

Gregory Busch
August 24, 2021

Page 90

1   2018 extension?
2   A.   Yes.  She came and did the extension survey.
3   Q.   This was Jessica Ward again?
4   A.   Yes.
5   Q.   Do you recall specifically what she did during that
6        inspection?
7   A.   Yeah.  I was kind of surprised it was a little more
8        extensive than I had experienced in the past.  She
9        went on the forward rake, she went in the aft peak
10       tanks, she went on the aft peak, and she went in I
11       think three of the midbody compartments.
12  Q.   Was there water in the tanks at that time?
13  A.   There was a trace amount.
14  Q.   I take it no gauge readings were done?
15  A.   No, you don't do gauges for those kind of surveys.
16  Q.   The barge was in the water at that time?
17  A.   Yes.
18  Q.   I would like to show you a document.  Give me one
19       second.  All right.  Do you see that document in front
20       of you, a pleading?
21  A.   Yes.
22  Q.   Okay.  This has been produced to you -- to us, I'm
23       sorry, on behalf of you, and it's entitled Plaintiff's
24       responses to Calumet River Fleeting's request for
25       admission, correct?

Page 91

1   A.   Yes.
2   Q.   Have you seen this document before?  And it's a
3        document where we asked you to admit or deny certain
4        statements.
5   A.   I reviewed a draft of it.
6   Q.   Did you have any input into its creation before it was
7        prepared?
8   A.   Yes, I probably did.
9   Q.   Well, you say you probably did.  Do you recall
10       specifically having any input into it?
11  A.   I don't recall this one specifically, no.
12  Q.   In request at number 23 you're asked to admit or deny
13       that during negotiations between Calumet and Gregory
14       J. Busch for the sale of the barge Busch provided
15       Calumet with information pertaining to the thickness
16       of the hull of the barge in the form of hull thickness
17       gauge readings that had been taken in 2013, and in the
18       answer it says denied.  Did I read that accurately?
19  A.   Yes.
20  Q.   Is that answer wrong?
21  A.   Yes, apparently.
22  Q.   Did you review this document after it was prepared?
23  A.   No.
24  Q.   So at least to that extent it's a false pleading,
25       correct?

Page 92

1   A.   I'm sorry, what was that?
2   Q.   To the extent of that question this is a false
3        pleading, correct?
4             MR. BLEVINS:  Objection, asked and
5        answered.
6   BY MR. CULLINAN:
7   Q.   Go ahead.
8             MR. BLEVINS:  Are you asking him whether
9        that -- asked and answered with respect to that
10       question.
11            MR. CULLINAN:  I didn't ask that question
12       before.
13  BY MR. CULLINAN:
14  Q.   Is this a false pleading given that it's got a wrong
15       answer?
16            MR. BLEVINS:  Objection to any legal
17       confusions, definition of pleadings.
18  BY MR. CULLINAN:
19  Q.   Go ahead, you can answer.
20            MR. BLEVINS:  If you can.
21  A.   I didn't view it as a mistake.
22  BY MR. CULLINAN:
23  Q.   At any point in time did -- was a contract for the
24       sale of the barge prepared?
25  A.   Yes.

Page 93

1   Q.   I'm showing you a document that has got three pages,
2        Bate stamped CRF 1, 2 and 3, third page?
3   A.   Yeah, just seeing bits and pieces here.
4   Q.   Okay.  I just want --
5   A.   Yes, that's the one.
6   Q.   Is that the contract for sale -- contract of sale that
7        was prepared with regard to the barge and signed by
8        Terry Hoeckendorff on behalf of Calumet River Fleeting
9        and signed by you?
10  A.   Well, all I see is the very beginning of it, but it
11       looks like the contract, yes.
12            MR. BLEVINS:  Did you reduce the size of
13       that?
14            MR. CULLINAN:  Yes, I'm sorry, I should
15       have thought of that before.  Start at 100.
16  BY MR. CULLINAN:
17  Q.   All right.  That's the second page?
18  A.   The last page.  The last page, yep.
19  Q.   And the last page has -- says addendum, closing date
20       extension addendum was something that was added to the
21       two-page contract of sale after it was originally
22       prepared and signed?
23  A.   Yes.
24  Q.   Okay.  This is the contract of sale that was signed by
25       you and Terry, correct?

Gregory Busch
August 24, 2021

Page 94

```
 1   A.   Yes.
 2   Q.   And within it it indicates that, as we discussed, that
 3        Sun Machinery is the broker?
 4   A.   I'm sorry, I couldn't hear the last part of the
 5        question.
 6   Q.   As we discussed earlier it indicates that at the
 7        bottom of page 2 that Sun Machinery Corp. is the
 8        broker?
 9   A.   Yes.
10   Q.   And that's signed by Anthony J. I-O-R-I-O?
11   A.   Iorio, yes.
12   Q.   And it looks like signed by all three parties on
13        April 24, 2019?
14   A.   Yes.
15   Q.   This contract of sale had certain terms and conditions
16        that had to be met before the sale would go through,
17        correct?
18   A.   Yes.
19             MR. BLEVINS:  Objection, to any legal
20        conclusion.
21   BY MR. CULLINAN:
22   Q.   All right.  And it says in the very first paragraph on
23        the terms and conditions set forth below, right?
24             MR. BLEVINS:  Objection, document speaks
25        for itself.
```

Page 95

```
 1             COURT REPORTER:  I can't hear you, Mr.
 2        Blevins.
 3   BY MR. CULLINAN:
 4   Q.   Go ahead, you can answer the question.
 5             MR. BLEVINS:  You can answer it, if you
 6        can.
 7   A.   Can you repeat the question, please?
 8   BY MR. CULLINAN:
 9   Q.   This document had certain terms and conditions that
10        had to be met in order for the contract to go through;
11        is that correct?
12             MR. BLEVINS:  Objection, it's a legal
13        conclusion.
14   BY MR. CULLINAN:
15   Q.   Go ahead, you can answer.
16             MR. BLEVINS:  If you can.
17   A.   Yes, there are terms in this contract.
18   BY MR. CULLINAN:
19   Q.   And those terms and conditions had to be met in order
20        for the contract to go through, correct?
21             MR. BLEVINS:  Objection, vague.  Objection
22        to any legal conclusion.
23   BY MR. CULLINAN:
24   Q.   Go ahead.
25             MR. BLEVINS:  If you can answer that
```

Page 96

```
 1        question.
 2   A.   Yeah, I don't know how to answer it.
 3   BY MR. CULLINAN:
 4   Q.   Who prepared this document?
 5   A.   Sun Machinery.
 6   Q.   Did you review it before you signed it?
 7   A.   Yes.
 8   Q.   Did you talk to anybody about it before you signed it?
 9   A.   No.
10   Q.   Did you -- and I'm just asking for your own
11        understanding.  Did you have any understanding that
12        there were terms and conditions that had to be met
13        before this contract would be valid?
14             MR. BLEVINS:  Objection, asked and
15        answered.  Objection to any legal conclusions.
16   BY MR. CULLINAN:
17   Q.   Go ahead.  I'm asking about his understanding.  Go
18        ahead.
19             MR. BLEVINS:  Same objection.
20             THE WITNESS:  Yeah, I'm not sure how to
21        answer that.  I guess my experience with contracts can
22        be fluid.
23   BY MR. CULLINAN:
24   Q.   I'm sorry, they can be what?
25   A.   Fluid.
```

Page 97

```
 1   Q.   What does that mean?
 2   A.   The parties changed from time to time.
 3   Q.   This one wasn't changed, was it?
 4   A.   No.
 5   Q.   In the second paragraph it says a closing shall occur
 6        on an agreed date on or about May 18, 2019 unless
 7        extended by the written agreement of the parties
 8        hereto.  Do you see that?  Right here in paragraph 2,
 9        second line.
10   A.   Yeah, that's what it says.
11   Q.   All right.  And was it your understanding that a
12        closing had to occur on or about May 18, 2019 unless
13        the written agreement was extended -- unless the date
14        was extended in order for Calumet to be obligated
15        under this contract?
16             MR. BLEVINS:  Objection, documents speaks
17        for itself and objection to any legal conclusion.
18             MR. CULLINAN:  I'm just asking for his
19        understanding.
20   BY MR. CULLINAN:
21   Q.   Go ahead.
22   A.   Well, my exception was Terry Hoeckendorff and
23        (inaudible) that he wanted the barge (inaudible).
24             COURT REPORTER:  I'm sorry, sir, can you
25        repeat that?  I'm not hearing you very well at all
```

Gregory Busch
August 24, 2021

Page 98

1   there.
2              THE WITNESS:  Yes.  I got a bad setup here.
3   What part?  Where do I need to start over?
4              COURT REPORTER:  You had an appointment
5   with Terry.
6              THE WITNESS:  Yeah.  My conversation with
7   Terry Hoeckendorff was that he wanted the barge and he
8   made a comment in his own words that the barge would
9   never come back to me, and he said that it was spurred
10  on two different occasions.
11  BY MR. CULLINAN:
12  Q.  And I appreciate that, but my question is was it your
13      understanding that the sale of this barge had to close
14      by May 18, 2019 for Calumet to be obligated under it
15      unless that date was extended?
16  A.  No, my understanding was that that date could be moved
17      back on Terry's comments if we needed to.
18  Q.  And the date was moved back, correct?
19  A.  Yes, it was.
20  Q.  And that's what that closing date extension, this page
21      3, is?
22  A.  Yes.
23  Q.  And that date was extended to June 7, 2019, correct?
24  A.  Yes.
25  Q.  Was it then your understanding that for Calumet to be

Page 99

1       obligated under this contract the sale had to close
2       and everybody had to do whatever they were required to
3       do by June 7, 2019?
4              MR. BLEVINS:  Objection to legal
5       conclusion.  Objection, the document speaks for
6       itself.  It's a misrepresentation of the document.
7   BY MR. CULLINAN:
8   Q.  Go ahead.
9   A.  Well, I don't understand the question then.
10             MR. CULLINAN:  Could you repeat the
11      question?
12  A.  Yeah, what's the question?
13  BY MR. CULLINAN:
14  Q.  No, I'm asking the court reporter to read back the
15      question.
16  A.  Oh.
17             (The following requested portion of the
18              record was read by the reporter at
19              3:38 p.m.)
20             Q. Was it then your understanding that
21             Calumet be obligated under this contract
22             that the sale had to close and everybody
23             had to do whatever they were required to do
24             by June 7, 2019?)
25             THE WITNESS:  No, that was not my

Page 100

1   understanding.  It had been extended.  The recent
2   extension was the Coast Guard was being very, very
3   slow in processing their paperwork.
4   BY MR. CULLINAN:
5   Q.  Okay.
6   A.  What Terry had told me I assumed that, you know, his
7       understanding, my understanding was that if we needed
8       to do another extension then we would.
9   Q.  Is it your position there is some language in this
10      written contract for sale that is meaningless?
11             MR. BLEVINS:  Objection to
12      misrepresentation of the document.
13             MR. CULLINAN:  I'm asking him.
14  BY MR. CULLINAN:
15  Q.  Go ahead.
16             MR. BLEVINS:  Objection to legal
17      conclusion.
18  BY MR. CULLINAN:
19  Q.  Is that your position?
20  A.  I'm not sure.  I don't know how to respond to that.
21  Q.  There are the original document and the closing date
22      extension --
23  A.  Yes.
24  Q.  -- with closing dates in them.
25             Are you telling us that it's your

Page 101

1   understanding that those words were meaningless in
2   this contract?
3   A.  No.  My understanding was that was a target date and
4       if we needed to do another extension then we would.
5   Q.  That doesn't say that anywhere though, does it?
6   A.  Not in those words, no.
7   Q.  In paragraph 4 it says seller warrants title to the
8       vessel, which will be delivered to buyer free of all
9       liens and encumbrances together with a properly
10      executed United States Coast Guard form bill of sale,
11      correct?
12  A.  That's what it says.
13  Q.  You would agree with me that at some point in time
14      there was a mortgage on that vessel, on the vessel
15      STC2004, that constituted a lien or encumbrance on it,
16      correct?
17  A.  That's correct.
18  Q.  And as we saw before, at least by way of that Coast
19      Guard letter that I showed you dated June 24, 2019,
20      that mortgage was still registered against the barge,
21      correct?
22             MR. BLEVINS:  Objection, misrepresents the
23      document.
24  BY MR. CULLINAN:
25  Q.  And I'll be glad to pull the document back up if you

Gregory Busch
August 24, 2021

Page 102

1    want.
2              MR. BLEVINS:  Well, it's your deposition.
3    My objection stands.
4    BY MR. CULLINAN:
5    Q.  Okay.  Go ahead.
6    A.  Well, my understanding in the document that I saw was
7        stamped June 4th, mortgage was of that date.
8    Q.  Setting aside when it was stamped and before even the
9        satisfaction was obtained, you understood that that
10       mortgage constituted a lien against the vessel,
11       correct?
12   A.  Well, yes.
13             MR. BLEVINS:  Objection to legal
14   conclusion.
15   BY MR. CULLINAN:
16   Q.  Correct?
17   A.  Yes.
18   Q.  Okay.  So if it was not -- if the satisfaction was not
19       recorded, that would -- or registered with the Coast
20       Guard by June 7, 2009 (sic), it would still show up on
21       the title to the vessel?  Is that your understanding?
22             MR. BLEVINS:  Objection, to any legal
23   conclusion and an opinion outside of (inaudible).
24   BY MR. CULLINAN:
25   Q.  Go ahead.

Page 103

1    A.  Do you want me to answer that?
2              MR. BLEVINS:  Subject to my objection you
3    can answer.
4              THE WITNESS:  Yeah, rephrase the question
5    there, please?
6    BY MR. CULLINAN:
7    Q.  You knew that a satisfaction had to be registered with
8        the Coast Guard in order to remove that mortgage from
9        the title; was that your understanding?
10   A.  That's true.
11             MR. BLEVINS:  Objection.
12             MR. CULLINAN:  Did you get his answer?
13             COURT REPORTER:  I think he said that's
14   true.
15   BY MR. CULLINAN:
16   Q.  And if that was not registered with the Coast Guard
17       prior to June 7th or through June 7, 2019, the
18       mortgage would continue to be a lien against the
19       vessel; is that your understanding?
20             MR. BLEVINS:  Same objection.
21   A.  Yes.
22   BY MR. CULLINAN:
23   Q.  I'm sorry, did you answer?
24   A.  Yes.
25   Q.  And your answer is yes?

Page 104

1    A.  Yes.
2    Q.  And you have not to your knowledge in this case
3        produced any document that shows it was registered
4        with the Coast Guard releasing or satisfying that
5        mortgage prior to June 7, 2019, correct?
6    A.  No.
7    Q.  It's not correct?  What document have you produced
8        that shows it was registered before that date contrary
9        to that June 24th letter from the Coast Guard?
10   A.  I don't know what documents were produced.
11   Q.  What is the -- with regard to the United States Coast
12       Guard form bill of sale, does that have to go through
13       the Coast Guard as well?
14   A.  Yes.
15             MR. BLEVINS:  Object to legal conclusion.
16   BY MR. CULLINAN:
17   Q.  And what does the Coast Guard have to do with it based
18       on your understanding.
19             MR. BLEVINS:  Objection to legal conclusion
20   and to opinion testimony beyond this witness' area of
21   expertise.
22   BY MR. CULLINAN:
23   Q.  Go ahead.
24   A.  Well, a bill of sale is the transfer of the vessel
25       from one owner to another.

Page 105

1    Q.  And did the Coast Guard play some role in the issuance
2        of the bill of sale?
3              MR. BLEVINS:  Same objection.
4    BY MR. CULLINAN:
5    Q.  To your knowledge?
6    A.  Yes.
7    Q.  What role did they play, to your knowledge?
8    A.  They're the agency that records the document.
9    Q.  To your knowledge had any bill of sale been reported
10       for a transfer of the ownership of this vessel from
11       you to Calumet River Fleeting by the end of June 7,
12       2019?
13   A.  Yes, it had.
14   Q.  Do you have any document that shows it was stamped or
15       recorded by the Coast Guard prior to that date?
16   A.  Yes, we do.
17   Q.  Has it been produced?  I haven't received it.  Sorry,
18       did you answer that?
19   A.  Oh, I don't know.  I don't know what documents have
20       gone between you and Mr. Blevins.
21   Q.  So you produced everything you had, right?
22   A.  He has all the documents that were in my possession.
23   Q.  Did you even look at one document that you gave to
24       your counsel before it was produced?
25   A.  There were boxes of them.

Gregory Busch
August 24, 2021

Page 106

1  Q.  But did you look at any of them?
2  A.  Yes.
3  Q.  Did you see a bill of sale that had any indication
4      that it had gone through the Coast Guard or stamped by
5      the Coast Guard or registered by the Coast Guard?
6  A.  I remember signing a bill of sale.
7  Q.  I'm sorry?
8  A.  I remember signing a bill of sale.  I don't know that
9      they sent a copy back.
10 Q.  Okay.  But just your signing it isn't the same thing
11     as it being accepted and stamped and registered by the
12     Coast Guard, is it?
13 A.  I don't know.
14 Q.  Would you agree with me that it's your understanding
15     that if you didn't provide clean title to the barge
16     and a registered bill of sale with the Coast Guard by
17     the close of business on June 7, 2019, Calumet --
18     Calumet was not obligated under this contract of sale?
19         MR. BLEVINS:  Objection to a legal
20     conclusion.  It's a misrepresentation of the document
21     and --
22 BY MR. CULLINAN:
23 Q.  Go ahead.  It doesn't misrepresent anything.  Go
24     ahead.  Go ahead, you can answer.
25 A.  Well, as I stated previously, my understanding with

Page 107

1      Terry Hoeckendorff was that if an extension was
2      necessary we would do that.
3  Q.  Did Sun Machinery ever deliver any document to Calumet
4      to your knowledge?
5  A.  I don't know.
6  Q.  Far as you knew were all of your negotiations with
7      Terry Hoeckendorff and Calumet just between you two?
8          MR. BLEVINS:  Objection to the form.
9          THE WITNESS:  Am I supposed to answer?
10         MR. BLEVINS:  Yeah, if you understand his
11     question.
12         THE WITNESS:  Yeah, my understanding was
13     that transaction people work the deals went between
14     Sun Machinery and CRF, and they were not between me
15     and CRF directly.
16 BY MR. CULLINAN:
17 Q.  I'm sorry, the fund transfers?
18 A.  No, no.  The paperwork -- any paperwork dealing with
19     the sale went from Sun Machinery to CRF and back.
20     They sent me a copy to sign and that was the extent of
21     my involvement, and I did not draft paperwork or send
22     anything directly to CRF.
23 Q.  Have you ever received any copies of paperwork that
24     Sun Machinery sent to Terry Hoeckendorff for signature
25     after he sent them back?

Page 108

1  A.  All I received was the completed bill of sale and the
2      completed contract of sale.  I don't know if there
3      were other documents.
4  Q.  Do you have any information that Sun Machinery ever
5      sent to Calumet any form of a release of that mortgage
6      at any time?
7  A.  No, I don't have knowledge of that.
8          COURT REPORTER:  Could we take a
9      five-minute break when it becomes convenient?
10         MR. CULLINAN:  Yeah, we can take right now,
11     if you'd like to take ten minutes.
12         (Recess taken at 3:50 p.m.)
13         (Back on the record at 4:03 p.m.)
14 BY MR. CULLINAN:
15 Q.  Mr. Busch, after June 15th of 2019 have you ever
16     spoken with Tony at Sun Machinery?
17 A.  Yes.
18 Q.  On how many occasions?
19 A.  I don't know.
20 Q.  More than one?
21 A.  Yes.
22 Q.  Was it always having to do with Sun Machinery working
23     as the broker for you in the sale of the barge?
24 A.  No.
25 Q.  Just generally what does it have to do with?

Page 109

1  A.  I've lost three portable dredges through Sun
2      Machinery.
3  Q.  After June 15, 2019 did you ever have any discussions
4      with Tony at Sun or anyone else at Sun in regard to
5      anything having to do with the STC2004?
6  A.  Yes.
7  Q.  How many of those discussions did you have?
8  A.  I don't know.
9  Q.  Do you know when those discussions took place?
10 A.  They were scattered through probably June and July.
11 Q.  Do you know what the nature of the conversations were?
12 A.  Well, it was concerning the barge sale.
13 Q.  Okay.  Anything in more detail that you can recall of
14     that?
15 A.  I don't recall, no.
16 Q.  Did you ever direct Sun Machinery to not return the
17     deposit money to Calumet?
18 A.  No.
19 Q.  Did you ever discuss with Sun Machinery the deposit
20     money?
21 A.  Yes.
22 Q.  When was the first time you discussed that with Sun
23     Machinery after June 15th?
24 A.  I don't know.
25 Q.  Did you ever demand that Sun Machinery return it to

Gregory Busch
August 24, 2021

Page 110

1   you?
2   A.   Yes.
3   Q.   When was the first time you demanded Sun Machinery
4        give you Calumet's deposit?
5   A.   I don't know.
6   Q.   And did Sun Machinery ever respond to those demands
7        before a lawsuit was filed by you?
8   A.   Yes.
9   Q.   What was their response?
10  A.   Well, it's actually they were afraid of CRF, and I
11       didn't understand his position, but Tony insisted on
12       holding the money.
13  Q.   Okay.  And did he communicate to you that he wanted
14       some sort of an agreement between Calumet and you
15       before he turned it over to anybody?
16  A.   Yes, he did.
17  Q.   And short of without ever having any sort of an
18       agreement between you two as to where the funds went,
19       he held onto it until you sued him?
20  A.   Yes.
21  Q.   And as far as you know he never appeared in that case
22       and a default was taken against Sun?
23  A.   Yes.
24  Q.   Recovering the $50,000, and that was the amount of the
25       deposit, right?

Page 111

1   A.   Yes.
2   Q.   Since receiving that from Sun have you had any
3        communications with Tony or anyone from Sun Machinery?
4   A.   Since -- what time frame?
5   Q.   Since you received those funds.
6   A.   No.
7   Q.   Have you and Tony ever discussed the lawsuit that you
8        filed against Sun Machinery?
9   A.   No.  Once it was filed I left it up to Mr. Blevins.
10  Q.   Did you ever indicate before the lawsuit was filed to
11       Tony that you were going to sue him?
12  A.   I don't know.
13  Q.   Now, at some point, and I'll give you the date, May
14       31, 2019 you entered into a bareboat charter for the
15       barge with Calumet?
16  A.   Yes.
17  Q.   And in doing so you recognize that there was the
18       potential that the sale of the barge was not going to
19       go through; would that be correct?
20  A.   No.
21  Q.   You signed a contract, a written bareboat charter,
22       correct?
23  A.   Yes.
24  Q.   Agreement?  Do you have that document in front of you
25       or no?

Page 112

1   A.   Yes.
2   Q.   All right.  The bareboat charter?
3   A.   Yes.
4            MR. BLEVINS:  Can you reduce the size of it
5        again, please?
6            MR. CULLINAN:  Yeah.  Sure.
7   BY MR. CULLINAN:
8   Q.   All right.  I put up here a -- I think it's a -- well,
9        the Bates document CRF4, and I'm just getting the last
10       page here, through CRF14, and we'll start on -- go
11       back here on page 14.  Does that bear your signature?
12  A.   Yes.
13  Q.   And I'll try and scroll somewhat slowly, and I'm not
14       expecting you to read this as I go backwards through
15       it.  At least based on the first page and generally,
16       does that look like the bareboat charter agreement
17       that you and Terry signed?
18  A.   Yes.
19  Q.   Right here on the first page paragraph 1(c) says
20       charter hire -- the barge charter hire will be $25,000
21       only in the event the sale of the barge is not
22       completed.  If there is no sale the charter will
23       return the barge to Busch Marine dock in Carrollton,
24       Michigan at charterer's expense.  Do you see that?
25  A.   Yes.

Page 113

1   Q.   And that was the term of the agreement that you
2        signed, correct?
3   A.   Yes.
4   Q.   Was it your understanding that there was the
5        possibility at the time you entered the bareboat
6        charter that the contract for sale was not going to go
7        through?
8   A.   No, none whatsoever.
9   Q.   Yet you signed this document with that very language
10       included in it, correct?
11  A.   I looked at it (inaudible) to protect myself.
12  Q.   But you signed that document with that very language
13       included, correct?
14  A.   Yes.
15  Q.   Now, this document as you understood it allowed
16       Calumet to take possession of the barge and to operate
17       it and use it, correct?
18  A.   Yes.  I was trying to accommodate their schedule.
19  Q.   Okay.  And entering into it at least as of the time
20       this was entered into it was your understanding that
21       Calumet did not own the barge at that time; is that
22       correct?
23  A.   Yes.
24  Q.   Now, as far as your understanding is concerned Calumet
25       could not use the barge pursuant to this charter

Gregory Busch
August 24, 2021

Page 114

1   agreement in such a way as being unsafe or negligent;
2   would you agree with that?
3           MR. BLEVINS:  Objection, it's a legal
4   conclusion.
5   BY MR. CULLINAN:
6   Q.  Go ahead.
7   A.  Yes, it's what it says.
8   Q.  Have you seen produced in this case or even before the
9   lawsuit was filed any reports of surveys done in June
10  of 2019 by Randal Wilkie?
11  A.  I'm sorry, the question again, please?
12  Q.  Sure.  Have you either within this case or before the
13  case was even filed seen either of the two reports
14  prepared by Randal Wilkie, one in June of 2019 and one
15  I believe in July of 2019 regarding surveys he did of
16  the barge?
17  A.  I only recall one report from Wilkie.
18  Q.  And do you recall him generally finding that the barge
19  was unseaworthy?
20  A.  Well, that it was damaged.
21  Q.  Okay.  But at least as of the time whatever report you
22  saw it was his conclusion within the report that the
23  barge was unseaworthy?
24  A.  Well, the report that he did that I read at the end of
25  the report, if I recall, it's been two years since

Page 115

1   I've read this, I did not get the impression that he
2   felt the barge was unseaworthy.
3   Q.  Was it his conclusion, as you recall, if you recall,
4   that the barge needed to be repaired?
5   A.  Yes.
6   Q.  Based on what you recall of Mr. Wilkie's conclusions
7   and the report you reviewed, do you have an
8   understanding as to whether it would have been unsafe
9   for Calumet to operate the barge in open waters in
10  that condition?
11          MR. BLEVINS:  Object to the form of the
12  question.
13          THE WITNESS:  Do I have to answer?
14          MR. BLEVINS:  You can answer.
15          THE WITNESS:  I cannot give an opinion on
16  that because I've not seen the barge or the damage.
17  BY MR. CULLINAN:
18  Q.  But I'm just asking based on what you saw in the
19  report that you reviewed of Mr. Wilkie do you have an
20  understanding of whether if those findings were
21  accurate, whether it would have been unsafe for
22  Calumet to operate the barge in open waters in that
23  condition?
24  A.  No, I would not agree with that.
25  Q.  You think it would have been negligent for Calumet to

Page 116

1   operate the barge in the condition that Mr. Wilkie
2   found?
3   A.  I don't know Mr. Wilkie's qualifications.  I don't
4   know the circumstances of the survey and I have not
5   seen the barge.  I cannot express an opinion on
6   whether it would be negligent to operate the barge or
7   not.
8   Q.  Have you seen the report of the surveys of Bob Ojala
9   from September of 2019?
10  A.  Yes.
11  Q.  And he found the barge to be unseaworthy when he
12  inspected it in September 2019, correct?
13  A.  That was his conclusion.
14  Q.  And he had findings as to repairs that needed to be
15  made to the barge?
16  A.  I don't recall seeing any repair estimates.  There was
17  a repair estimate that I recall being done by Basic
18  Marine, it was not very credible.  Other than that I
19  didn't remember seeing anything about repairs or
20  repairs he recommended.
21  Q.  Did you see anything regarding findings that he made
22  as to the condition of the barge, deficiencies in the
23  barge at the time he surveyed it in September of 2019?
24  A.  I remember looking at his photographs and there were
25  some inconsistencies in his survey, so I really didn't

Page 117

1   give Ojala's survey a lot of credibility.
2   Q.  Based on the findings that were in that report would
3   you believe it had been unsafe for Calumet to operate
4   that barge in that condition in open water?
5   A.  I can't answer that for the same reason I could not
6   answer that question with Mr. Wilkie's.
7   Q.  Can you say as of now since Calumet took the barge on
8   June 1, 2019 you've not seen it; is that correct?
9   A.  That is correct.
10  Q.  Looking at this paragraph 2 on page 2 of the barge
11  charter agreement it says charterer warrants barge
12  shall be employed by charter only in suitable, safe,
13  lawful trade and operations and will not be navigated
14  or used in any improper or negligent manner for its
15  proposed service, correct?
16  A.  That's what it says, yes.
17  Q.  Was it your understanding that in taking possession of
18  the barge that Calumet could not operate it in an
19  unlawful manner?
20  A.  Yes.
21          MR. BLEVINS:  Objection to the form of the
22  question.
23          MR. CULLINAN:  Did you get the answer,
24  Kathryn?
25          COURT REPORTER:  I got yes.

Gregory Busch
August 24, 2021

Page 118

1   THE WITNESS:  Yes.
2   BY MR. CULLINAN:
3   Q.   Would it be unlawful to operate a barge with an
4        expired load line certification that had not been
5        renewed?
6   A.   Yes.
7   Q.   And the load line certification for this barge expired
8        on June 13, 2019, correct?
9   A.   Yes, but you can easily get a one-way load line
10       certificate.
11                  COURT REPORTER:  I'm sorry, you can easily
12       get what?
13  BY MR. CULLINAN:
14  Q.   And it expired on --
15                  COURT REPORTER:  I'm sorry, you can easily
16       get what?
17                  THE WITNESS:  A one-way load line
18       certificate.
19                  COURT REPORTER:  A one way?
20                  THE WITNESS:  Load line certificate.
21                  COURT REPORTER:  Load line certificate,
22       yes.
23  BY MR. CULLINAN:
24  Q.   Who would get that, the owner of the barge?
25  A.   No, the charterer in this case.

Page 119

1   Q.   Did you have to get that before the load line
2        certificate expires?
3   A.   No.
4   Q.   So it's your position that Calumet could have gotten
5        some sort of certificate that if it was in a seaworthy
6        condition would have allowed it to operate?
7   A.   No.  You can get those, and I've done it, with a
8        damaged vessel.
9   Q.   Was the load line certificate expired with that
10       damaged vessel?
11  A.   Yes.
12  Q.   So again, is it your position that Calumet after the
13       load line certificate expired on June 13, 2019 could
14       have obtained some certificate to operate the barge if
15       it was seaworthy?
16  A.   Yes, you can get it -- well, no, there's no
17       seaworthiness condition on that.  You can move a
18       damaged vessel that's not seaworthy under certain --
19       they put restrictions on.  They issue a one-way
20       certificate for the sole purpose of getting the barge
21       or vessel back to another location.
22  Q.   ABS or somebody would have to inspect the vessel to
23       make sure it's in okay shape to do that?
24  A.   Coast Guard sometimes they'll delegate to ABS.
25  Q.   Do you know if ABS looked at this barge in the summer

Page 120

1        of 2019 after -- after Calumet had left it in
2        Escanaba?
3   A.   I don't know if they did or not.
4   Q.   Aside from anyone at Calumet, have you spoken with
5        anyone who's seen the barge since June 7, 2019?
6   A.   No.
7   Q.   Paragraph 5(a) says owner shall cause an on-charter
8        hire condition survey to be conducted prior to
9        possession of the barge by owner and charterer at no
10       cost to owner and charterer.  What was your
11       understanding of an on-charter hire condition survey?
12  A.   Well, the charter view was provided to me by Calumet,
13       and that particular clause -- let me read it here
14       again.  It kind of didn't make sense when I read it
15       the first time.  The first sentence is kind of
16       ambiguous.
17                  MR. BLEVINS:  If you don't mind, give the
18       witness a chance to read the entire document.
19                  MR. CULLINAN:  Sure.  I didn't inject.
20                  MR. BLEVINS:  Yeah.  So if I can point him
21       to a particular phrase and I'd ask him to read, you
22       know, the entire -- at least the entirety of paragraph
23       5.
24                  MR. CULLINAN:  Sure.  Absolutely.  Take
25       your time.

Page 121

1                  THE WITNESS:  Okay.  What's the question
2        here?
3   BY MR. CULLINAN:
4   Q.   All right.  The first sentence in paragraph 5(a) says
5        the owner shall cause an on-charter hire condition
6        survey to be conducted prior to possession of the
7        barge by owner and charterer at no cost to owner and
8        charterer, okay?
9   A.   Right.  I found that ambiguous there, because
10       elsewhere in this contract it specifically states that
11       the charterer is to -- has a duty to inspect, and this
12       is somewhat in contradiction to that.
13  Q.   Okay.  That's way beyond anything I asked.  All I
14       asked is did I read that correctly?
15  A.   Well, yeah, you're reading words correctly.
16  Q.   Okay.  That's all I asked.  That's all I asked.  My
17       next question is do you know what an on-charter hire
18       condition survey is?
19  A.   Yes.
20  Q.   What is it?
21  A.   The general procedure is that you hire an independent
22       surveyor and they survey the barge, produce a report
23       and that's an on-charter survey.
24  Q.   Did you prior to Calumet taking possession of the
25       barge pursuant to this agreement have an on-charter

Gregory Busch
August 24, 2021

Page 122

1    hire condition survey performed?
2  A.  No.  I think we relied on the ABS survey.
3  Q.  The ABS survey is not an on-charter hire condition
4    survey, is it?
5  A.  It's a survey.
6  Q.  It's not an on-charter hire condition survey, is it?
7  A.  No.
8  Q.  Going down to page 7, paragraph 14, starting in the
9    middle of the paragraph it says further, owner
10   warrants that neither owner nor any assignee of
11   owner's rights hereunder will do or permit anything to
12   disturb charterer's full right of possession and
13   peaceful enjoyment thereof, and that owner has
14   exercised due diligence and prudence to ensure that
15   the vessel is seaworthy at the time of delivery.  Did
16   I read that correctly?
17 A.  Yes.
18 Q.  Did you do anything in terms of exercising due
19   diligence and prudence to ensure that the vessel was
20   seaworthy at the time of delivery?
21 A.  Yes.
22 Q.  What did you do specifically?
23 A.  ABS survey.
24 Q.  The ABS survey from almost 12 months before?
25 A.  That's correct.  Barge did not move from the dock

Page 123

1    during that time period.
2  Q.  Okay.  You had not done -- had that survey done in
3    2018 as part of your exercising due diligence and
4    prudence in furtherance of this agreement that wasn't
5    entered into until months later, did you?
6  A.  Well, we also did (inaudible), did some minor
7    maintenance --
8        COURT REPORTER:  I'm sorry, sir, I'm not
9    understanding you.  You also did what?
10       THE WITNESS:  (Inaudible).  Yeah, we'd also
11   replaced some gauge cover gaskets and general
12   maintenance on the barge in that time period.
13 BY MR. CULLINAN:
14 Q.  Did you do anything with the tanks in the barge or
15   anything with regard to the bottom hull plating?
16 A.  Not on the bottom hull plating.  I think we welded
17   some welds on some of the framing.
18 Q.  Within the tanks?
19 A.  Yes.
20 Q.  Where specifically did you do that work?
21 A.  I know there was some longitudinal deck brace under
22   the deck and number 2 compartment.  I think there was
23   a weld on the diagonal truss frame in the number 1
24   compartment, and I think there were a few scattered
25   out through the vessel.

Page 124

1  Q.  Paragraph 16 talks about any controversy or claims
2    arising out of or relating to this contract or the
3    breech thereof shall be governed by the general
4    maritime laws of the United States insofar as
5    applicable, otherwise by the laws of the State of
6    Florida, correct?
7  A.  That's what it says.
8  Q.  Okay.  That's what you agreed to, correct?
9  A.  Yes.
10 Q.  Doesn't provide for any laws in the State of Michigan
11   to apply, does it?
12 A.  It doesn't read that way, no.
13 Q.  Was it your understanding that any change in the
14   condition of the barge that was caused by the ordinary
15   use of the barge was something that Calumet would not
16   be responsible for?
17       MR. BLEVINS:  Objection to legal
18   conclusion.  Document speaks for itself.
19 BY MR. CULLINAN:
20 Q.  Go ahead.
21 A.  My understanding is the agreement is that Calumet had
22   a duty to inspect prior to accepting the barge, and
23   they were responsible for any damage during their
24   possession of the barge, and they also had obligation
25   to return it, which they didn't do, if the sale was

Page 125

1    not completed.
2  Q.  Did you have an understanding that there was an
3    exception to their responsibility for any damage that
4    was caused by wear and tear through the ordinary use
5    of the barge?
6  A.  No.
7        MR. BLEVINS:  Same objection.
8        THE WITNESS:  No.  Wear and tear is
9    generally in barges, you know, minor.
10 BY MR. CULLINAN:
11 Q.  Would you agree with me that the things you can use --
12   well, strike that.  Is the -- well, strike that.  I'll
13   get back to it.  I'm sorry.
14       Did you eventually make delivery of the
15   barge to Calumet?
16 A.  They picked it up at my dock.
17 Q.  And that happened on about June 1st of 2019?
18 A.  Yes.
19 Q.  You actually delivered it to them, didn't it -- didn't
20   you?
21 A.  I moved it about 200 feet and nailed the side up.
22 Q.  And how did you do that?
23 A.  With a (inaudible).
24       COURT REPORTER:  I'm sorry, with a what?
25 BY MR. CULLINAN:

Gregory Busch
August 24, 2021

Page 126

1  Q.  With what?

2  A.  With the Edwin C. Busch tug.

3  Q.  And was that because the Calumet tug couldn't get into
4      the dock because of the shallowness of the water in
5      the area?

6  A.  That is correct.  There's about 6 feet of water in
7      that canal.

8  Q.  Okay.  Did anyone assist you in moving it, moving this
9      barge out to Calumet's tug?

10 A.  I think I had a laborer from the machine shop just tie
11     me off.

12 Q.  Was Terry on the barge -- I'm sorry, on the tug with
13     you?

14 A.  Yes.  He had driven it and he got on the barge and we
15     moved it out.

16 Q.  Did you have any difficulty moving the barge out to
17     Calumet's tug?

18 A.  A little bit.  I had to tug between the shoreline and
19     the barge, and the tug is only 42 feet long, and I had
20     a little difficulty steering trying to get out the
21     canal.

22 Q.  While you were trying to move it out was the barge
23     banging against the shore in the bay?

24 A.  No, no, because the tug was between the barge and the
25     shoreline.

Page 127

1  Q.  When you first removed the barge from the shoreline to
2      make the delivery was part of the barge, and
3      specifically the stern, up on the bank?

4  A.  No.

5  Q.  Had it been like in that condition with the stern up
6      on the bank at any time say in the six months prior to
7      delivery of the barge?

8  A.  No.  We had it tied up there all -- the bow rake was
9      obviously up against the shoreline to facilitate
10     getting on and off the barge.

11 Q.  Was anyone serving as a lookout for you when you moved
12     the barge?

13 A.  It really wasn't necessary.  My assistant from the
14     machine shop I believe was on the barge and we got our
15     lines on, and he'd help radio if I needed someone to
16     look out, he could have.

17 Q.  What's that's person's name?

18 A.  Corey -- shoot, it's been a couple years here.  I
19     can't think of his last name offhand.  We can get it
20     to you.

21 Q.  Does he still work for you?

22 A.  No.

23 Q.  Did you have any communication with anyone on the
24     Calumet tug that was taking delivery of the barge?

25 A.  Yeah.  The captain there called and told me who he was

Page 128

1      and then they were trying to face off, and they
2      couldn't get their cables on properly, so I had to
3      tell them, you know, how to hook their cables up to
4      their base wires.

5  Q.  Did you know the captain of the tug?

6  A.  Very vaguely.  I used to operate a lot of the guys
7      that they do and I probably talked to him on a radio
8      different times.

9  Q.  Did you know anybody else who was working on the tug?

10 A.  Well, the only -- the kid that was in the pilot house,
11     his name was Chad, and Terry was on the barge when
12     they were trying to hook up, and I think it was one or
13     two deck hands that came out and I didn't recognize
14     them at all.

15 Q.  Once you -- once they got it faced up to the tug did
16     they leave with the barge?

17 A.  Yes.

18 Q.  Since they left with the barge have you seen it again?

19 A.  Yeah, I was dredging at the mouth of the river and
20     after they left I drove out to their dredge site and
21     administration and I saw it go by.

22 Q.  That would have been how long after delivery?

23 A.  About two hours, two and-a-half hours.

24 Q.  And how long were you able to continue seeing them?

25 A.  Until probably about three hours from that point.

Page 129

1  Q.  Was there any problem in terms of the way they were
2      operating the boat as far as you could tell or moving
3      the barge?

4  A.  Not at that point.  I was a little surprised that they
5      had trouble facing off because that's something that
6      river tug boaters should be very expert at.

7  Q.  But in terms of the operation when you saw it going
8      by, was there any problem or was there any
9      difficulties they appeared to be having?

10 A.  No, they were going at a pretty high rate of speed for
11     the river.

12 Q.  How fast were they going?

13 A.  I don't know.  My estimation just looking at it I'd
14     say probably 7 or 8 knots, and where I was the mouth
15     of the river looked like they increased their speed
16     when they made a corner on the interest channel.

17 Q.  And they were doing dredging at the time?

18 A.  Yes.

19 Q.  Did you continuously watch them for two to three
20     hours?

21 A.  Well, no, I watched -- your original question was how
22     long had they picked it up did I see them go by.  It
23     was about two and-a-half, three hours after I left my
24     dock that they passed my dredge site and they were out
25     of sight within a half hour of the dredge site.

Gregory Busch
August 24, 2021

Page 130

1  Q.  Is it during that half hour that you think you saw
2      them going too fast?
3  A.  Well, for the end of the river they were.
4  Q.  And how long did the end of the river continue for
5      before open water?
6  A.  For the stretch that I could see was about two miles
7      long, two, three miles.
8  Q.  And what happens at the end of that two miles?
9  A.  It all comes up into Saginaw Bay, making about a
10     35 degree turn to the right, and then not long after
11     that you go out of sight from where we were.
12 Q.  Once they got to the mouth of the river at that point
13     could you still see them?
14 A.  No.  As I answered previously, it was for a short time
15     as they made that corner.
16 Q.  Okay.  Once they made the corner after that could you
17     see them?
18 A.  No.
19 Q.  After they made that corner have you since then seen
20     the barge?
21 A.  No, that was the last time I saw it.
22 Q.  And after they made that corner did you see any of
23     Calumet's operation or handling of the barge?
24 A.  I watched on AIS.
25         COURT REPORTER:  I'm sorry, can you repeat

Page 131

1      that, sir?
2          THE WITNESS:  What part do you need?
3          COURT REPORTER:  The whole answer.  When
4      you lean back like that your voice gets really
5      muddled.  I couldn't understand what you said.
6          THE WITNESS:  I said I watched them on AIS,
7      which is -- the answer is -- the question after that
8      is automatic identification system and it's on a
9      website.
10 BY MR. CULLINAN:
11 Q.  Can you describe in more detail how that works and
12     what it is?
13 A.  Yeah, commercial vessels required to have an AIS
14     transmitter receiver and it sends out the name of the
15     vessel and its -- excuse me, IMO number, its speed,
16     its course.  They're supposed to be destination on
17     there and the dimensions for the vessel and so on.
18 Q.  And for what period of time specifically did you pay
19     attention to that with regard to Calumet's operation
20     of this?
21 A.  I watched it periodically all the way up to when they
22     drive to the loop (phonetic).
23 Q.  And I need to know as specific as you can tell me when
24     you say periodically what days, for how long, what
25     time period.

Page 132

1  A.  It was two years ago.  I don't know when that was.
2  Q.  And you cannot recall any of the information that you
3      observed on this automatic identification system?
4  A.  Well, I was kind of surprised they were traveling at
5      over 9 knots and their speed never changed and went in
6      open water, and the last words that Terry Hoeckendorff
7      had told me was that he said that I'm worried that
8      we're going to get caught in bad weather, and so that
9      kind of -- my antenna up, and that's why I was
10     watching the AIS, because the prudent thing to do
11     would be to slow down if they encountered bad weather.
12 Q.  Do you have any information that they in fact
13     encountered bad weather?
14 A.  What's that?
15 Q.  Do you have any information that they in fact
16     encountered bad weather at any time with the barge?
17 A.  Well, yeah, it got real windy where we were, and on
18     the morning of June 4th Terry Hoeckendorff called me
19     up and said that they encountered 6- to 7-foot waves.
20 Q.  When you say where you were, they weren't where you
21     were, correct?
22 A.  That's correct.
23 Q.  Is the only information you have with regard to
24     Calumet vessel and the barge encountering bad weather
25     your claim that Terry Hoeckendorff said they

Page 133

1      encountered 6- to 7-foot waves?
2  A.  No.  I also looked at the weather reports and there
3      was one report, you know, to the north end of the
4      lake.
5  Q.  What specifically did you look at?
6  A.  I don't remember.  There is -- I use anywhere four or
7      five different sites.  So it went Finders One, there's
8      Gullet Lake Forecasts.
9  Q.  I need to know which ones you actually looked at.
10 A.  I don't remember.
11 Q.  And can you tell me specifically what they said?
12 A.  I don't remember that either, just 20 to 25 knot winds
13     I believe and that's about what we had where we were.
14 Q.  And where was that?
15 A.  That was Bay City.  So I assume that was pretty much
16     widespread over the lake.
17 Q.  Sometimes is the wind not widespread over the lake?
18 A.  Oh, frequently, yes.
19 Q.  Have you ever spoken with anyone, Ted or anyone else
20     who was a crew member of the Calumet tug, that was
21     moving the barge?
22 A.  No.
23 Q.  Do you have -- did you retain any documentation
24     regarding any weather reports or any sea conditions or
25     anything else that the Calumet barge was traveling in

Gregory Busch
August 24, 2021

Page 134

1      at the time it had the barge?
2   A. No.
3   Q. And as far as the 7-foot waves as high as 7 feet, the
4      only place that's coming from is your claiming Terry
5      Hoeckendorff told you that they encountered that on
6      June 4th?
7   A. Well, it's not a claim, that's what he told me.
8   Q. Was there any other time that Terry or anyone else
9      told you they were encountering waves of any
10     particular height?
11  A. No.  Well, when he said he had moved the barge from
12     Duluth to Escanaba he said it was calm all the way.
13     That's the only other instance.
14  Q. Do you have any knowledge whether Calumet ever loaded
15     the barge?
16  A. No.  I have no idea what they did up there.
17  Q. I asked that poorly.  Do you know one way or another
18     if Calumet ever loaded anything on the barge?
19  A. No, I don't have that knowledge.
20  Q. At some point Calumet informed you that there was some
21     sort of damage to the barge.
22  A. In the same phone call he told me the waves were 6 to
23     7 feet.
24  Q. What do you know about the nature and extent of any
25     damage that occurred to the barge at that time?

Page 135

1   A. His exact words were -- I think he said there was
2      water in five compartments.  The barge is crap.  And
3      he said he'd get back to me, which he never did.
4   Q. As you sit here now do you have anymore information
5      about any damage to the barge?
6   A. Just in the reports that I saw and have been furnished
7      with.
8   Q. And what reports would those be?
9   A. The ones you just went through.
10  Q. The Ojala one and the Wilkie one?
11  A. Right.
12  Q. I put up a copy of the complaint in this case.  Have
13     you seen that?
14  A. Yes.
15  Q. Let me downsize it.  All right.  I want to ask you
16     about a few items in the complaint.  Let's go all the
17     way down to paragraph 78 under the negligence count
18     against Calumet River Fleeting.  Do you see that?
19  A. Line 78?
20  Q. Yes.
21  A. Yes.
22  Q. CRF, meaning Calumet, had a duty to maintain and
23     operate the barge with care that was commensurate with
24     the barge's condition and abilities.  Do you see that?
25  A. Yes.

Page 136

1   Q. With regard to the allegation about the barge's
2      condition and abilities, what is that referring to?
3   A. Well, that's, you know, true of any marine vessel, or
4      actually any piece of machinery for that matter, that
5      it needs to be operated in a prudent and common sense
6      manner.
7   Q. Is there something in particular about the STC2004
8      that required it to be operated and maintained
9      differently than any other barge?
10  A. Well, that's, you know, a somewhat difficult question
11     to answer because all vessels are different.  Vessels
12     are designed for different purposes and you can't just
13     make a generalization that is this barge different
14     than all other barges.
15  Q. Are there different standards that apply to barges
16     based on how old they are or what kind of condition
17     they're in?
18  A. I would agree with that statement, yes.
19  Q. And you say down in -- you mentioned a number of other
20     duties that we'll get to, but in paragraph 82 it
21     alleges that Calumet failed in each of the above
22     duties.  What is your basis for saying that Calumet
23     failed to maintain and operate the barge with care and
24     commensurate with the barge's conditions and
25     abilities?

Page 137

1   A. Well, my first response is they towed it too fast in
2      weather conditions, and on 79, I'm reading on here --
3   Q. I'll get to those in a minute, but I'm still on 78.
4   A. All right.
5   Q. Anything else other than towing it too fast and the
6      weather and conditions?
7   A. Well, I really can't answer that because I don't know
8      what they did with the barge.  I don't know that they
9      did run aground somewhere between Bay City and Duluth
10     for that matter.
11  Q. Okay.
12  A. And I saw it leave and a got a phone call three days
13     later, so that's the extent of my knowledge.
14  Q. And that's exactly what I'm trying to find out, the
15     extent of your knowledge.  So as you sit here now the
16     only information that you have about Calumet failing
17     to maintain and operate the barge with care
18     commensurate with the barge's conditions and abilities
19     is your having felt they towed it too fast for the
20     weather and conditions, correct?
21  A. That, and the obvious conclusion that the barge was
22     damaged and so obviously something happened, and
23     that's a violation of the care and maintenance.
24  Q. And you don't have any knowledge regarding the nature
25     and extent of the damage to the barge, right?

Gregory Busch
August 24, 2021

Page 138

1   A.   Just from what I reviewed in the two reports.  I was
2        not allowed to go see the barge.
3   Q.   Okay.  And those two reports talked about the damage
4        to the barge being the result of age and deterioration
5        over time, correct?
6   A.   I would disagree with that, because I saw there were
7        parts to that barge that are new, like any other
8        vessel, and so it's not just strictly a matter of age.
9        It's not like a car that you buy and you drive it for
10       ten years and it falls apart and nothing was ever
11       replaced on it.  This barge had a lot of numerous
12       replacements and repairs and maintenance through the
13       years to maintain it in ABS condition.
14  Q.   And I understand you may disagree with Mr. Ojala
15       and/or Mr. Wilkie, but I'm just saying it's their
16       conclusion that the damage to the barge was based on
17       age and deterioration over time and further normal use
18       of the barge in ordinary circumstances; is that
19       accurate?
20  A.   No, I would disagree with that.  I mean, I'm not
21       disagreeing that Wilkie and Ojala made those
22       conclusions, I'm not agreeing with their conclusions.
23  Q.   Right, but their conclusions are that they've got this
24       damage to the barge as a result of the age and
25       deterioration and that's the only information you have

Page 139

1        with regard to any damage, correct?
2   A.   Well, we expect to get more information here shortly.
3   Q.   But as of now as you sit here that's all you have,
4        right?
5   A.   That is correct.
6   Q.   All right.  Paragraph 79 says Calumet had a duty to
7        inspect the barge and be familiar with the barge's
8        suitability for Calumet's intended use, correct?
9   A.   Yes, that's correct.
10  Q.   What was the barge's suitability for Calumet's
11       intended use?  What was it Calumet was supposed to be
12       familiar with?
13  A.   Well, number one, a towing operation that hooks onto a
14       tow has a duty to inspect the vessel and determine
15       that it's seaworthy, that it's suitable for what
16       they're going to do.  Calumet did not share with me
17       what their plans were, what their intentions were.  I
18       didn't go up there and view this barge in the Calumet
19       River, which is where most of their business is, for
20       example, and so, you know, it was -- the contract's
21       very clear, both the sales agreement, that there was
22       no warranty made on my part, and they had ample
23       opportunity to inspect the barge, and I -- they had
24       essentially unlimited time and ability to inspect the
25       barge and they failed to do that.

Page 140

1   Q.   Well, you do say in paragraph 82 that Calumet failed
2        in each of the above duties, meaning that you were
3        alleging Calumet failed in its duty to inspect the
4        barge and be familiar with its suitability for
5        Calumet's intended use.  If you are able to say they
6        breached that duty I need to know what duty you're
7        talking about.
8   A.   Well, they failed to inspect.
9   Q.   You know nothing about the barge's suitability in
10       terms of what Calumet was intended to use it for
11       though because you don't know what Calumet was
12       intending to use it for, correct?
13  A.   That is correct.
14  Q.   Paragraph 81 you say Calumet had a duty to load the
15       barge properly so the barge could be operated safely
16       in the conditions that Calumet was exposing it in; is
17       that correct?
18  A.   Yes, that's what it says.
19  Q.   You say Calumet failed in that duty as well, correct?
20  A.   That's what it says.
21  Q.   And you, however, do not know what, if anything,
22       Calumet loaded onto the barge, correct?
23  A.   That's correct.
24  Q.   Specifically you don't know that Calumet loaded
25       anything on the barge, right?

Page 141

1   A.   That's correct.
2   Q.   And as far as paragraph 80 is concerned you say
3        Calumet had a duty to pilot the barge only at a rate
4        of speed suitable for the barge's condition and the
5        conditions of the weather and sea, correct?
6   A.   Yes.
7   Q.   And the only information that you actually observed
8        yourself about the piloting of the boat was within the
9        river while you were dredging, correct?
10  A.   No, it was other areas actually.
11  Q.   But the only observation you made of the vessel being
12       operated, actually operating, actually seeing the
13       vessel, was in the river, right?
14  A.   That is correct.
15  Q.   Bear with me, I'm getting through here.  I'm putting
16       up a document that is entitled Busch Marine, Inc. and
17       Gregory J. Busch responses to Defendants'
18       interrogatories.  Do you see that document?
19  A.   Yes.
20  Q.   All right.  Have you seen this document before?  Let
21       me shrink it down for you.
22  A.   I haven't seen enough of it to know if I have or not.
23  Q.   This is a document where we ask a number of questions
24       and ask you to provide answers to the questions.  Do
25       you know whether you've seen it before?

Gregory Busch
August 24, 2021

Page 142

1  A.  Probably a rough draft of it.
2  Q.  I notice it's not signed.  Do you know enough about
3      this document to know whether these answers are
4      truthful and correct?
5  A.  I'm going to have to say no.
6           MR. BLEVINS:  It's just a few pages.  We'd
7      be happy to go through the documents and --
8           THE WITNESS:  Yeah, I can verify my answer,
9      yes, with specific ones there.
10 BY MR. CULLINAN:
11 Q.  All right.  You want to make maybe five minutes and
12     read it?  I'm going to make it just a little smaller.
13     Tell me, is that too small to read?
14 A.  No, it's just a touch --
15          MR. BLEVINS:  You know, we can put it up on
16     our screen as well.  This one we can get.
17 BY MR. CULLINAN:
18 Q.  Okay.  Tell me if you need me to scroll down.
19 A.  Yeah, we're good.  What's your question?
20 Q.  Well, there's a ways to go if you want to continue
21     reading with.
22 A.  Let me look at it on a different screen here, so --
23 Q.  Oh, okay.
24          (Off the record at 4:57 p.m.)
25          (Back on the record at 4:58 p.m.)

Page 143

1  BY MR. CULLINAN:
2  Q.  All right.  Is it -- first of all, with regard to the
3      interrogatory answers of you and Busch Marine --
4           (Off the record due to technical difficulty
5           at 4:58 p.m.)
6           (Back on the record at 5:01 p.m.)
7  BY MR. CULLINAN:
8  Q.  All right.  You've had an opportunity to read through
9      the pleading that we were served with that is titled
10     Busch Marine, Inc. and Gregory J. Busch responses to
11     Defendants' interrogatories?
12 A.  Yes.
13 Q.  Although it's not signed by you, you certify under
14     penalty of perjury that the above answers and all of
15     the answers contained therein are true and correct to
16     the best of your knowledge, information and belief?
17 A.  Yes, with the proviso that some of these questions and
18     answers refer to documents that were provided, and I
19     don't know what's in those documents offhand.
20 Q.  Okay.  Answer -- the question in interrogatory number
21     4 asked to identify all persons who have knowledge of
22     the condition of the barge, including the condition of
23     the hull thickness of the barge at any time while
24     basically you owned the barge, and you indicated that
25     those persons would include yourself, representatives

Page 144

1      of Calumet, representatives of Great American and
2      representatives of American Bureau of Shipping,
3      correct?
4  A.  Yes, that's correct, with the condition that's over a
5      huge time span.
6  Q.  Right.  And with regard to the members of the American
7      Bureau of Shipping, who would have knowledge about the
8      condition of the barge?  Would that be anyone who was
9      involved in doing any surveys of the barge?
10 A.  That is correct, and then there's people that reviewed
11     that that I've never met, don't know, and supervisors
12     and so on.
13 Q.  How about representatives of Calumet?  Are you aware
14     of by name anyone other than Terry Hoeckendorff and
15     possible Ted, the pilot?
16 A.  No, I'm not aware of anybody at CRF.
17 Q.  In answer to interrogatory number 5 there's an
18     objection made.  The interrogatory asks for
19     information regarding the condition of the barge prior
20     to entry of the proposed purchase agreement in the
21     complaint, and within the answer after the objection
22     you state the barge was seaworthy for its intended
23     use, correct?
24 A.  Yes, except intended use by whom and when and what was
25     the intended use.

Page 145

1  Q.  Well, that's my question.  This is your answer and
2      your referring to the barge's intended use.  What are
3      you talking about there?
4  A.  I didn't write that response personally, so I guess I
5      don't know.
6  Q.  Did you ever review these responses before today?
7  A.  No, I didn't.
8  Q.  Did you review any version before today?
9  A.  Draft copy.
10 Q.  Did you make changes to the draft copy?
11 A.  Some, yes.
12 Q.  And again, where you say the barge was seaworthy for
13     its intended use you're relying on the fact that -- of
14     the 2018 load line extension survey?
15 A.  Yes.
16 Q.  In answer to interrogatory number 5 still you say you
17     used the barge many times over the course of your
18     ownership and you never experienced failure reported
19     by CRF, correct?
20 A.  That's correct.
21 Q.  What is the failure reported by CRF?
22 A.  Well, the damage that they are alleging that it's not
23     seaworthy, not seaworthy.
24 Q.  And other than what's in the Ojala and Wilkie reports
25     you don't have any knowledge regarding that damage,

Page 146

1    correct?
2  A.  That's correct.
3  Q.  In answer number 12 it asks for you to identify all
4      occasions on which you or somebody else submitted
5      marine surveys pertaining to the barge to ABS. You
6      answer: ABS performed marine surveys pertaining to
7      the barge every year, correct?
8  A.  That's correct.
9  Q.  And while that's true, they do different kinds of
10     surveys over the course of each year, correct?
11 A.  I'm sorry, restate that, please?
12 Q.  Yeah, the surveys that are performed every year are
13     not the same, are they?
14 A.  They follow the same format, but if it's a different
15     surveyor each surveyor does it slightly differently.
16 Q.  Right. And even the surveyors themselves may exercise
17     different discretions from year to year, correct?
18 A.  That's correct yes.
19 Q.  And also the five-year surveys are entirely different
20     from the annual survey and the extension survey,
21     correct?
22 A.  That's correct.
23 Q.  And annual surveys as we discussed I think at length
24     earlier do not involve dry-dock inspections, correct?
25 A.  That's correct.

Page 147

1  Q.  And they do not involve taking audio gauge readings of
2      the thickness of the hull, correct?
3  A.  That is correct.
4  Q.  And there's no inspection of the underside plating of
5      the hull during the annual survey, correct?
6  A.  Yes.
7  Q.  Interrogatory number 15 asks you to identify with
8      specificity what you did to comply with the conditions
9      of the proposed contract for the sale of the barge,
10     and after an objection is asserted it says: In order
11     to comply with the conditions of the proposed contract
12     for the sale of the barge by Busch to Calumet, you
13     gathered and participated in the preparation of
14     sale-related documents, obtained a probate release of
15     the lien held by Ed Busch and Ruth Busch, and
16     cooperated with the broker, Sun Machinery, and CRF in
17     the submission of documentation to the Coast Guard,
18     correct?
19 A.  Yes.
20 Q.  So you understood that you were attempting to comply
21     with conditions of the contract when you were doing
22     those things such as trying to obtain a release of the
23     lien held by your -- the mortgage that had been taken
24     by your parents, correct?
25         MR. BLEVINS: Objection to any legal

Page 148

1      conclusion.
2         MR. CULLINAN: Well, it's his answer.
3  BY MR. CULLINAN:
4  Q.  Is that correct?
5  A.  Yes.
6  Q.  And also in order to comply with the conditions you
7      understood that certain documents had to be submitted
8      to the Coast Guard, correct?
9  A.  Yes.
10        MR. BLEVINS: Same objection and
11     we're readmitting (inaudible) --
12        COURT REPORTER: Sorry, can't hear that,
13     Mr. Blevins.
14        MR. BLEVINS: I'm sorry, the same
15     objection, and we are restating the objection
16     expressed in a response to that interrogatory.
17        COURT REPORTER: Thank you.
18        MR. BLEVINS: Thank you.
19 BY MR. CULLINAN:
20 Q.  Did you ever see any audio gauge measurements or gauge
21     measurements taken by Diversified Naval Architects in
22     July of 2019 with regards to the barge?
23 A.  Yeah, I did some audio gauges. I'm not sure who they
24     came from or who took them.
25 Q.  Can you see -- let me first shrink it -- the document

Page 149

1      entitled thickness measurement report that I put up?
2  A.  I don't recognize that, but go ahead.
3  Q.  You do see it on the screen though?
4  A.  We see it, yeah.
5  Q.  Right. And just for the record it's CRF 24 through
6      CRF 44, okay? And I'm going to go back to the top of
7      it, I'm going to try to, and it says name of company
8      performing thickness measurements, Diversified Naval
9      Architects, Inc., okay? And on this first page it has
10     a date of July 15, 2019 being the day of the first and
11     the last measurement. Do you see that?
12 A.  Yes.
13 Q.  Do you know -- and I'll scroll down slowly and stop me
14     if you need me to. Do you know if you were ever
15     provided with these measurements?
16 A.  I don't recognize them, no.
17 Q.  As you sit here today do you have any basis to contend
18     that these measurements are in any way wrong?
19 A.  Well, yeah, to answer your question, yes.
20 Q.  What is your basis for saying they're wrong?
21        MR. BLEVINS: Let me object to this line of
22     questioning. It's a very detailed document,
23     several -- numerous pages. He said he hasn't any
24     memory of seeing them before today, so he's going to
25     have to express opinions -- whether he agrees or

Gregory Busch
August 24, 2021

```
                                                   Page 150
1    disagrees with these documents, he's going to have to
2    have time to actually review them.
3             MR. CULLINAN:  Well, that's why I was a
4    little surprised when he said he disagrees with them,
5    because he hasn't even seen the document.  I'm just
6    trying to find out if as you sit here -- sits here
7    right now does he have any information from any source
8    that any of the information in here is wrong?  And if
9    he hasn't seen it, I can't believe he doesn't, but
10   I'll need him to say that.
11            MR. BLEVINS:  Can you verify these
12   documents were produced to us?
13            MR. CULLINAN:  Yeah, they were produced
14   with our initial disclosures at the beginning of the
15   case.
16            MR. BLEVINS:  Okay.  Thank you.
17            MR. CULLINAN:  CRF 24 through 44.
18            MR. BLEVINS:  Okay.
19   BY MR. CULLINAN:
20   Q.   So again, do you have any information as you sit here
21        today that any of the information in this report is
22        incorrect or inaccurate?
23   A.   I can't verify these.
24   Q.   We are almost done.  Bear with me just one little bit
25        more.  I'm putting up on the screen -- first of all,
```

```
                                                   Page 151
1    can you see it, the first one up here, the e-mail?  Do
2    you see it?
3    A.   Yes.
4    Q.   Just for the record, this is a number of different
5         e-mails that were produced by Calumet in the case as
6         CRF 231 through CRF 240, okay?  Here's the last page.
7         There's 240.  And the fist page, page 231, has two
8         e-mails on it, one dated June 7, 2019 from Terry
9         Hoeckendorff to you with Sun Machinery copied, and it
10        says in the beginning I regret to inform you Calumet
11        River Fleeting, Inc. will not be purchasing barge
12        STC2004 due to the lapse in the closing date of
13        June 7, 2019 to finalize the sale per closing date
14        extension addendum.  Do you see that?
15   A.   Yes.
16   Q.   Did you receive that e-mail correspondence from Mr.
17        Hoeckendorff?
18   A.   Yes.
19   Q.   And then in response to it did you then write, Terry,
20        when do you plan to return my barge, capitalized my,
21        to the Busch Marine document (sic) in Carrolton,
22        Michigan and where is it currently located?
23   A.   Yes, that's what it says.
24   Q.   Okay.  And that was in response to Mr. Hoeckendorff's
25        e-mail, correct?
```

```
                                                   Page 152
1    A.   Yes.
2    Q.   Okay.  And without the time difference, Mr.
3         Hoeckendorff, Calumet being here in decuble (phonetic)
4         discoval (phonetic) area would be on Central time and
5         you would be on Eastern time, right?
6    A.   Yes.
7    Q.   So at least as of that time you understood that the
8         barge was yours and was not Calumet's at the close of
9         business on June 7, 2019, correct?
10            MR. BLEVINS:  Objection to the legal
11   conclusion.
12   BY MR. CULLINAN:
13   Q.   Correct?
14   A.   No.  My view was the barge was not being paid for,
15        and until it was paid for it was still my barge --
16   Q.   Okay.  Right.  So --
17   A.   -- you know, yeah.
18   Q.   That was my question.  Was it your understanding at
19        this time that that barge was yours?
20            MR. BLEVINS:  Objection to any legal
21   conclusion.
22            COURT REPORTER:  I'm sorry, objection to
23   what?
24            MR. BLEVINS:  To any legal conclusion.
25   BY MR. CULLINAN:
```

```
                                                   Page 153
1    Q.   Go ahead.
2    A.   Yeah, not intended as a statement that the barge was
3         mine.  It was a reference to the fact that basically
4         they hadn't paid for it or were intending not to pay
5         for it.
6    Q.   Was it your understanding when you wrote this e-mail
7         that the barge was yours?
8             MR. BLEVINS:  Same objection.
9    A.   No, and for the sample fact that I was informed by the
10        Coast Guard and the Haynes International that the only
11        way the barge would be returned to me would be a bill
12        of sale would have to be agreed on.  I would have to
13        agree to sign it, CRF would have to sign it.  It would
14        have to be submitted to the Coast Guard, and that was
15        the only condition that the barge would return to my
16        ownership.
17   BY MR. CULLINAN:
18   Q.   Yet in spite of everything you just said you referred
19        to it as my barge, correct?
20   A.   I think we're parsing words here in a big way.
21   Q.   I'm not parsing words, I'm reading what you wrote.
22        You wrote --
23   A.   Yes, you are.
24   Q.   -- and called it my barge, correct?
25            MR. BLEVINS:  Objection, the document
```

Gregory Busch
August 24, 2021

Page 154

1    speaks for itself.
2    BY MR. CULLINAN:
3    Q.   Is that correct?
4    A.   No.
5    Q.   It's not?  This document does not say my barge?  Are
6         you -- where are you reading that?  Tell me where it
7         doesn't say that.
8              MR. BLEVINS:  Objection to the form of the
9    question.
10   BY MR. CULLINAN:
11   Q.   In the first line of the e-mail that you wrote after
12        the close of business on June 7th you refer to it as
13        my barge, correct?
14   A.   That is what it says.
15   Q.   That's all I'm asking you.
16   A.   That's not what I meant.
17   Q.   Okay.  Well, that's a different story.  And on June 8,
18        2019 Mr. Hoeckendorff wrote you and requested the
19        return of the $50,000 deposit, correct?
20   A.   I don't remember getting that letter, but that's what
21        it says.
22   Q.   CRF 232?
23   A.   Yes.  It's kind of flipping up and down when you were
24        moving it.
25   Q.   Just doing it to get the number there.

Page 155

1    A.   Yes.  What's the question?
2    Q.   He wrote to you requesting the -- well, strike that.
3              As of the e-mail that he sent to you on
4         June 7th at the close of business he requested
5         directly of you the return of the down payment of
6         $50,000, correct?
7    A.   That's what the letter says.
8    Q.   And just so we're clear, I think I asked you this but
9         I just need to tie up the loose ends, separately there
10        was a payment of $25,000 by Calumet to you of the --
11        for the barge charter?
12   A.   That's correct.
13   Q.   And that was I think maybe (inaudible) --
14             COURT REPORTER:  I'm sorry, I can't hear
15        you, sir.  You're turned away.
16   BY MR. CULLINAN:
17   Q.   That was the check that you cashed upon receipt of it?
18   A.   Yes.
19   Q.   Very quickly, I have a couple more pages.  Do you
20        initially see an e-mail at the top of the first page
21        from Leo Evans to Terry Hoeckendorff?
22   A.   Yes.
23   Q.   Okay.  This is just a couple of e-mails on three pages
24        previously produced as CRF 266 through CRF 268.  Okay.
25        Do you recall around June 12th Terry Hoeckendorff

Page 156

1    advising you that Basic Marine in Escanaba would have
2    available dry-dock opening on June 27th?
3    A.   Yes, I remember.
4    Q.   All right.  And upon receipt of that e-mail, or some
5         time shortly after, but on June 12, 2019 you wrote to
6         Leo Evans and said please be advised you are not
7         authorized to do any work on barge STC2004 without my
8         written authorization, correct?
9    A.   That is correct.
10   Q.   And Leo Evans is at North Shore Marine Terminal where
11        Terry had referred to potentially there being work --
12        or a dry-dock space available later on?
13   A.   What's the question there?
14   Q.   That was in response to Terry advising you of Basic
15        Marine having a dry-dock opening later in the month?
16   A.   Not -- not really the dry docking.  I didn't want CRF
17        running up a big bill and, you know, trying to collect
18        from me at some point.
19   Q.   Is Leo Evans who you wrote to, is he at Basic Marine
20        or North Shore Marine Terminal?
21   A.   It's the same company.  They have two names for the
22        same company.
23   Q.   Okay.  Perfect.  That's what I thought.  But you
24        advised Basic Marine slash North Shore Marine Terminal
25        not to do any work on the barge, right, as of

Page 157

1    June 12th?
2              MR. BLEVINS:  Well, that misrepresents the
3    document.
4              MR. CULLINAN:  Oh, my God.  It's one
5    sentence.  It says --
6              MR. BLEVINS:  Without my written
7    permission, written authorization.
8    BY MR. CULLINAN:
9    Q.   Okay.  You're right.  It says in one sentence please
10        be advised that you are not authorized to do any work
11        on barge STC2004 without my written authorization,
12        correct?
13   A.   That is correct.
14   Q.   You were writing that as the owner of the barge,
15        correct?
16             MR. BLEVINS:  Objection to any legal
17   conclusions.
18   BY MR. CULLINAN:
19   Q.   Go ahead.
20   A.   No, I was not.
21   Q.   In what capacity were you writing it?
22   A.   Previous owner of the barge.
23   Q.   Why would you do that if you didn't have an ownership
24        in the barge anymore?
25   A.   Protect myself.

Gregory Busch
August 24, 2021

Page 158

1  Q.  In case you're determined to be the owner of the
2      barge?
3  A.  No.  Basic Marine has a bad reputation, and it just
4      seemed to be a very prudent thing to make it clear
5      that I was not going to be responsible for any charges up
6      there without knowing about it.
7  Q.  Did you ever request a renewal of the load line
8      certificate in 2019 after Calumet took possession of
9      the barge?
10 A.  I don't know.  We have some auto renewals on CODs, and
11     we stopped -- stopped at somewhere around that time
12     period.
13 Q.  With regard to any surveys that Bob Ojala did of the
14     barge --
15 A.  I'm sorry, I can't hear you there.
16 Q.  I'm sorry.  With regard to any surveys that Bob Ojala
17     did of the barge in September of 2019, first of all,
18     you're aware he did a survey at that time, correct?
19 A.  Yes.
20 Q.  Did you know prior to his arriving there that he was
21     going to do the survey?
22 A.  Yes.
23 Q.  Do you know who he had been hired by to do it?
24 A.  My understanding was CRF hired him.
25 Q.  You didn't understand that the insurance company,

Page 159

1      Great American, had hired him?
2  A.  Oh, yeah, yeah, it might have been Great American,
3      yeah.
4  Q.  And you were aware before he did the survey that he
5      was going to do the survey, right?
6  A.  Yes.  I saw him and an employee drove up the night
7      before, Basic Marine telling them I'd be up here to
8      observe the surveying, and they told me they would not
9      let me in the gate.
10 Q.  Hadn't Great American previously advised you that he
11     would be doing the survey?
12 A.  I don't remember.
13 Q.  Did they -- did Great American run Mr. Ojala's name
14     past you in terms of someone who would possibly do a
15     survey to make sure you were okay with it?
16 A.  They didn't get my -- no, they didn't ask my
17     permission, Ojala.  They never denied having them use
18     Ojala, but...
19 Q.  So Great American in August or so of 2019 had a survey
20     done by a gentleman from Davis & Company, correct?
21 A.  Right.
22 Q.  And you objected to that survey, correct, to his
23     findings?
24 A.  Yeah, he was a company that does pleasure boats, you
25     know what I mean?  He referred to barnacles on the

Page 160

1      bottom of the barge and he was pretty incomprehensible
2      as a survey.
3  Q.  Right, so you objected to the survey, right?
4  A.  Yes.
5  Q.  And they asked that another one be done?
6  A.  Yes.
7  Q.  And they ran the name Bob Ojala past you in advance of
8      his doing the survey, correct, they being Great
9      American?
10 A.  Yeah, I think they did, yes.
11 Q.  And you had no objections to him doing it, did you?
12 A.  Well, I would have objected, but I think they were --
13     there was quite a bit of correspondence went back and
14     forth or e-mails or phone calls.  I don't remember
15     which form they were in.
16 Q.  You said you would have objected.  Did you actually
17     raise any objections to Great American to Bob Ojala
18     doing the survey?
19 A.  At this time I don't know if I did or not.
20 Q.  So I don't have to show this document, I think you
21     said this earlier, but prior to 2019 you had not used
22     the barge in any way since 2016; is that correct?
23 A.  Yeah.  The barge I have not used in 2017 except for
24     two days to go up to Tawas Bay for the submarine
25     dives.  2018 it was not used at all.

Page 161

1  Q.  And just to make sure I ask it the right way, these
2      load line certificates that was in effect as of the
3      first few days of June were set to expire on June 13,
4      2018?
5  A.  No, it was set to expire on --
6  Q.  I'm sorry.
7  A.  -- with the extension on June 13th, 2019.
8  Q.  I misspoke.  So the load line certificates that was in
9      effect when Calumet took possession of the barge was
10     to expire June 13, 2019 pursuant to the five-year
11     survey and the one-year extension that had been
12     granted, correct?
13 A.  Yes.
14         MR. CULLINAN:  All right.  Mr. Busch, you
15     have been incredibly patient, I appreciate it.  That's
16     all the questions I have.  Thank you.
17         THE WITNESS:  Okay.  Thank you.
18         MR. BLEVINS:  I have nothing.
19             EXAMINATION
20 BY MR. LIDDANE:
21 Q.  Mr. Busch, Mike Liddane here.  I have just a few
22     scattered questions.  Obviously counsel has been
23     pretty thorough, but there is a few things I need to
24     follow up with you.  Do you need a break?  I won't be
25     very long I don't believe.

Gregory Busch
August 24, 2021

Page 162

1    A.   Yeah, a quick one.
2              MR. LIDDANE:  A quick one, a bathroom
3    break, and we'll start up again.
4              (Recess taken at 5:34 p.m.)
5              (Back on the record at 5:40 p.m.)
6    BY MR. LIDDANE:
7    Q.   So I want to go back to sort of a big picture here on
8    the nature of these five-year special periodic surveys
9    of the hull for getting load lines.  Those -- that
10   five-year load line survey, that's the only time that
11   the hull gaugings with ultrasonic equipment is
12   required; is that true?
13   A.   That's correct.
14   Q.   Okay.  And if I understand the purpose, obviously it's
15   measuring the thickness of the steel of the hull in
16   various places, because it's a way of checking the
17   integrity of the hull to make sure it's seaworthy,
18   correct?
19   A.   Yes.  That's correct.
20   Q.   All right.  And that's necessary, as I understand it,
21   because it's a generally known phenomenon that vessels
22   working during the course of their ordinary life on
23   the Great Lakes their hulls tend to thin and waste
24   away over time; isn't that true?
25   A.   That is correct.

Page 163

1    Q.   Okay.  And that's regardless of whether there is an
2    accident, it's just that the natural phenomenon of the
3    stretching of the hull and the thinning of the plate
4    that needs ultimately possibly some correction or
5    replacement if it gets too thin, correct?
6    A.   Yes.
7    Q.   All right.  And so when these five-year load line
8    gaugings are done as you explained it, let's focus on
9    the 2013 gauges that were taken where you did the
10   gauging but as I understand it in the presence and
11   direction of Ms. Ward of the ABS; is that right?
12   A.   That's correct.
13   Q.   Okay.  And so I take is it that she was telling you
14   where to do the gauging on a particular plate or were
15   you making those selections for her?
16   A.   Generally, as I explained before, they typically
17   (inaudible) --
18             COURT REPORTER:  I'm sorry, I can't
19   understand you, sir.
20             THE WITNESS:  I'm sorry.  The procedure, I
21   don't know if it's in their rule book how these
22   gaugings are done, but in my experience you always do
23   a forward belt, a middle belt and an aft belt, and if
24   it's a riveted hull, for example, which my one tug is,
25   they take one gauging per plate streak.  On a welded

Page 164

1    hull you can't tell where the streaks are because
2    they -- you know, it just kind of blends together
3    because of the welding process, and so generally it's
4    about every 5 to 10 feet depending on the size of the
5    vessel.
6    Q.   Okay.  So whatever location the plate that are going
7    to be gauged at the direction of the ABS surveyor,
8    each reading has some importance, correct?
9    A.   Yes.
10   Q.   Okay.  Because each reading is telling you something
11   about the condition of that section of plate as to
12   whether it's acceptable or not acceptable, so good
13   readings are important to know and bad readings are
14   important to know, correct?
15   A.   Yes.
16   Q.   Okay.  So I was confused then by your testimony that
17   Ms. Ward may have in some fashion had you take
18   readings but not record them as somehow irrelevant.
19   Did I hear you correctly?
20   A.   Yes.  They're good readings, you know, in that
21   particular case.  You know, some surveyors do that,
22   some don't.  If it was a bad reading, then they would
23   record more readings in that same area to determine
24   the extent of the wastages would weigh.  If there is a
25   good reading there's no point in taking additional

Page 165

1    readings in that particular area.
2    Q.   So that I understand though, every reading that is
3    taken is and should be recorded, correct?
4    A.   It's to the discretion of the surveyor.  You know, in
5    that particular case, you know, we had the required
6    readings, and she said well, yeah, take one over here,
7    and we did it and it was a good reading and she moved
8    on, so....
9    Q.   So were you doing -- you're doing the actual gauging
10   using the ultrasonic device?
11   A.   Right.
12   Q.   Is she writing notes or are you writing notes after
13   you do the gauge?
14   A.   Well, I write notes.  I don't know if she did or not.
15   Q.   Okay.  The -- let's focus on the bottom hull of the
16   barge in those 2013 readings.  Counsel went through
17   them.  I don't need to go through those again, those
18   ten readings, but if every plate on the bottom of that
19   hull were to be gauged, how many readings would it be?
20   I guess my question is how many plates are there on
21   the bottom of that hull, on the bottom?
22   A.   Well, (inaudible) --
23             COURT REPORTER:  I can't hear you, sir.
24   I'm sorry, I can't understand you.
25             THE WITNESS:  Oh, I'm sorry.  Yeah, you

Gregory Busch
August 24, 2021

Page 166

1    could essentially take an infinite number of readings,
2    but the ABS rules it does state that audio gauge
3    readings are not to become a fishing expedition.
4    That's the exact wording.  And so the surveyors
5    generally stick to the three belts, random, and, you
6    know, discretionary readings.
7  Q.  Okay.  Maybe I'll ask the question again.  I asked it
8       poorly.  How many bottom hull plates are there on that
9       barge?  Forget readings.  How many bottom hull plates
10      are there?
11 A.  Well, there's four on a welded vessel but then you
12      have streaks, so you really can't identify the plates.
13      So I have no idea how many there are.  You know, I
14      mean, that area is 250 by probably about 70 when you
15      take in the (inaudible) barrel of the radius.
16 Q.  But despite your familiarity of the barge you can't
17      identify or maybe quantify the number of plates, like
18      each plate is a certain dimension that we can do some
19      math and figure it out?
20 A.  No, because the other problem is the plate sizes vary
21      and they're all standard steel size, you know,
22      manufactured plates.  They're going to be 8 by 20, 10
23      by 40s.  If there was a repair made in some way they
24      may have put a plate that's 2 feet by 2 feet.  So, I
25      mean, there's really no way to quantify that.

Page 167

1  Q.  All right.  Okay.  In the documents that you were able
2       to provide through counsel there was a document in
3       there looks like a nondestructive testing personal
4       certification.  Looks like you are certified to do
5       the -- to use this particular piece of equipment for
6       doing gaugings.  Do you recall that?
7  A.  Yes.
8  Q.  Okay.  And I'm not going to call it up, it's not that
9       critical, but I want to understand what the nature of
10      the training is.  This certificate, this is at your
11      production page 723.  I can't read the gentleman's
12      signature.  Looks like a J.  Maybe the last name is
13      Gee or Lee, and it's dated January 9th of 2013.  It
14      says there were two hours of training.  How does that
15      training take place, Mr. Busch?  What did you do to
16      train for the use of that device?
17 A.  Well, it's (inaudible) --
18            COURT REPORTER:  I'm sorry, I can't
19      understand you, sir.
20            THE WITNESS:  I'm sorry.  Yeah, I'm getting
21      tired.  I tend to lean back.
22            COURT REPORTER:  Yeah, I know.
23            THE WITNESS:  I'll try to avoid that.
24      There's (inaudible) by the manufacturer of the audio
25      gauge.  It's an extremely simple device to use and it

Page 168

1    has three buttons on it basically, and the
2    manufacturers sent me a document to read on the
3    fundamentals of audio gauging and so on.  I read that.
4    I called them back -- and this was all done remotely.
5    Called them back and they said -- they asked a few
6    questions that related to things in the document to
7    prove that I'd actually read it, and then they had me
8    do a couple of sample gauge readings, and that was
9    pretty much the extent of it.
10 Q.  Okay.  And so that training is in the operation of the
11      device itself in an effective and correct way, but it
12      doesn't include any training to act in fulfillment of
13      the ABS's duties?  You would rely on the ABS person to
14      do that job; is that right?
15 A.  I'm not sure I understand your question.
16 Q.  Well, in other words, this is simply a certification
17      for how to use a unique ultrasonic device, not how to
18      perform the duties of an ABS surveyor in conducting a
19      five-year survey?
20 A.  Well, as I said earlier, the rules have changed.
21      Years ago you had to have an ABS certification
22      directly from ABS, you know.  It was very expensive to
23      get.  A lot of the shipyards complained because they
24      had paid out to get a shipyard worker trained, and
25      these people are not technical, you know, people that

Page 169

1    would do this usually, and a person would quit and
2    then they got to do it all over again, so ABS dropped
3    their direct certification, and then, I don't know,
4    two or three years ago they reinstated all that and
5    you had to have special ABS certification.
6  Q.  And you haven't received that certification from the
7       ABS?
8  A.  No, I don't -- I'm not interested because I'm out of
9       that field, you know, so...
10 Q.  I understand.  And the fact that you at least as of
11      this date in 2013 were recertified, does that have an
12      expiration time, was that going to last for a year or
13      two years, this certificate of being able to do the
14      nondestructive ultrasonic testing with this device?
15 A.  I don't recall if it did.  I don't think it did.  It
16      was basically, you know, I think for the life of the
17      instrument.  You know, if you had to buy a new
18      instrument you had to be recertified with that
19      particular instrument.
20 Q.  And just so I want to be sure I heard your earlier
21      testimony correctly, you've done the ultrasonic
22      testing on this occasion as you've described it on
23      this barge in 2013 and just a couple other times on
24      your own vessel; is that right?
25 A.  Well, I used the instrument all the time.  It's at the

Gregory Busch
August 24, 2021

Page 170

1    machine shop.  We use it for measuring things at the
2    shop.  When I was hoping to purchase another vessel I
3    gauged all of those myself, because I -- you know,
4    when I propose to buy a vessel, I mean, I won't buy a
5    vessel unless I gauge it or hire, you know, a -- I was
6    extremely surprised the CRF didn't show up with a
7    professional surveyor or somebody to auto-gauge the
8    barge before they agreed to buy it, but they didn't.
9    Q.   So your use of the ABS prevented the -- the ultrasonic
10        device is when you've done some shopping for vessels
11        yourself as a prudent buyer; is that right?
12   A.   Yes.
13   Q.   Okay.  And then on some other occasions -- forget the
14        machine shop work, let's just focus on your vessels,
15        and you've done it, you've have checked the gaugings
16        on your own vessels as well a couple of times; is that
17        right?
18   A.   Well, more than a couple times.  I've done the tug I
19        think for two five-year cycles.
20   Q.   Okay.
21   A.   We don't routinely just, you know, gauge our barges or
22        something.  You know, it's not a -- we only done it
23        when it's required.
24   Q.   Oh, I understand.  Yeah, you would have done them in
25        the association with the five-year period of load line

Page 171

1    survey, right?
2    A.   That's correct.
3    Q.   Got you.  You've never performed the ultrasound --
4        ultrasonic testing as sort of a third-party service, a
5        contract hire for the ABS on other vessels or at the
6        request of other vessel owners, have you?
7    A.   I have done some other vessels, but not for ABS.
8    Q.   Okay.  Who have you done them for?
9    A.   Oh, I did one here last -- it was February.  It was an
10        aluminum dye boat, and the insurance company wanted
11        gaugings on it for some reason, and the aluminum in
12        the Great Lakes usually, you know, doesn't grow it,
13        but I went up and I gauged that boat.
14   Q.   Okay.
15              COURT REPORTER:  I'm sorry, you gauged
16        what, sir?  Dibble?
17              THE WITNESS:  Yeah, I guaged, yeah, a boat
18        for an owner.
19   BY MR. CULLINAN:
20   Q.   Let's talk about Basic Marine or North Shore, however
21        you care to describe them.  Have they communicated
22        with you at all since June of 2019 as to the status of
23        the barge?
24   A.   No.
25   Q.   Have they sent you any mail, mailing or invoice or

Page 172

1    billings attempting to collect storage or other fees
2    or charges relative to their holding of the barge?
3    A.   No.  Absolutely nothing.
4    Q.   Have they threatened litigation?
5    A.   No.
6    Q.   Have they telephoned you to say when are you going to
7        pay us for this storage?
8    A.   No, I wanted to do something at this point
9        (inaudible.)
10   Q.   I missed that, Mr. Busch.  I'm sorry.
11   A.   I said my assumption (inaudible).
12              COURT REPORTER:  I still didn't catch it.
13        I still didn't hear what he said.
14              THE WITNESS:  Oh.  I said my assumption is
15        that -- in answer to his question was that all of that
16        is going to be in our pleadings, CRF.
17   BY MR. CULLINAN:
18   Q.   And you haven't reached out to Basic Marine to inquire
19        about the status either, have you?
20   A.   No.  I tried to go up there but they refused.  I was
21        refused entry to the property, so...
22   Q.   Why?
23   A.   Well, you'd have to know the Nick Kobasick (phonetic),
24        the Basic Marine people.  They're kind of difficult to
25        deal with.  And I had rented their dry dock in '89,

Page 173

1    '90 to dry dock my tug, and that was with Dan Kobasick
2    and that was a very difficult experience, and the -- I
3    won't go into details on that, and I swore I'd never
4    go back there again.  Dan died, and then Nick, which I
5    think is his nephew or something, took the company
6    over, and I actually -- I thought well, I'll give
7    maybe this guy's all right.  I had my tug on their dry
8    dock in 2018 and I had issues with that, and so, you
9    know, we just don't have a lot a good relationship at
10        all at this point.
11   Q.   All right.  The litigation that you had against Sun
12        Machinery, can you tell me or recall which court that
13        was in?  Was that in a state court here in Michigan?
14   A.   You know, it was in Saginaw, Michigan, and I don't
15        know if that's what you'd call a court district or
16        something there or...
17   Q.   And did you sue Sun Machinery or Mr. Iorio, or both?
18   A.   I don't know.  I know it was Sun Machinery.  I'm not
19        sure if Tony was included.
20   Q.   Okay.  In some of the records you provided through
21        counsel, Mr. Busch, there were some descriptions of
22        work that had been done on the barge, and I'm going to
23        paraphrase at least what I thought I read that there
24        was some strapping added to the top deck.  Can you
25        explain to me what the purpose of that work was, that

Gregory Busch
August 24, 2021

Page 174

1     additional strapping to this particular barge?
2  A.  Yes.  When I put the notches on the back of the barge,
3     which really facilitated pushing and handling of the
4     barge, it had lengthened the barge, and I -- there's a
5     holger formula that ABS uses, and it's calculation
6     moment of inertia in a hull during strain, and when
7     you lengthen the vessel you have to add the
8     longitudinal strength of the vessel, and those straps
9     were put on there to increase the bar strength.
10 Q.  Do those straps go across deck?  Give me a sense of
11    how they're physically located and provide the
12    supporting structure for the barge.
13 A.  Well, they're -- they're lengthwise, they are about 5
14    inches in from the side shell.  They're roughly
15    18 inches wide, about an inch and a quarter thick, and
16    they run for about 120 feet in length.  They're a
17    little more than that.  So they run from the end of
18    forward to -- they're almost 250 long and there's one
19    on each side.
20 Q.  Okay.  That's really deck top.  That's not on the
21    sides and that's not on the hull bottom?
22 A.  It's on the top of the cab.  You're allowed about
23    three-quarters (inaudible).
24         COURT REPORTER:  I'm sorry, I want to make
25    sure I'm hearing this right.  You said it's not on the

Page 175

1     top, it's about --
2         THE WITNESS:  Yes.  The first straps
3     involved are on the deck.  There's another set of
4     strands, they're about 8 or 10 inches roll the decking
5     edge on the sides, and those are three-quarters inches
6     thick and I think 10 inches or 12 inches wide.
7  Q.  Okay.  When you engaged Sun Machinery to help market
8     and sell the barge, did you provide them with a
9     description much the way we might when we're selling a
10    used car, provide a description of the barge's age,
11    its dimensions, its characteristics, did you provide
12    Mr. Iorio --
13 A.  Yeah, you know, they didn't ask for was -- I mean, it
14    was the length, width, the depth.  That it was ABS
15    load level.  I think the age.  That it was on the
16    Great Lakes, and that was about the extent of it.
17 Q.  Did you ever see the ad or listing or classified ad he
18    ran to sell the barge?
19 A.  No, I never -- never really looked for it.
20 Q.  Did you have a sense or understanding of how many
21    different commercial outlets he was going to list the
22    barge as for sale?
23 A.  No.  No.  As far as I know it's his website.
24 Q.  So that I understand your answer, as far as you know
25    the Sun Machinery website itself was going to be the

Page 176

1     location of the information for posting and
2     advertising the barge as opposed to a broader market?
3  A.  That's my understanding is the website.
4  Q.  In response to Sun Machinery's efforts how many
5     companies went out to get a look at the barge?
6  A.  Well, there were two inquiries in a very short period
7     of time and CRF is the only one that actually came and
8     looked at it.  The other company said the barge was
9     too big for what they wanted and so they -- we didn't
10    consider them a serious inquiry.
11 Q.  Okay.  So that I understand then, CRF is the only
12    entity that came out and actually looked at the barge
13    in response to Sun Machinery's advertisement as you
14    understand it?
15 A.  That's correct.
16 Q.  And there was some discussion earlier about Great
17    Lakes Towing coming out and giving it a look the prior
18    fall.  That was not in relation to the ad or
19    advertising being posted by Sun, but more of a random
20    opportunity by another Great Lakes entity to give it a
21    look?
22 A.  That is correct.
23 Q.  Okay.  In the three years prior -- four years prior
24    have you ever had another entity to come out and look
25    at this barge as a potential purchaser?

Page 177

1  A.  Not in that time period.
2  Q.  Had anybody come out to look at the barge as a
3     potential purchaser any time in the prior ten years,
4     if you know?
5  A.  No.  The inquiries that I mentioned earlier were about
6     2000 or late '90s.
7  Q.  And you don't recall if they came out and actually
8     looked at the barge and surveyed it?
9  A.  Well, they -- I think in the Lake Michigan car ferry
10    people did a little more due diligence.  The other
11    company was a trucking company that we hauled stone
12    for, and the owner came down and he looked at the
13    barge from the dock.  We didn't go through and do a
14    survey or anything, and so in '81 -- and I wasn't
15    interested in selling until, you know, early 2019, so
16    I really didn't pursue any of these seriously.
17         MR. LIDDANE:  Okay.  Mr. Busch, that's all
18    I have.  Thank you for your time this afternoon.
19         THE WITNESS:  Thank you.
20         MR. CULLINAN:  I don't have anything more.
21         MR. BLEVINS:  Nothing from me, so...
22         MR. CULLINAN:  Kathryn, I'll please order
23    transcript.  E-tran is fine.
24         COURT REPORTER:  Okay.  Mr. Blevins, did
25    you want a copy?

Page 178

1          MR. BLEVINS:  Yes, the same for me.  Do you
2     have my contact information?
3          COURT REPORTER:  I believe so.  Yep.  Yep.
4          MR. LIDDANE:  I'll take a copy as well,
5     Kathryn, same thing.
6          COURT REPORTER:  Very good.  Thank you.
7          (Deposition concluded at 6:05 p.m.
8     Signature of the witness was requested.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1          I, having read the foregoing deposition
2     consisting of my testimony at the aforementioned time
3     and place, do hereby attest to the correctness and
4     truthfulness of the transcript.
5
6
7          _____
8          GREGORY J. BUSCH
9          Dated:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 179

1     BUSCH MARINE GROUP, INC.,
2     A Michigan Corporation,
3               Plaintiff,
4          and               Case No. 1:20-cv-11427-LVP-PTM
5                            Hon. Linda V. Parker
6     GREGORY J. BUSCH,       Mag. Patricia T. Morris
7     A Michigan resident,
8          Plaintiffs/
9          Counter-Defendants,
10
11          vs.
12
13    CALUMET RIVER FLEETING, INC.,
14    A Wisconsin Corporation,
15          Defendant/
16          Counter-Plaintiff,
17          and
18
19    Great American INSURANCE COMPANY,
20    an Ohio Corporation,
21          Defendant.
22    _____/
23
24          VERIFICATION OF DEPONENT
25

Page 181

1                    ERRATA SHEET
2     PAGE    LINE   READ           PAGE    LINE  SHOULD READ
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Gregory Busch
August 24, 2021

Page 182

```
1                    CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                     ) SS
4    COUNTY OF OAKLAND )
5
6              I, KATHRYN M. STANDAL, certify that this
7         deposition was taken before me on the date
8         hereinbefore set forth; that the foregoing questions
9         and answers were recorded by me stenographically and
10        reduced to computer transcription; that this is a
11        true, full and correct transcript of my stenographic
12        notes so taken; and that I am not related to, nor of
13        counsel to, either party nor interested in the event
14        of this cause.
15
16
17
18
19
20
21
22              KATHRYN M. STANDAL, CSR-2966
23              Notary Public,
24              Oakland County, Michigan.
25    My Commission expires: February 25, 2026
```

Gregory Busch
August 24, 2021

**$**

**$25,000**
  112:20
  155:10
**$50,000**
  110:24
  154:19 155:6

**-**

**--utilize**
  15:18

**1**

**1**
  56:4 61:14,
  15 67:4,5
  93:2 117:8
  123:23
**1(c)**
  112:19
**1,000-foot**
  38:12
**1/2**
  36:7
**1/4**
  36:8
**10**
  164:4 166:22
  175:4,6
**10,000**
  77:7
**100**
  48:5 54:16
  93:15
**12**
  12:21 49:23
  122:24 146:3
  156:5 175:6
**12'6"**
  31:23
**12-inch**
  36:9

**120**
  174:16
**12th**
  155:25 157:1
**13**
  118:8 119:13
  161:3,10
**13th**
  161:7
**14**
  33:6,16 35:9
  112:11 122:8
**143**
  12:20
**15**
  16:18,20
  109:3 147:7
  149:10
**150-gross**
  40:6
**15th**
  108:15
  109:23
**16**
  36:5 124:1
**18**
  55:16 56:5,
  12 67:16
  97:6,12
  98:14 174:15
**19**
  9:7 23:10
**1974**
  9:7
**1977**
  13:6 50:3
**1984**
  10:10 23:18
  75:12
**1985**
  42:25 43:3,
  4,19
**1987**
  35:4
**1990**
  71:7

**1995**
  24:10
**1:03**
  5:3
**1s**
  65:18
**1st**
  125:17

**2**

**2**
  35:24 58:14,
  17,20,25
  59:2,5,8
  60:21 63:18,
  19,25 64:6,
  10,12 93:2
  94:7 97:8
  117:10
  123:22
  166:24
**20**
  16:4,5
  82:14,21,25
  133:12
  166:22
**200**
  31:22 125:21
**2000**
  16:7 20:5,8
  34:24 35:20
  46:3,9 56:19
  177:6
**2001**
  36:1
**2004**
  32:23 36:20
**2007**
  13:7,8,9
**2008**
  13:7,9
**2009**
  102:20
**2011**
  49:23

**2013**
  16:13,14,16
  37:8 38:6
  47:3 48:11
  49:1,8 50:10
  52:25 54:4
  55:16 56:5,
  12,16 67:16
  88:13 89:1
  91:17 163:9
  165:16
  167:13
  169:11,23
**2014**
  16:18,20
  18:3,22
  19:12,14,18,
  19 20:5,6,7,
  8,15,20
**2015**
  19:20
**2016**
  16:18 17:24
  18:17,20
  160:22
**2017**
  18:24 160:23
**2018**
  21:6,7 23:6
  43:8 70:8
  71:7 86:25
  89:17,21
  90:1 123:3
  145:14
  160:25 161:4
  173:8
**2019**
  11:3 14:21
  23:9 25:14
  26:16 27:8,
  16 28:5
  31:17 32:2
  33:5 68:6
  75:9 76:7
  82:12 89:6,
  10 94:13
  97:6,12
  98:14,23

Gregory Busch
August 24, 2021

99:3,24
101:19
103:17 104:5
105:12
106:17
108:15 109:3
111:14
114:10,14,15
116:9,12,23
117:8 118:8
119:13
120:1,5
125:17
148:22
149:10
151:8,13
152:9 154:18
156:5 158:8,
17 159:19
160:21
161:7,10
171:22
177:15
**2021**
  5:2
**21.E**
  26:6
**226**
  58:13 63:16
**23**
  19:9 91:12
**231**
  151:6,7
**232**
  154:22
**24**
  5:2 26:16
  27:7,16 28:5
  94:13 101:19
  149:5 150:17
**240**
  34:23 151:6,
  7
**24th**
  25:14 104:9
**25**
  12:23 73:7
  133:12

**250**
  31:18,21,22
  34:22 166:14
  174:18
**252**
  28:13
**253**
  26:15 28:13
**266**
  155:24
**268**
  155:24
**27**
  12:20
**27th**
  156:2
**2:15**
  51:25
**2:25**
  52:1
**2s**
  65:18

---

### 3

**3**
  35:24 36:7,8
  37:10 61:14,
  15,17 67:4,
  5,9 93:2
  98:21
**3-7-52**
  8:20
**3/4**
  36:5
**3/8**
  36:7 37:14
**30**
  38:15 73:7
  82:14,21
  83:1
**31**
  111:14
**35**
  130:10
**375**
  65:25 66:3

**3:38**
  99:19
**3:50**
  108:12
**3s**
  65:18

---

### 4

**4**
  25:15 35:24
  36:8 37:10
  61:14,16
  67:4,5 101:7
  143:21
**40s**
  166:23
**42**
  12:21 126:19
**44**
  149:6 150:17
**48623**
  8:22
**49'11"**
  34:24
**4:03**
  108:13
**4:57**
  142:24
**4:58**
  142:25 143:5
**4s**
  65:19
**4th**
  24:25 27:19
  102:7 132:18
  134:6

---

### 5

**5**
  120:23
  144:17
  145:16 164:4
  174:13
**5(a)**

120:7 121:4
**5,000**
  77:8,9
**5/16**
  36:6
**5/8**
  36:5
**50**
  31:18,23
**50-foot**
  33:12
**50-foot-long**
  33:9,11
**5:01**
  143:6
**5:34**
  162:4
**5:40**
  162:5

---

### 6

**6**
  36:7 126:6
  134:22
**6-**
  132:19 133:1
**60**
  22:17
**6:05**
  178:7

---

### 7

**7**
  98:23 99:3,
  24 102:20
  103:17 104:5
  105:11
  106:17 120:5
  122:8 129:14
  134:3,23
  151:8,13
  152:9
**7-foot**
  132:19 133:1

134:3

**70**
22:18 166:14

**7049**
8:22

**70s**
9:7

**723**
167:11

**7251**
9:23

**78**
135:17,19
137:3

**79**
137:2 139:6

**7th**
103:17
154:12 155:4

---

**8**

**8**
13:3 19:9,11
129:14
154:17
166:22 175:4

**80**
141:2

**80s**
15:8

**81**
140:14
177:14

**82**
136:20 140:1

**85**
23:18 75:12

**86**
35:4

**87**
35:5

**88**
35:5

**89**
12:22 40:6

172:25

---

**9**

**9**
132:5

**90**
173:1

**90s**
177:6

**99**
88:11

**9th**
167:13

---

**A**

**A36**
39:10

**abilities**
135:24
136:2,25
137:18

**ability**
139:24

**able**
62:11 128:24
140:5 167:1
169:13

**above**
136:21 140:2
143:14

**ABS**
34:12,13
35:13 37:21
38:25 40:15,
16 42:1
43:24 44:13,
14,16 45:16,
25 46:17,19
47:6,8,15
48:4,6,20,
22,23 49:10,
12 50:20,24
53:11 54:2
56:25 57:5
67:11,12

68:1 88:18
89:25
119:22,24,25
122:2,3,23,
24 138:13
146:5,6
163:11 164:7
166:2
168:13,18,
21,22 169:2,
5,7 170:9
171:5,7
174:5 175:14

**ABS's**
168:13

**absolutely**
48:10 51:17
67:18 79:18
80:11,15
120:24 172:3

**abstract**
24:13

**acceptable**
164:12

**accepted**
25:11,13,15,
16 27:15
106:11

**accepting**
124:22

**accident**
163:2

**accommodate**
8:15 113:18

**accurate**
53:21 54:16
84:12 115:21
138:19

**accurately**
91:18

**acknowledge**
5:6,9

**across**
21:23 29:16
33:19,20,22
38:11 47:22,
23 174:10

**act**
168:12

**acting**
73:12,15
77:3

**actual**
165:9

**ad**
15:17 175:17
176:18

**add**
33:16 174:7

**added**
35:14,16
93:20 173:24

**addendum**
93:19,20
151:14

**addition**
49:2,9

**additional**
36:11 164:25
174:1

**address**
8:21,23 9:22
78:22

**addressed**
29:10,18

**administered**
5:10

**administration**
128:21

**admission**
90:25

**admit**
91:3,12

**advance**
160:7

**advertise**
20:11 21:20

**advertisement**
176:13

**advertising**
21:18 176:2,
19

Gregory Busch
August 24, 2021

advised
  69:4 156:6,
  24 157:10
  159:10
advising
  156:1,14
afraid
  26:22 110:10
aft
  33:12,19
  35:15,16
  42:14 47:18
  53:2 58:14,
  25 59:2,8
  60:21 63:18,
  25 64:10
  90:9,10
  163:23
afternoon
  6:13 177:18
age
  138:4,8,17,
  24 175:10,15
agency
  105:8
ago
  11:23 73:7,8
  132:1 168:21
  169:4
agree
  66:25 86:5
  101:13
  106:14 114:2
  115:24
  125:11
  136:18
  153:13
agreed
  5:17,19,21,
  22 85:10,12
  97:6 124:8
  153:12 170:8
agreeing
  138:22
agreement
  5:15,16
  22:23 77:6,

16 97:7,13
  110:14,18
  111:24
  112:16 113:1
  114:1 117:11
  121:25 123:4
  124:21
  139:21
  144:20
agrees
  149:25
aground
  137:9
ahead
  8:11 19:17
  25:22 29:3
  92:7,19
  95:4,15,24
  96:17,18
  97:21 99:8
  100:15
  102:5,25
  104:23
  106:23,24
  114:6 124:20
  149:2 153:1
  157:19
ahold
  72:22
AIS
  130:24
  131:6,13
  132:10
allegation
  136:1
alleges
  136:21
alleging
  140:3 145:22
allow
  8:10
allowable
  52:14
allowed
  51:3 52:16
  113:15 119:6
  138:2 174:22

allowing
  44:17
Alternatively
  43:19
aluminum
  171:10,11
ambiguous
  120:16 121:9
American
  5:21 38:12,
  13 39:22
  40:16 56:12
  144:1,2,6
  159:1,2,10,
  13,19 160:9,
  17
amount
  33:18 52:20
  54:21 90:13
  110:24
amounts
  54:22
ample
  139:22
anchor
  75:15,21
anchored
  19:6 75:12
and-a-half
  82:15 85:18
  128:23
  129:23
and/or
  81:1 138:15
angle
  35:9 36:7
angles
  36:8
annual
  40:23 41:1,
  6,11,19,24
  146:20,23
  147:5
annually
  41:1
answer
  8:10,11,17

19:17 29:3,4
  31:14 48:18
  55:4 62:9,18
  91:18,20
  92:15,19
  95:4,5,15,25
  96:2,21
  103:1,3,12,
  23,25 105:18
  106:24 107:9
  115:13,14
  117:5,6,23
  131:3,7
  136:11 137:7
  142:8 143:20
  144:17,21
  145:1,16
  146:3,6
  148:2 149:19
  172:15
  175:24
answered
  19:16 55:3
  92:5,9 96:15
  130:14
answering
  7:25 8:3
answers
  7:14,20
  141:24 142:3
  143:3,14,15,
  18
antenna
  132:9
Anthony
  94:10
anybody
  29:11 69:11
  70:1 72:2
  75:24 84:21
  96:8 110:15
  128:9 144:16
  177:2
anymore
  46:24 135:4
  157:24
anyone
  8:23 23:16,

21 50:15
51:9 69:13,
20,22 72:7
75:10 76:4
82:8 109:4
111:3 120:4,
5 126:8
127:11,23
133:19 134:8
144:8,14
**apart**
138:10
**apologize**
18:20
**apparently**
81:5 91:21
**appeared**
110:21 129:9
**applicable**
6:25 124:5
**applies**
44:14
**apply**
124:11
136:15
**appointment**
98:4
**appreciate**
98:12 161:15
**approve**
44:17
**approved**
53:13
**approximately**
54:22 89:8
**Apri**
32:1
**April**
31:17 33:4
81:12 82:11,
12 89:6,10
94:13
**architect**
73:24 74:3,
11,12
**Architects**
148:21 149:9

**architecture**
74:15
**area**
10:22 54:9
104:20 126:5
152:4 164:23
165:1 166:14
**areas**
42:9,10
47:18 48:6,9
52:24 53:4
54:1,5,11,
12,14 57:9
66:4,6,9,10,
12 141:10
**arising**
124:2
**around**
13:7,10
24:10 35:4
46:3 47:21
49:23 81:12
85:20 155:25
158:11
**arrangement**
5:13
**arrangements**
85:5
**arriving**
158:20
**Aruba**
72:18
**ascertain**
42:3
**asked**
14:23 30:23
54:3 72:14,
18 77:19
78:6 80:10
83:3 87:11
88:5,9,11
91:3,12
92:4,9 96:14
121:13,14,16
134:17
143:21 155:8
160:5 166:7
168:5

**asking**
7:5 30:7
31:13 80:12
92:8 96:10,
17 97:18
99:14 100:13
115:18
154:15
**asks**
144:18 146:3
147:7
**aspect**
49:1
**aspects**
10:11,12
15:21 48:17
**asserted**
147:10
**asset**
22:9
**assignee**
122:10
**assist**
126:8
**assistant**
127:13
**association**
170:25
**assume**
8:11 39:10
61:6 83:11
133:15
**assumed**
100:6
**assumption**
83:20 85:22
172:11,14
**attempt**
69:11
**attempted**
24:21
**attempting**
147:20 172:1
**attention**
131:19
**attorney**
28:2 40:2

**attorneys**
5:5 6:14 7:4
**audio**
41:14 45:6,
7,8,16
46:13,18
47:1,2,25
49:5,8 52:3
53:24 60:9
68:1 87:16
88:1,13,25
147:1
148:20,23
166:2 167:24
168:3
**August**
5:2 159:19
**authority**
39:21
**authorization**
156:8 157:7,
11
**authorized**
156:7 157:10
**auto**
158:10
**auto-gauge**
170:7
**automatic**
131:8 132:3
**available**
20:11,16,18
21:5 77:20
156:2,12
**avoid**
167:23
**aware**
52:20
144:13,16
158:18 159:4

---

**B**

---

**B-U-S-C-H**
6:21
**bachelor**
9:1,3

Gregory Busch
August 24, 2021

**back**
15:8 17:4
19:23 22:11
23:18 24:9
29:22 37:4
42:2,24
49:20 50:23,
25 51:3 52:1
53:13 70:3
72:4,21 73:3
75:12,16
89:16 98:9,
17,18 99:14
101:25 106:9
107:19,25
108:13
112:11
119:21
125:13 131:4
135:3 142:25
143:6 149:6
160:13
162:5,7
167:21
168:4,5
173:4 174:2

**background**
8:25 74:19

**backwards**
112:14

**bad**
51:5 98:2
132:8,11,13,
16,24 158:3
164:13,22

**Ball**
38:10

**banging**
126:23

**bank**
87:4 127:3,6

**bar**
174:9

**Barbara**
12:21 13:8

**bareboat**
17:5,9
111:14,21

112:2,16
113:5

**barge**
12:9,24,25
13:24,25
14:5 15:1
16:8 17:1,
13,19,25
19:5,21
20:11,19
21:5,12
22:5,18,22
23:1,5,8,17,
19,24 24:9,
11 30:4
31:18 32:1,
4,10,11,13,
16,18,19,24,
25 33:16
34:5,6,17,
21,25 35:1,
6,12,15,22
36:21 38:4,
7,14,18 39:4
40:5 42:1,9,
14 43:15
44:4 47:25
48:6 54:23
56:4,7 57:10
59:11,14,17
67:22 68:22
69:2,5,9,14,
16,18,20,22
70:2,5,13,17
71:15 72:4,
9,23 73:2
75:9,12,14,
18,19 76:11,
12 77:9,24
81:1,6
82:15,18,24
83:1,2,7,8,
10,15,18,24
84:1,5,7,16
85:2,6,13,16
86:2,17,23
87:3 89:13
90:16 91:14,
16 92:24

93:7 97:23
98:7,8,13
101:20
106:15
108:23
109:12
111:15,18
112:20,21,23
113:16,21,25
114:16,18,23
115:2,4,9,
16,22 116:1,
5,6,11,15,
22,23 117:4,
7,10,11,18
118:3,7,24
119:14,20,25
120:5,9
121:7,22,25
122:25
123:12,14
124:14,15,
22,24 125:5,
15 126:9,12,
14,16,19,22,
24 127:1,2,
7,10,12,14,
24 128:11,
16,18 129:3
130:20,23
132:16,24
133:21,25
134:1,11,15,
18,21,25
135:2,5,23
136:9,13,23
137:8,17,21,
25 138:2,4,
7,11,16,18,
24 139:7,18,
23,25 140:4,
15,22,25
141:3
143:22,23,24
144:8,9,19,
22 145:12,17
146:5,7
147:9,12
148:22

151:11,20
152:8,14,15,
19 153:2,7,
11,15,19,24
154:5,13
155:11
156:7,25
157:11,14,
22,24 158:2,
9,14,17
160:1,22,23
161:9 165:16
166:9,16
169:23 170:8
171:23 172:2
173:22
174:1,2,4,12
175:8,18,22
176:2,5,8,
12,25 177:2,
8,13

**barge's**
135:24
136:1,24
137:18
139:7,10
140:9 141:4
145:2 175:10

**barges**
10:1,4 12:10
13:2,11 14:2
15:3,7,9,12,
16 22:3,10
32:20 49:25
71:21 73:10
86:10,21
125:9
136:14,15
170:21

**barnacles**
159:25

**barrel**
166:15

**base**
128:4

**based**
104:17
112:15

Gregory Busch
August 24, 2021

115:6,18
117:2 136:16
138:16
**Basic**
116:17
156:1,14,19,
24 158:3
159:7 171:20
172:18,24
**basically**
16:11 28:1
34:6 42:10
44:22 47:14
48:21 53:8
81:25 143:24
153:3 168:1
169:16
**basis**
136:22
149:17,20
**Bate**
63:16 93:2
**Bates**
26:22 56:3
112:9
**bathroom**
162:2
**bathymetric**
10:14,17
**bay**
18:24 19:6
34:20 38:9
75:13 126:23
130:9 133:15
137:9 160:24
**bear**
16:9 112:11
141:15
150:24
**beginning**
93:10 150:14
151:10
**behalf**
5:18 70:1
72:3,7
73:12,15
90:23 93:8

**belief**
143:16
**believe**
15:8 18:16
19:16 24:25
53:11 55:3
61:24 63:16
78:20 114:15
117:3 127:14
133:13 150:9
161:25 178:3
**Belleville**
70:4
**below**
94:23
**belt**
47:17,18,20,
23 61:17
64:22,24
65:3 163:23
**belts**
47:16 53:1
61:3,4 166:5
**best**
7:19,24 31:4
61:25 62:14
63:5 68:14
143:16
**better**
18:13,14,15
**big**
38:22 51:5
153:20
156:17 162:7
176:9
**bigger**
66:3
**biggest**
22:9
**bilge**
36:19 37:7
**bill**
101:10
104:12,24
105:2,9
106:3,6,8,16
108:1 153:11

156:17
**billings**
172:1
**birth**
8:19
**bit**
26:17 37:9
58:12 63:11,
12 70:3
73:24 83:6
85:9 86:4
126:18
150:24
160:13
**bits**
93:3
**blends**
164:2
**Blevins**
5:17 15:24
18:5,8,12,16
26:4,11,21
28:8,14,22
29:1,4 30:6,
16 31:7
51:12,15,23
55:20,22
61:21,23,24
62:8,21
63:4,10
66:20,24
78:11,13,14,
19 79:6,18
80:11 81:9
92:4,8,16,20
93:12 94:19,
24 95:2,5,
12,16,21,25
96:14,19
97:16 99:4
100:11,16
101:22
102:2,13,22
103:2,11,20
104:15,19
105:3,20
106:19
107:8,10

111:9 112:4
114:3
115:11,14
117:21
120:17,20
124:17 125:7
142:6,15
147:25
148:10,13,
14,18 149:21
150:11,16,18
152:10,20,24
153:8,25
154:8 157:2,
6,16 161:18
177:21,24
178:1
**BMI**
43:16
**BMT4**
13:1
**BMT5**
13:3
**board**
72:16
**boat**
129:2 141:8
171:10,13,17
**boaters**
129:6
**boats**
12:9 159:24
**Bob**
69:24 70:3,
13,16 71:6,
24 72:17,18
73:5 74:24
116:8
158:13,16
160:7,17
**book**
43:24 44:1
163:21
**bottom**
34:20 37:1,
12,24 38:1,
20,23 39:4,
13 47:22,25

Gregory Busch
August 24, 2021

50:22,23
59:15,17,23
65:11,24
66:4,6,12
94:7 123:15,
16 160:1
165:15,18,21
166:8,9
174:21
**bought**
32:15
**bow**
127:8
**boxes**
105:25
**brace**
123:21
**brake**
33:8
**brand**
55:1
**breached**
140:6
**break**
8:14 28:16
51:13,16,18
54:13 108:9
161:24 162:3
**breath**
23:4
**breech**
124:3
**briefly**
68:5
**bring**
17:3
**broader**
176:2
**brochure**
21:24
**broker**
15:18 21:11,
22 68:10,12
77:3 94:3,8
108:23
147:16

**brokerage**
77:6,16
**brokers**
21:21
**build**
57:16
**building**
16:22
**bulkhead**
36:22 37:3
**bulwarks**
34:16
**burden**
36:11
**Bureau**
39:22 40:16
56:12 144:2,
7
**Busch**
5:22 6:4,13,
19,23 7:3
9:11,12,19,
24 10:1,13,
24 11:1,4,7,
11,13,14,16,
24 12:1,2,6,
20,21,22
13:6,7,8,12,
14,16,21
14:9,12,17,
20,23 15:3,
9,22 16:24
17:22,25
18:4,21
23:6,13
27:4,11
28:21 30:13
42:19 44:5
49:21,24
50:1,2,7,15
51:18 52:3
56:6 68:6
71:2 72:7
73:21 78:7
79:2 80:19
81:4 91:14
108:15
112:23 126:2

141:16,17
143:3,10
147:12,15
151:21
161:14,21
167:15
172:10
173:21
177:17
**business**
9:24 10:7,
11,12 12:2
14:9 15:22
16:5,6 21:13
22:9 69:12
72:24 75:10
83:12 106:17
139:19 152:9
154:12 155:4
**businesses**
16:2
**BUTG**
56:19
**buttons**
168:1
**buy**
20:19 22:19
138:9 169:17
170:4,8
**buyer**
22:23 68:21
76:18,19
77:12 101:8
170:11
**buying**
71:23

---

**C**

**cab**
174:22
**cables**
128:2,3
**calculation**
174:5
**calculations**
87:15

**calibrated**
55:5 56:20
**calibrating**
55:2
**calibration**
55:6,9
**call**
12:3 24:15
34:19 35:16
42:1 81:21,
24 134:22
137:12 167:8
173:15
**called**
6:5 9:19
13:24 15:17
22:12 38:9
43:25 47:23
72:13,14
75:4 76:21
87:11 127:25
132:18
153:24
168:4,5
**calls**
160:14
**calm**
134:12
**Calumet**
5:19 6:15
7:4 14:8
19:13 24:4,
13 69:22
75:4,10,11,
24 76:5,12
81:13,16
83:9 84:16
90:24 91:13,
15 93:8
97:14 98:14,
25 99:21
105:11
106:17,18
107:3,7
108:5 109:17
110:14
111:15
113:16,21,24

Gregory Busch
August 24, 2021

115:9,22,25
117:3,7,18
119:4,12
120:1,4,12
121:24
124:15,21
125:15 126:3
127:24
132:24
133:20,25
134:14,18,20
135:18,22
136:21,22
137:16
139:6,11,16,
18 140:1,3,
10,11,14,16,
19,22,24
141:3 144:1,
13 147:12
151:5,10
152:3 155:10
158:8 161:9
**Calumet's**
110:4 126:9,
17 130:23
131:19
139:8,10
140:5 152:8
**camera**
5:25
**canal**
126:7,21
**capabilities**
83:23
**capable**
83:15,18
**capacity**
157:21
**capital**
22:19
**capitalized**
151:20
**captain**
127:25 128:5
**car**
20:22 138:9
175:10 177:9

**care**
135:23
136:23
137:17,23
171:21
**cargo**
16:8,12,16
31:18 32:1,
4,6,7,11,19
83:13,21
86:17,21
**carries**
32:18
**Carrolton**
82:7 112:23
151:21
**carrying**
10:13
**case**
7:22 10:9
26:19 27:25
30:2,4,11,
14,19,20
56:2 62:2
80:21 104:2
110:21
114:8,12,13
118:25
135:12
150:15 151:5
158:1 164:21
165:5
**cashed**
155:17
**catch**
10:3 172:12
**caught**
132:8
**caused**
124:14 125:4
**caveat**
8:16
**center**
33:10 36:4,
22
**Central**
74:10 152:4

**certain**
46:16 57:9
67:18 87:12
88:10,11
91:3 94:15
95:9 119:18
148:7 166:18
**certainly**
8:15 79:12
**certificate**
39:14 40:19
41:22 46:7,
10 118:10,
18,20,21
119:2,5,9,
13,14,20
158:8 167:10
169:13
**certificates**
161:2,8
**certification**
40:4,14,21
42:18 45:5
46:4,13,14,
15 49:25
52:16 118:4,
7 167:4
168:16,21
169:3,5,6
**certifications**
40:10
**certified**
46:18 47:1
167:4
**certify**
143:13
**Chad**
128:11
**chance**
120:18
**change**
16:11 34:9
124:13
**changed**
16:5 43:17,
20 46:17

97:2,3 132:5
168:20
**changes**
34:14,15,18
36:2 145:10
**changing**
22:10
**channel**
34:20 129:16
**channels**
36:10
**characteristics**
175:11
**characterize**
17:7
**charged**
55:2
**charges**
158:5 172:2
**chart**
57:13,25
**charter**
16:17,20
17:5,23
19:19 20:12
75:9 76:11
111:14,21
112:2,16,20,
22 113:6,25
117:11,12
120:12
155:11
**chartered**
19:14,21
20:1,4
**charterer**
117:11
118:25
120:9,10
121:7,8,11
**charterer's**
112:24
122:12
**chartering**
22:13

charters
  19:20 20:3,9
charts
  57:18
check
  41:11 51:4
  72:20 155:17
checked
  56:20 170:15
checking
  53:20 162:16
Chicago
  85:5
chitchatted
  82:23
circumstances
  116:4 138:18
City
  38:9 133:15
  137:9
Civil
  6:25
claim
  132:25 134:7
claiming
  134:4
claims
  73:24 74:1
  124:1
clarification
  30:17
classified
  175:17
Classing
  43:25 44:1
clause
  120:13
clean
  106:15
clear
  13:13 23:7
  24:22 48:25
  139:21 155:8
  158:4
cleared
  24:11,17
  27:15

click
  62:23
close
  24:3,4 33:25
  98:13 99:1,
  22 106:17
  152:8 154:12
  155:4
closer
  78:17
closing
  93:19 97:5,
  12 98:20
  100:21,24
  151:12,13
coal
  38:10
Coast
  24:12,22
  25:16 26:15
  27:7,16,19
  28:4,20
  29:13 31:10
  39:21 40:13
  44:15 100:2
  101:10,18
  102:19
  103:8,16
  104:4,9,11,
  13,17 105:1,
  15 106:4,5,
  12,16 119:24
  147:17 148:8
  153:10,14
CODS
  158:10
cofferdam
  33:12,19
  37:5,6
coffered
  33:9
collect
  156:17 172:1
collection
  28:3
come
  22:21 42:3

43:16,19
  50:23,25
  51:3 53:13
  69:17,20,22
  72:3 76:19,
  22 98:9
  176:24 177:2
comes
  12:4 50:20
  130:9
commenced
  77:9
commensurate
  135:23
  136:24
  137:18
comment
  80:14 98:8
comments
  98:17
commercial
  131:13
  175:21
common
  86:20 136:5
communicate
  110:13
communicated
  76:15 171:21
communication
  76:24 127:23
communication
s
  111:3
companies
  16:10 176:5
company
  9:19 13:17,
  20 16:19,22
  20:23 73:13,
  16,17 76:20
  149:7
  156:21,22
  158:25
  159:20,24
  171:10 173:5
  176:8 177:11

compartment
  33:8,11 67:9
  123:22,24
compartments
  32:20 33:1,
  2,4,9,11,12,
  14 34:7
  35:24 37:10
  41:10,20
  42:13 71:15
  90:11 135:2
compensated
  77:5
complained
  168:23
complaint
  135:12,16
  144:21
complete
  60:9 67:12,
  13,14 88:20
completed
  108:1,2
  112:22 125:1
complicated
  22:9
comply
  147:8,11,20
  148:6
concerned
  8:4 113:24
  141:2
concluded
  178:7
conclusion
  94:20 95:13,
  22 97:17
  99:5 100:17
  102:14,23
  104:15,19
  106:20
  114:4,22
  115:3 116:13
  124:18
  137:21
  138:16 148:1
  152:11,21,24

Gregory Busch
August 24, 2021

conclusions
  96:15 115:6
  138:22,23
  157:17
condition
  52:15 71:22
  83:1,3 85:3
  115:10,23
  116:1,22
  117:4 119:6,
  17 120:8,11
  121:5,18
  122:1,3,6
  124:14 127:5
  135:24
  136:2,16
  138:13 141:4
  143:22
  144:4,8,19
  153:15
  164:11
conditions
  94:15,23
  95:9,19
  96:12 133:24
  136:24
  137:2,6,18,
  20 140:16
  141:5 147:8,
  11,21 148:6
conduct
  43:23
conducted
  120:8 121:6
conducting
  168:18
confident
  62:10
confirm
  24:2
confirmed
  55:6
confused
  164:16
confusions
  92:17
connection

35:15
consent
  5:13
consider
  14:5 22:6
  176:10
consistent
  52:10
constituted
  101:15
  102:10
construct
  39:3
construction
  43:25 69:12
consultant
  45:18
Consumers
  38:11
contact
  69:11 70:15
  76:14 178:2
contacted
  72:17
contained
  25:1 57:13
  63:23 143:15
contemplate
  22:2
contemporaneo
usly
  57:22
contend
  149:17
continue
  32:25 103:18
  128:24 130:4
  142:20
continuously
  129:19
contract
  76:11 92:23
  93:6,11,21,
  24 94:15
  95:10,17,20
  96:13 97:15
  99:1,21

100:10 101:2
  106:18 108:2
  111:21 113:6
  121:10 124:2
  147:9,11,21
  171:5
contract's
  139:20
contracts
  96:21
contradiction
  121:12
contrary
  104:8
control
  38:14
controversy
  124:1
convenient
  51:12,15
  108:9
conversation
  7:23 71:16,
  19 79:8
  82:25 84:23,
  25 86:7 98:6
conversations
  72:6 81:23
  109:11
conversed
  82:14
convert
  32:13
converted
  32:14,24
  34:5
cooperated
  147:16
copied
  29:10 151:9
copies
  87:21 107:23
copy
  87:12,14,15
  88:19,21
  106:9 107:20
  135:12

145:9,10
  177:25 178:4
Corey
  127:18
corner
  129:16
  130:15,16,
  19,22
corners
  86:4
Corp
  94:7
corporation
  9:14 11:5
correct
  8:9 20:16
  24:19,20
  25:14 26:19
  34:7 38:24
  40:16,20
  48:11 52:8,
  12 57:10
  59:1,8,20,24
  60:2,6,14,
  15,22 61:8
  63:20,23
  64:7,10,13,
  17,20,23
  65:8,12,13,
  25 66:3,7,
  10,17 67:16
  88:18 89:6
  90:25 91:25
  92:3 93:25
  94:17 95:11,
  20 98:18,23
  101:11,16,
  17,21
  102:11,16
  104:5,7
  111:19,22
  113:2,10,13,
  17,22 116:12
  117:8,9,15
  118:8 122:25
  124:6,8
  126:6
  132:21,22

Gregory Busch
August 24, 2021

137:20 138:5
139:1,5,8,9
140:12,13,
17,19,22,23
141:1,5,9,14
142:4 143:15
144:3,4,10,
23 145:19,20
146:1,2,7,8,
10,17,18,21,
22,24,25
147:2,3,5,
18,24 148:4,
8 151:25
152:9,13
153:19,24
154:3,13,19
155:6,12
156:8,9
157:12,13,15
158:18
159:20,22
160:8,22
161:12
162:13,18,
19,25 163:5,
12 164:8,14
165:3 168:11
171:2
176:15,22
**correction**
163:4
**correctly**
37:8 121:14,
15 122:16
164:19
169:21
**correspond**
58:24 59:8
**correspondence**
77:23 87:21
151:16
160:13
**corresponding**
59:18 60:5
**corresponds**
57:25

**corrosion**
48:7,20 54:2
**cost**
85:7 120:10
121:7
**counsel**
5:12 27:5
30:24 31:13
79:7,16,21
81:2 105:24
161:22
165:16 167:2
173:21
**counsel's**
78:14,18
**count**
135:17
**counter**
29:16
**COUNTY**
5:1
**couple**
7:10 46:23
72:22 89:11
127:18
155:19,23
168:8 169:23
170:16,18
**course**
26:23 41:8
44:6,24 84:9
131:16
145:17
146:10
162:22
**court**
5:5,23 6:3,9
7:16 10:15
13:18 17:15
18:6,10,14
24:15 25:6,
19 31:20,24
36:24 43:1,5
54:12 61:22
65:1 70:22
74:1 75:17
78:12,16
86:18 95:1

97:24 98:4
99:14 103:13
108:8 117:25
118:11,15,
19,21 123:8
125:24
130:25 131:3
148:12,17
152:22
155:14
163:18
165:23
167:18,22
171:15
172:12
173:12,13,15
174:24
177:24
178:3,6
**cover**
123:11
**covered**
80:5
**cracks**
86:16,20,23
**crap**
135:2
**creation**
91:6
**credibility**
117:1
**credible**
116:18
**crew**
133:20
**CRF**
76:14 93:2
107:14,15,
19,22 110:10
135:22
144:16
145:19,21
147:16
149:5,6
150:17 151:6
153:13
154:22
155:24

156:16
158:24 170:6
172:16
176:7,11
**CRF14**
112:10
**CRF4**
112:9
**criteria**
52:23
**critical**
167:9
**cross**
23:25
**Cullinan**
5:18 6:12,
14,22 7:2,3
10:18 13:22
15:25 17:18
18:18 25:12,
21 26:8,12
27:1 28:12,
18,24 29:2,9
30:7,9,21
31:3,25
37:11 43:6
51:14,17,21,
24 52:2
54:15 55:21,
24 62:7,17
63:1,7,9,13,
14 65:5
66:22 67:2
71:1 74:5
75:23 79:1,
12 80:4,17,
18 86:22
92:6,11,13,
18,22 93:14,
16 94:21
95:3,8,14,
18,23 96:3,
16,23 97:18,
20 98:11
99:7,10,13
100:4,13,14,
18 101:24
102:4,15,24

103:6,12,15,
22 104:16,22
105:4 106:22
107:16
108:10,14
112:6,7
114:5 115:17
117:23
118:2,13,23
120:19,24
121:3 123:13
124:19
125:10,25
131:10
142:10,17
143:1,7
148:2,3,19
150:3,13,17,
19 152:12,25
153:17
154:2,10
155:16
157:4,8,18
161:14
171:19
172:17
177:20,22
**current**
  8:21 41:12
**customers**
  15:23 16:9
  20:24
**cut**
  36:10 51:1
**cutting**
  12:4
**cycles**
  170:19

————————

**D**

————————

**Dabil**
  70:12
**damage**
  38:4,17
  41:25 42:1
  48:13,20,25
  49:2,6,11

115:16
124:23 125:3
134:21,25
135:5 137:25
138:3,16,24
139:1
145:22,25
**damaged**
  38:8 114:20
  119:8,10,18
  137:22
**damages**
  42:4
**Dan**
  173:1,4
**date**
  8:19 19:18
  20:6 24:25
  27:20 46:12
  55:17 67:16
  76:22 82:11
  93:19 97:6,
  13 98:15,16,
  18,20,23
  100:21 101:3
  102:7 104:8
  105:15
  111:13
  149:10
  151:12,13
  169:11
**dated**
  26:16 28:5
  101:19 151:8
  167:13
**dates**
  72:12 100:24
**Dating**
  42:24
**Davis**
  159:20
**day**
  12:15,16
  50:20,21
  58:8 72:2
  149:10
**days**
  18:24 131:24

137:12
160:24 161:3
**deal**
  15:23 77:2
  172:25
**dealing**
  75:22 107:18
**dealings**
  19:13 75:10,
  25 76:3,10
**deals**
  107:13
**deceased**
  24:16
**decide**
  21:4
**decided**
  65:21 68:6
**decision**
  22:1 60:17
**deck**
  12:9,24 16:8
  31:18 32:6,
  8,13,24,25
  34:5,6 35:24
  36:4,6,9,10
  47:21,23
  85:11 86:15,
  16,17,20,21,
  23 123:21,22
  128:13
  173:24
  174:10,20
  175:3
**decking**
  85:8 175:4
**declare**
  5:11
**decuble**
  152:3
**deemed**
  48:7
**deep**
  31:23
**default**
  23:1 78:4
  110:22

**Defendants'**
  141:17
  143:11
**deficiencies**
  116:22
**deficiency**
  8:10
**definition**
  92:17
**degree**
  9:2 74:15
  130:10
**degrees**
  9:6
**delegate**
  119:24
**delegated**
  39:21
**delighted**
  78:21
**deliver**
  107:3
**delivered**
  28:21 29:19
  101:8 125:19
**delivery**
  84:16
  122:15,20
  125:14
  127:2,7,24
  128:22
**demand**
  109:25
**demanded**
  110:3
**demands**
  110:6
**denied**
  91:18 159:17
**Dennis**
  11:22
**deny**
  91:3,12
**depending**
  164:4
**depends**
  48:3

Gregory Busch
August 24, 2021

deposit
    78:2 81:5,10
    109:17,19
    110:4,25
    154:19
deposition
    5:6,7,8 6:23
    7:6 62:12
    80:15 102:2
    178:7
depth
    175:14
depths
    10:20
describe
    31:17 32:4
    39:18 131:11
    171:21
described
    169:22
description
    175:9,10
descriptions
    173:21
designed
    136:12
destination
    131:16
detail
    43:13 109:13
    131:11
detailed
    41:15 149:22
details
    76:21 173:3
deteriorates
    37:23
deterioration
    38:1 52:12,
    14,20 138:4,
    17,25
determine
    52:5,10
    139:14
    164:23
determined
    52:21 158:1

determining
    40:19
device
    165:10
    167:16,25
    168:11,17
    169:14
    170:10
diagonal
    36:11 123:23
diagram
    58:1 63:19
    64:3,9 66:17
diagrams
    57:18
Dibble
    171:16
died
    24:1 173:4
difference
    152:2
different
    26:25 37:17
    41:1 43:22,
    23 46:15
    48:16 83:5
    98:10 128:8
    133:7
    136:11,12,
    13,15 142:22
    146:9,14,17,
    19 151:4
    154:17
    175:21
differently
    136:9 146:15
difficult
    26:22 62:13
    136:10
    172:24 173:2
difficulties
    129:9
difficulty
    126:16,20
    143:4
dig
    27:23

diligence
    122:14,19
    123:3 177:10
dimension
    166:18
dimensions
    131:17
    175:11
direct
    47:14 75:22
    109:16 169:3
directed
    37:21
direction
    47:10 54:17,
    19 56:24
    163:11 164:7
directly
    29:14
    107:15,22
    155:5 168:22
disagree
    138:6,14,20
disagreeing
    138:21
disagrees
    150:1,4
disapprove
    44:17
disapproved
    53:14
disclosures
    150:14
discoval
    152:4
discovery
    78:20
discrepancies
    41:21
discretion
    38:25 41:20
    42:11,16
    165:4
discretionary
    52:18 166:6
discretions
    146:17

discuss
    82:21 109:19
discussed
    63:21 64:4
    72:13 83:5
    94:2,6
    109:22 111:7
    146:23
discussing
    70:19
discussion
    83:7,13,14
    176:16
discussions
    72:16 109:3,
    7,9
district
    7:1 173:15
disturb
    122:12
Diversified
    148:21 149:8
dives
    18:25 19:2
    160:25
dock
    36:20 38:11,
    13,25 40:23
    41:14 43:11
    50:20 55:14
    82:5 84:8
    85:5,6
    112:23
    122:25
    125:16 126:4
    129:24
    172:25
    173:1,8
    177:13
docked
    41:14
docking
    156:16
docks
    16:9
document
    23:10 25:25

26:2,13,14,
17,23 27:4,
17,18,22
28:2,5,10,20
29:23 53:18
55:18 56:1,
2,8,13,22
57:15 60:6,8
61:20 62:11,
12,24 66:15,
19,21,23
67:11,13,14
79:23 88:23
89:2 90:18,
19 91:2,3,22
93:1 94:24
95:9 96:4
99:5,6
100:12,21
101:23,25
102:6 104:3,
7 105:8,14,
23 106:20
107:3 111:24
112:9 113:9,
12,15 120:18
124:18
141:16,18,
20,23 142:3
148:25
149:22 150:5
151:21
153:25 154:5
157:3 160:20
167:2 168:2,
6
**documentation**
25:4 29:6,24
30:14 72:25
77:20 79:14,
15 80:8 81:3
88:1,7
133:23
147:17
**documents**
26:5 27:6,24
28:1 29:12,
15,16,17

30:1,3,10,
18,19,24,25
44:16 62:1
67:7 75:7
77:23 78:5
79:3,20
80:5,19
81:1,9 97:16
104:10
105:19,22
108:3 142:7
143:18,19
147:14 148:7
150:1,12
167:1
**doing**
11:24 15:19
16:11,14,24
21:20 35:12
45:17 46:24
47:24 49:20
53:23 61:25
62:13 63:4,5
68:25 69:1
71:12 77:14
82:16 83:18
111:17
129:17 144:9
147:21
154:25
159:11
160:8,11,18
165:9 167:6
**dollars**
77:7
**Don**
5:17
**door**
12:4
**double**
35:9
**downsize**
135:15
**dozen**
60:12
**draft**
91:5 107:21
142:1 145:9,

10
**drawing**
34:13 53:8
58:13 59:2,
13,16,19,22
61:19 62:15,
16 63:15
64:19
**drawings**
35:13 57:8,
12 60:20
**dredge**
128:20
129:24,25
**dredged**
17:24
**dredges**
12:10 109:1
**dredging**
10:1,5,8,21
11:1 12:13,
15 15:21
16:14,19
18:1 38:9
128:19
129:17 141:9
**drive**
131:22 138:9
**driven**
126:14
**drop**
51:8
**dropped**
46:21 169:2
**drove**
128:20 159:6
**dry**
36:20 38:25
40:23 41:14
43:11 50:20
55:14 85:5
86:3 156:16
172:25
173:1,7
**dry-dock**
146:24
156:2,12,15

**due**
86:15
122:14,18
123:3 143:4
151:12
177:10
**Duluth**
134:12 137:9
**duly**
6:6
**duties**
136:20,22
140:2
168:13,18
**duty**
121:11
124:22
135:22
139:6,14
140:3,6,14,
19 141:3
**dye**
171:10

---

**E**

**e-mail**
28:10,16
77:1 87:18
151:1,16,25
153:6 154:11
155:3,20
156:4
**e-mailed**
87:20 88:4
**e-mails**
73:3 87:23
151:5,8
155:23
160:14
**E-TRAN**
177:23
**earlier**
54:10 79:23
88:17,25
94:6 146:24
160:21

Gregory Busch
August 24, 2021

168:20
169:20
176:16 177:5

early
14:21 15:8
23:6 68:5
177:15

easier
63:3

easily
118:9,11,15

Eastern
7:1 152:5

Ed
147:15

edge
175:5

educational
8:25

Edwin
12:21 13:6
27:11 126:2

effect
161:2,9

effective
40:3 168:11

efforts
176:4

eight
65:15

either
14:17 17:22
18:21 31:14
33:18 42:4
44:5,17
53:13 77:1
86:5 114:12,
13 133:12
172:19

eligible
27:9 28:7

else's
23:21

employed
9:8,18 75:11
117:12

employee
30:13 159:6

employees
10:24 11:16
12:14

employment
9:16

encountered
132:11,13,
16,19 133:1
134:5

encountering
132:24 134:9

encumbrance
101:15

encumbrances
101:9

end
41:18 42:14
58:14,25
59:3 60:8
63:18 64:10
67:9 105:11
114:24
130:3,4,8
133:3 174:17

ends
155:9

engaged
175:7

engineering
9:2,4

Engineers
74:10

enjoyment
122:13

ensure
122:14,19

ensures
39:20

ensuring
39:25

entered
111:14
113:5,20
123:5

entering
113:19

entire
7:25 36:16
37:19 55:10
63:19 69:16
120:18,22

entirely
146:19

entirety
37:15 42:18
50:13,19
63:17 87:3
120:22

entities
15:13 69:17

entitled
90:23 141:16
149:1

entity
9:12 13:15
17:5 27:9
75:4 80:24
176:12,20,24

entry
144:20
172:21

equal
34:3

equipment
12:11 14:10
162:11 167:5

Escanaba
120:2 134:12
156:1

essentially
40:18 43:13
75:20 139:24
166:1

estimate
116:17

estimates
116:16

estimation
129:13

Evans
155:21

156:6,10,19

event
112:21

eventually
125:14

everybody
48:23 61:25
99:2,22

exact
39:24 40:1
76:21 135:1
166:4

exactly
137:14

examination
6:11 47:14
161:19

examine
41:14

examined
6:8

exception
97:22 125:3

excess
48:5

exchanged
72:25

exclusively
77:13

excuse
6:18 131:15

executed
101:10

executing
27:9

exercise
39:22 146:16

exercised
122:14

exercising
122:18 123:3

existence
34:25

expect
139:2

expected

Gregory Busch
August 24, 2021

86:11
expecting
112:14
expedition
166:3
expense
112:24
expensive
168:22
experience
42:13 44:23
47:24 96:21
163:22 173:2
experienced
90:8 145:18
expert
129:6
expertise
104:21
expiration
46:12 169:12
expire
161:3,5,10
expired
118:4,7,14
119:9,13
expires
119:2
explain
34:9 173:25
explained
163:8,16
explanation
78:8
exposing
140:16
express
83:9 116:5
149:25
expressed
22:15 148:16
extend
44:3
extended
97:7,13,14
98:15,23
100:1

extension
36:22,25
41:17 42:8
44:6,8,12,
14,17,20,21,
22 89:16,19
90:1,2 93:20
98:20 100:2,
8,22 101:4
107:1 145:14
146:20
151:14
161:7,11
extensions
89:23
extensive
41:18 90:8
extent
35:6 37:20
42:3 52:11
68:20 71:19
91:24 92:2
107:20
134:24
137:13,15,25
164:24 168:9
175:16
extremely
167:25 170:6

### F

face
25:20 81:22
128:1
faced
128:15
facilitate
127:9
facilitated
174:3
facing
129:5
fact
23:13 79:11,
15 132:12,15
145:13

153:3,9
169:10
failed
136:21,23
139:25
140:1,3,8,19
failing
137:16
failure
145:18,21
fair
8:12 74:18,
22 79:5
fairly
37:2
fall
176:18
falls
48:19 138:10
false
91:24 92:2,
14
familiar
7:11 13:24
15:13 21:17
27:17,18
56:8 75:4
139:7,12
140:4
familiarity
166:16
family
75:14
far
8:4 28:19
31:4 41:8
49:20 50:10
67:17 71:12
107:6 110:21
113:24 129:2
134:3 141:2
175:23,24
fashion
164:17
fast
129:12 130:2
137:1,5,19

faster
28:15
father
15:10 23:17
24:1,9,16
32:14 34:11
February
72:14 171:9
Federal
6:24
feel
27:2
fees
172:1
feet
19:9 31:18,
21,22,23
34:22,23
35:9 36:5
40:6 125:21
126:6,19
134:3,23
164:4 166:24
174:16
felt
115:2 137:19
ferry
20:22 177:9
field
22:12 169:9
figure
166:19
filed
81:4 110:7
111:8,9,10
114:9,13
files
44:15
filler
34:19
final
66:15
finalize
151:13
finally
22:1

Gregory Busch
August 24, 2021

find
  27:23 28:17
  68:21 81:8
  87:1 137:14
  150:6
Finders
  133:7
finding
  114:18
findings
  115:20
  116:14,21
  117:2 159:23
fine
  51:21 177:23
first
  6:6 10:3
  43:14 44:14
  46:2 50:20
  58:13 63:15
  68:9 76:15
  84:18 94:22
  109:22 110:3
  112:15,19
  120:15 121:4
  127:1 137:1
  143:2 148:25
  149:9,10
  150:25 151:1
  154:11
  155:20
  158:17 161:3
  175:2
fishing
  166:3
fist
  151:7
fit
  36:10 51:2,4
  80:16
five
  12:10 13:2
  41:18 43:7,
  8,15,21 46:1
  60:1,2 61:6
  133:7 135:2
  142:11

five-minute
  108:9
five-year
  40:23 41:2,
  13 42:21
  43:14,17,20
  44:4,7 45:1,
  4,12,22
  48:13 49:1,
  8,9 50:6
  52:5 89:13
  146:19
  161:10
  162:8,10
  163:7 168:19
  170:19,25
Fleeting
  5:19 6:15
  7:4 14:8
  19:14 24:13
  75:5 76:5,12
  81:13,16
  83:10 93:8
  105:11
  135:18
  151:11
Fleeting's
  90:24
fliers
  21:18
flipping
  154:23
floating
  87:5
Florida
  124:6
fluid
  96:22,25
focus
  16:15 22:10
  163:8 165:15
  170:14
folder
  26:4
follow
  44:2 146:14
  161:24

following
  64:3 99:17
follows
  6:8
forced
  22:25
fore
  42:14
Forecasts
  133:8
forget
  166:9 170:13
form
  7:15,20 8:7
  9:16 15:24
  28:22 57:13
  58:7 68:2,3,
  4 91:16
  101:10
  104:12 107:8
  108:5 115:11
  117:21 154:8
  160:15
formally
  20:17 33:1
format
  146:14
formula
  174:5
forth
  29:22 73:4
  94:23 160:14
forward
  33:21 35:10
  36:20 47:17
  53:1,3
  54:10,13
  59:3 65:17
  80:15 90:9
  163:23
  174:18
forwarded
  29:8
found
  24:14 77:12
  80:9 116:2,
  11 121:9

foundation
  28:23
four
  7:9 18:24
  33:23,24
  34:1,2,3
  41:3 46:1
  58:20 71:4
  133:6 166:11
  176:23
four-foot
  34:16
four-piece
  33:8
fourth
  27:6 41:23,
  25
fraction
  62:16
frame
  15:5,6 16:3
  19:23 89:12
  111:4 123:23
framing
  36:12 85:11
  123:17
free
  101:8
Freeland
  8:22 9:23
frequently
  56:20 133:18
friction
  73:8
friendship
  67:23
front
  33:9 35:7
  67:9 90:19
  111:24
fulfillment
  168:12
full
  6:16 26:25
  28:1 49:8
  62:11,12
  122:12

Gregory Busch
August 24, 2021

function
  10:6
functioned
  74:16
fund
  107:17
fundamentals
  168:3
funds
  23:2 110:18
  111:5
furnished
  135:6
furtherance
  123:4

---

G

gaps
  51:6
garnered
  89:3
gaskets
  123:11
gate
  159:9
gather
  30:19,21
gathered
  147:13
gauge
  52:3 53:6,24
  54:8,16,21
  55:10 56:20
  60:9 61:13,
  15 62:19
  67:18 68:1
  88:1,13,25
  89:3 90:14
  91:17 123:11
  147:1 148:20
  165:13 166:2
  167:25 168:8
  170:5,21
gauged
  164:7 165:19
  170:3

171:13,15
gauges
  41:15 45:7,
  8,16 46:13,
  18 47:1,2,11
  49:8 87:16
  90:15 148:23
  163:9
gauging
  45:2,6 47:25
  56:11 67:8
  163:10,14,25
  165:9 168:3
gaugings
  47:13 49:5
  56:19,24
  162:11
  163:8,22
  167:6 170:15
  171:11
gave
  28:1 30:24
  31:6 87:25
  105:23
Gee
  167:13
general
  11:25 44:2
  121:21
  123:11 124:3
generalizatio
n
  136:13
generally
  16:9 19:25
  32:16,21
  41:9 42:12
  44:8,10
  47:16 50:21
  51:7,11
  56:10 73:17
  84:2 108:25
  112:15
  114:18 125:9
  162:21
  163:16 164:3
  166:5

gentleman
  25:4 159:20
gentleman's
  167:11
getting
  14:13 44:25
  112:9 119:20
  127:10
  141:15
  154:20 162:9
  167:20
give
  8:19 28:11,
  14 42:4
  47:10 79:10
  85:10 89:11
  90:18 110:4
  111:13
  115:15 117:1
  120:17 173:6
  174:10
  176:20
given
  7:5 44:23
  58:7 67:11
  81:2,16
  92:14
giving
  176:17
glad
  101:25
God
  157:4
goes
  33:19,20,21
  38:2 40:7
  41:9 48:21
going
  7:10,13,15,
  24 19:23
  26:13 31:13
  46:3 55:13,
  25 56:3
  58:12 62:17
  67:3 79:1
  83:21 85:25
  111:11,18
  113:6 122:8

129:7,10,12
130:2 132:8
139:16
142:5,12
149:6,7,24
150:1 158:5,
21 159:5
164:6 166:22
167:8 169:12
172:6,16
173:22
175:21,25
good
  6:13 35:8
  60:11,18
  71:21 85:2
  142:19
  164:12,20,25
  165:7 173:9
  178:6
governed
  124:3
government-
issued
  5:24 6:1
grade
  39:6,9
graduated
  9:7
granted
  161:12
great
  5:20 22:14
  40:9 70:5,
  11,15,19
  71:2 72:2,3,
  8,19,23 73:1
  74:25 79:16
  144:1 159:1,
  2,10,13,19
  160:8,17
  162:23
  171:12
  175:16
  176:16,20
Greg
  70:4,10,11,
  15,18 71:6,

21 72:12,22

**Gregory**
5:22 6:4,19,
23 12:20
13:6,16
50:1,2,7
91:13 141:17
143:10

**grew**
21:25

**ground**
7:10 38:16

**grow**
171:12

**guaged**
171:17

**Guard**
24:12,22
25:16 26:16
27:7,16,19
28:4,20
29:13 31:10
39:21 40:13
44:15 100:2
101:10,19
102:20
103:8,16
104:4,9,12,
13,17 105:1,
15 106:4,5,
12,16 119:24
147:17 148:8
153:10,14

**guess**
48:4 82:22
96:21 145:4
165:20

**Gulf**
22:25

**Gullet**
133:8

**guy's**
173:7

**guys**
128:6

**H**

**half**
33:17,18
36:20 42:12
61:19 129:25
130:1

**hand**
53:15

**handed**
29:15

**handle**
85:7

**handled**
29:25

**handling**
29:6 130:23
174:3

**hands**
128:13

**handwriting**
57:20

**handwritten**
57:9,19 58:1
59:23

**happened**
78:3 125:17
137:22

**happy**
64:2 142:7

**Harbor**
17:24 18:3

**Harbors**
15:17

**haul**
32:11 83:21

**hauled**
177:11

**hauling**
16:12,16
83:12

**Haynes**
25:4,8 29:5,
11,14,19
153:10

**he'll**
42:3,4,5

**hear**
18:7,10,11
31:20 61:22
66:24 67:1
72:17 78:12,
16 94:4 95:1
148:12
155:14
158:15
164:19
165:23
172:13

**heard**
9:3 10:4
75:3 78:18
169:20

**hearing**
8:5 97:25
174:25

**heavier**
36:21 37:6

**height**
134:10

**held**
110:19
147:15,23

**help**
34:12 62:22
127:15 175:7

**helpful**
7:20 8:1

**hereto**
97:8

**hereunder**
122:11

**high**
9:1 34:16
129:10 134:3

**highlighted**
26:6

**hire**
11:22 12:14
112:20
120:8,11
121:5,17,21

122:1,3,6
170:5 171:5

**hired**
45:19 71:4
73:17,18
158:23,24
159:1

**hiring**
70:20

**historically**
89:22

**hit**
38:14

**Hoeckendorff**
69:23 76:8,
13,14,21
81:21 93:8
97:22 98:7
107:1,7,24
132:6,18,25
134:5 144:14
151:9,17
152:3 154:18
155:21,25

**Hoeckendorff'
s**
151:24

**hold**
7:24 16:8

**holding**
5:25 110:12
172:2

**holds**
32:6

**holger**
174:5

**honest**
79:11

**hook**
128:3,12

**hooks**
139:13

**hoping**
68:15 170:2

**hour**
82:15 85:18
129:25 130:1

Gregory Busch
August 24, 2021

hours
    82:16
    128:23,25
    129:20,23
    167:14
house
    128:10
huge
    144:5
hull
    35:21,23
    36:14,15
    37:13,22
    38:1,20,23
    39:4,13
    45:14 47:25
    52:6,12,15
    59:15 84:11
    86:14 91:16
    123:15,16
    143:23
    147:2,5
    162:9,11,15,
    17 163:3,24
    164:1
    165:15,19,21
    166:8,9
    174:6,21
hulls
    162:23
Huron
    16:23

_____

I

_____

I-O-R-I-O
    68:16 94:10
ID
    12:25
idea
    21:25 32:12
    35:8 134:16
    166:13
identificatio
n
    5:24 6:2
    131:8 132:3

identify
    143:21 146:3
    147:7
    166:12,17
identities
    25:2
identity
    6:2
IMO
    131:15
impact
    38:22
importance
    164:8
important
    164:13,14
impression
    115:1
improper
    117:14
in-person
    84:15
inaccurate
    150:22
inaudible
    18:5 25:5,18
    30:6 31:8,19
    32:9 36:23
    42:25 46:11
    54:11 61:21
    70:21 78:11,
    15 97:23
    102:23
    113:11
    123:6,10
    125:23
    148:11
    155:13
    163:17
    165:22
    166:15
    167:17,24
    172:9,11
    174:23
inch
    36:5,8
    174:15

inches
    174:14,15
    175:4,5,6
include
    143:25
    168:12
included
    14:2 60:16
    62:20 67:7,
    11 113:10,13
    173:19
includes
    26:5
including
    34:2 143:22
incomplete
    7:18
incomprehensi
ble
    160:1
inconsistenci
es
    116:25
incorrect
    150:22
increase
    34:17 63:11
    174:9
increased
    129:15
incredibly
    161:15
independent
    121:21
indicate
    5:15 111:10
indicated
    143:24
indicates
    64:22 94:2,6
indication
    106:3
Indirectly
    40:15
individuals
    15:12

industry
    46:20 69:12
inertia
    34:17 174:6
infinite
    166:1
inform
    151:10
informally
    20:18
information
    53:15 56:6
    57:13,18,19
    58:1,24
    59:19 62:1
    63:22 64:15,
    16 65:7
    66:16 67:10
    74:8,9 89:3
    91:15 108:4
    132:2,12,15,
    23 135:4
    137:16
    138:25 139:2
    141:7 143:16
    144:19
    150:7,8,20,
    21 176:1
    178:2
informed
    22:22 76:17
    134:20 153:9
initial
    25:3 150:14
initially
    34:15 42:25
    43:1,3 77:8
    155:20
inject
    120:19
input
    91:6,10
inquire
    172:18
inquiries
    176:6 177:5

Gregory Busch
August 24, 2021

inquiry
  176:10
inside
  32:19 50:25
insisted
  110:11
inspect
  62:11 84:11
  119:22
  121:11
  124:22
  139:7,14,23,
  24 140:3,8
inspected
  116:12
inspection
  40:23,24
  41:6,9,13,
  16,19 49:9
  50:23 69:18
  76:19,23
  82:16,20
  90:6 147:4
inspections
  41:1,2,4
  42:22 45:5
  146:24
install
  34:18
installed
  34:16
instance
  73:20 134:13
instances
  54:7
instruction
  47:10
instrument
  27:10 53:20
  54:25
  169:17,18,
  19,25
insurance
  73:6,9,13,
  16,17 158:25
  171:10

intake
  16:23
integrity
  162:17
intended
  139:8,11
  140:5,10
  144:22,24,25
  145:2,13
  153:2
intending
  140:12 153:4
intentionally
  82:19
intentions
  139:17
interest
  22:15 46:23
  69:13 72:19
  129:16
interested
  21:2,25
  22:12 47:19
  70:19 71:22
  72:15 83:10,
  11 169:8
  177:15
interfere
  30:17 82:20
internal
  36:12
International
  25:9 29:5,
  11,20 153:10
Internet
  21:19
interrogatori
es
  141:18
  143:11
interrogatory
  143:3,20
  144:17,18
  145:16 147:7
  148:16
invoice
  171:25

involve
  13:24 14:10
  146:24 147:1
involved
  17:13 144:9
  175:3
involvement
  107:21
involving
  54:1
Iorio
  68:13 94:11
  173:17
  175:12
irons
  36:7
irrelevant
  89:5 164:18
issuance
  105:1
issue
  119:19
issued
  40:19 52:16
issues
  40:13 173:8
item
  32:9 44:19
item-placed
  65:20
items
  37:17 135:16

_____

         J

jack
  12:4 38:10
James
  6:19
January
  23:9,10
  167:13
Jesse
  65:23
Jessica
  49:15,16

50:17 54:3
  57:6 67:19
  90:3
job
  12:3 16:19
  168:14
John
  75:13
jointly
  15:10
judgment
  78:4
July
  109:10
  114:15
  148:22
  149:10
June
  24:25 25:14,
  15 26:16
  27:7,16,19
  28:5 75:9
  98:23 99:3,
  24 101:19
  102:7,20
  103:17
  104:5,9
  105:11
  106:17
  108:15
  109:3,10,23
  114:9,14
  117:8 118:8
  119:13 120:5
  125:17
  132:18 134:6
  151:8,13
  152:9
  154:12,17
  155:4,25
  156:2,5
  157:1 161:3,
  7,10 171:22
jury
  32:5

Gregory Busch
August 24, 2021

**K**

Kathryn
  7:16 117:24
  177:22 178:5
keep
  7:12 30:3
kid
  128:10
kind
  10:15 21:25
  36:15 38:22
  46:23 74:16
  77:19 83:5
  90:7,15
  120:14,15
  132:4,9
  136:16
  154:23 164:2
  172:24
kindly
  5:23
kinds
  146:9
knew
  22:8 82:23
  103:7 107:6
knot
  133:12
knots
  129:14 132:5
know
  7:9,23 8:8,
  15 20:4
  21:8,24
  23:5,11,12,
  15,22 25:3
  26:24,25
  27:2,4
  28:10,19
  30:8 31:4,6,
  8,9,14,16
  32:14 37:13
  39:8,24 40:1
  43:22 46:3
  48:3 49:10,

12,20 50:6
51:5,19
52:22 53:17
54:1 55:12,
13,14,17
57:16 60:11,
17 61:6
62:5,9 63:4
65:21 66:25
67:17,22
68:23 69:4,
6,7,24 70:1
72:20 73:23
75:2 76:3
77:8 78:22
79:9,21,25
80:2,7
81:11,13,15,
16,18,20
82:11 83:3
84:7 85:23
86:10,24
96:2 100:6,
20 104:10
105:19
106:8,13
107:5 108:2,
19 109:8,9,
11,24 110:5,
21 111:12
116:3,4
119:25
120:3,22
121:17
123:21 125:9
128:3,5,9
129:13
131:23 132:1
133:3,9
134:17,24
136:3,10
137:7,8
139:20
140:6,9,11,
21,24
141:22,25
142:2,3,15
143:19
144:11 145:5

149:13,14
152:17
156:17
158:10,20,23
159:25
160:19
163:21
164:2,13,14,
20,21 165:4,
5,14 166:6,
13,21 167:22
168:22,25
169:3,9,16,
17 170:3,5,
21,22 171:12
172:23
173:9,14,15,
18 175:13,
23,24 177:4,
15
knowing
  158:6
knowledge
  68:20 74:19,
  23 104:2
  105:5,7,9
  107:4 108:7
  134:14,19
  137:13,15,24
  143:16,21
  144:7 145:25
known
  73:5 162:21
Kobasick
  172:23 173:1

**L**

L.L.C.
  11:6
labor
  11:25
laborer
  126:10
lake
  16:23 20:22
  42:2 133:4,

8,16,17
177:9
Lakes
  22:14 40:9
  70:5,11,16,
  19 71:2
  72:2,3,8,19,
  24 73:1
  162:23
  171:12
  175:16
  176:17,20
language
  100:9 113:9,
  12
lapse
  151:12
large
  16:19
late
  177:6
latest
  87:16 88:13
launch
  19:7
lawful
  117:13
laws
  124:4,5,10
lawsuit
  78:5 81:4,
  14,17 110:7
  111:7,10
  114:9
leading
  43:8
leaks
  84:5
lean
  131:4 167:21
learn
  24:6,8
lease
  20:12
leave
  38:13 41:10
  128:16

Gregory Busch
August 24, 2021

137:12

leaves
  42:6
led
  22:5
Lee
  167:13
left
  111:9 120:1
  128:18,20
  129:23
legal
  9:12 92:16
  94:19 95:12,
  22 96:15
  97:17 99:4
  100:16
  102:13,22
  104:15,19
  106:19 114:3
  124:17
  147:25
  152:10,20,24
  157:16
leisure
  51:8
length
  34:21 35:1
  40:7 146:23
  174:16
  175:14
lengthen
  174:7
lengthened
  35:12 174:4
lengthening
  35:14
lengthwise
  174:13
Leo
  155:21
  156:6,10,19
lesser
  33:18
letter
  26:15 27:3,7
  29:7 44:13

87:15 101:19
104:9 154:20
155:7
Liddane
  5:20 161:20,
  21 162:2,6
  177:17 178:4
lien
  101:15
  102:10
  103:18
  147:15,23
liens
  101:9
lieu
  5:9
life
  162:22
  169:16
likewise
  8:1 59:7
line
  16:22 34:12
  39:16,19
  40:4,10,14,
  21 42:17
  45:5 49:25
  52:16 80:13
  87:12,14
  97:9 118:4,
  7,9,17,20,21
  119:1,9,13
  135:19
  145:14
  149:21
  154:11 158:7
  161:2,8
  162:10 163:7
  170:25
lined
  43:4,5
  175:15
lines
  127:15 162:9
liquid
  32:18
list

22:1 85:4
175:21
listed
  21:8 22:22
  77:13
listing
  21:12 22:2
  175:17
litigation
  172:4 173:11
little
  19:4 22:8
  23:4 25:22
  26:9,17,25
  43:13,23
  58:12 63:11,
  12 70:3
  73:24 83:6
  85:9 86:4
  90:7 126:18,
  20 129:4
  142:12
  150:4,24
  174:17
  177:10
live
  8:23
load
  34:12 39:16,
  19 40:4,10,
  14,21 42:17
  43:3,5 45:5
  49:25 52:16
  87:12,14
  118:4,7,9,
  17,20,21
  119:1,9,13
  140:14
  145:14 158:7
  161:2,8
  162:9,10
  163:7 170:25
  175:15
loaded
  134:14,18
  140:22,24
local
  6:25

located
  21:15 33:7
  151:22
  174:11
location
  9:20 54:18
  58:14 59:2
  63:18 64:10
  119:21 164:6
  176:1
long
  10:9 13:5
  19:9,24
  25:23 31:18,
  21,23 35:7
  40:21 50:2
  73:7 75:1
  82:13 126:19
  128:22,24
  129:22
  130:4,7,10
  131:24
  161:25
  174:18
longitudinal
  123:21 174:8
longitudinals
  36:8
look
  28:15 30:22,
  25 50:25
  69:20,22
  70:2,5,13
  71:6 72:4
  78:21 81:3
  105:23 106:1
  112:16
  127:16 133:5
  142:22
  176:5,17,21,
  24 177:2
looked
  27:24 68:2
  71:14 74:6
  79:13,14,20
  80:8,19 81:8
  88:17,20
  113:11

119:25
129:15
133:2,9
175:19
176:8,12
177:8,12
**looking**
21:22 22:20,
24 58:14
59:3 62:15
70:17 83:4
116:24
117:10
129:13
**lookout**
127:11
**looks**
41:7 58:23
60:1 93:11
94:12 167:3,
4,12
**loop**
131:22
**loose**
155:9
**lost**
25:24 38:13
46:23 109:1
**lot**
13:23 29:14
46:19 55:13
117:1 128:6
138:11
168:23 173:9

---

**M**

---

**machine**
9:19 11:4,
13,14 12:2
14:12 46:6
68:21 78:7
126:10
127:14
170:1,14
**machinery**
21:9,10,12,

13,15,17
22:22 68:25
69:4,6,7
76:17 77:2,
24 78:7
80:6,7,20,23
81:5,10
94:3,7 96:5
107:3,14,19,
24 108:4,16,
22 109:2,16,
19,23,25
110:3,6
111:3,8
136:4 147:16
151:9
173:12,17,18
175:7,25
**Machinery's**
176:4,13
**machining**
12:5
**made**
20:15,18
22:1 34:24
35:21,23
36:2,13,19
38:3,7 39:13
49:11 52:17
81:13 83:20
85:5,17,21
86:25 98:8
116:15,21
129:16
130:15,16,
19,22 138:21
139:22
141:11
144:18
166:23
**mail**
87:18 171:25
**mailing**
171:25
**main**
10:6 16:15
33:9

**maintain**
135:22
136:23
137:17
138:13
**maintained**
136:8
**maintenance**
123:7,12
137:23
138:12
**major**
38:22
**make**
7:19 18:12
21:4 41:12
42:5 44:11
48:24 51:4
53:20 62:4,9
63:2,11
69:11 76:19
83:17,22
84:1,4 85:4,
6,7 119:23
120:14
125:14 127:2
136:13
142:11,12
145:10 158:4
159:15 161:1
162:17
174:24
**making**
20:25 130:9
163:15
**manner**
5:14 117:14,
19 136:6
**manpower**
17:11
**manufactured**
166:22
**manufacturer**
167:24
**manufacturers**
168:2
**March**

81:11
**marine**
9:11,12,24
10:1,13,24
11:1,4,7,11,
17,24 12:1,6
13:12,14,21
14:9,12,17,
20,24 15:3,
9,22 16:24
17:22,25
18:4,21
23:7,13
28:21 30:13
42:19 44:5
49:21,24
50:15 56:6
68:6,17
69:12 71:3
72:7 73:21
81:4 82:23
112:23
116:18 136:3
141:16
143:3,10
146:5,6
151:21
156:1,10,15,
19,20,24
158:3 159:7
171:20
172:18,24
**Mariner**
38:12
**maritime**
124:4
**marked**
26:13
**market**
69:1 175:7
176:2
**marketing**
69:8
**Mary**
12:21 13:8
**material**
45:9

Gregory Busch
August 24, 2021

materials
  39:3 45:12
  69:8
math
  166:19
matter
  5:11 34:6
  44:6,23
  136:4 137:10
  138:8
maximum
  52:14
mean
  16:1 19:23
  30:19,23
  38:21 39:8
  42:10 48:18
  74:12,13
  85:22 87:1
  97:1 138:20
  159:25
  166:14,25
  170:4 175:13
meaning
  135:22 140:2
meaningless
  100:10 101:1
meant
  18:19 154:16
measured
  45:11,13
  66:13
measurement
  149:1,11
measurements
  45:17 57:9,
  23 58:5,7
  59:11,12,23
  60:2 64:20,
  25 65:4,8,
  11,12,13,15,
  21,25 66:6,9
  67:4,5
  148:20,21
  149:8,15,18
measures
  45:9

measuring
  10:20 162:15
  170:1
mechanics
  40:18
meet
  54:5 72:23
  76:7
meeting
  81:22,25
  82:10,13
  89:10
member
  11:12 133:20
members
  72:16 144:6
memory
  149:24
mention
  86:11
mentioned
  10:12 12:18
  14:3 34:21
  35:11,18
  37:18 39:16
  40:12 41:23
  42:7 45:1,6
  73:20 77:16
  84:8 88:25
  136:19 177:5
mentioning
  13:11
menu
  62:22
met
  46:19 94:16
  95:10,19
  96:12 144:11
Mexico
  22:25
Michael
  5:20
Michigan
  5:1 7:1 8:22
  9:1,23 10:23
  20:22 82:7
  112:24

124:10
151:22
173:13,14
177:9
microphone
  78:17
midbody
  90:11
middle
  122:9 163:23
Midland
  8:22 9:23
midship
  37:4 47:17
  53:2 59:8
  61:17 64:22,
  24 65:3
Mike
  161:21
miles
  130:6,7,8
mill
  39:15
mind
  14:18 120:17
mine
  153:3
minor
  34:18 123:6
  125:9
minute
  137:3
minutes
  51:22 55:15
  82:14,21
  83:1 108:11
  142:11
misrepresent
  106:23
misrepresenta
tion
  99:6 100:12
  106:20
misrepresents
  18:9 101:22
  157:2

missed
  172:10
missing
  55:14 88:24
misspoke
  161:8
mistake
  92:21
mistaken
  11:6
model
  55:1 72:24
modifications
  35:21 36:2,
  13 38:20
  39:13
modified
  34:23 36:9
  37:19
moment
  6:18 34:17
  174:6
money
  109:17,20
  110:12
month
  156:15
months
  122:24 123:5
  127:6
moot
  77:15
morning
  132:18
mortgage
  24:19 27:8,
  14 28:6
  31:10
  101:14,20
  102:7,10
  103:8,18
  104:5 108:5
  147:23
mortgagee
  27:10
mortgagees
  27:11

mother
  24:1,16
mother's
  23:22,23
motivation
  22:18
mouth
  128:19
  129:14
  130:12
move
  80:2 119:17
  122:25
  126:22
moved
  98:16,18
  125:21
  126:15
  127:11
  134:11 165:7
moving
  126:8,16
  129:2 133:21
  154:24
muddled
  131:5
multi-page
  56:1
Muskegon
  75:15,20

_____

  N

Nah
  51:11
nailed
  125:21
name
  5:16 6:13,
  16,19,20 7:3
  11:22 12:24
  13:1 21:23
  23:19,21,22,
  23 24:11
  25:4,8 29:12
  49:14 55:1
  68:14 70:4,

10 76:20
127:17,19
128:11
131:14
144:14 149:7
159:13 160:7
167:12
names
  12:19 156:21
narrow
  35:7
natural
  163:2
nature
  9:24 12:1
  16:21 43:17,
  20 79:7 86:7
  109:11
  134:24
  137:24 162:8
  167:9
naval
  73:24 74:3,
  12,15 148:21
  149:8
navigated
  117:13
necessary
  24:22 107:2
  127:13
  162:20
need
  7:15 8:14
  26:24 27:2
  51:18 54:8
  58:11 62:10,
  18 63:24
  79:2 80:7
  98:3 131:2,
  23 133:9
  140:6 142:18
  149:14
  150:10 155:9
  161:23,24
  165:17
needed
  22:19 37:21
  85:4,21

98:17 100:7
101:4 115:4
116:14
127:15
needing
  52:17
needs
  62:11 136:5
  163:4
negligence
  135:17
negligent
  114:1 115:25
  116:6 117:14
negotiation
  85:9
negotiations
  14:15 75:7
  76:10 91:13
  107:6
nephew
  173:5
never
  24:14 44:25
  68:17 72:21
  74:15 75:3,
  15 98:9
  110:21 132:5
  135:3 144:11
  145:18
  159:17 171:3
  173:3 175:19
NGT
  46:6
Nick
  172:23 173:4
night
  159:6
nods
  7:17
nondestructiv
e
  167:3 169:14
normal
  7:23 62:12
  138:17

north
  133:3
  156:10,20,24
  171:20
Northeast
  74:10,14
nose
  42:4
notch
  35:14
notches
  174:2
note
  85:15
notes
  48:23 85:17
  165:12,14
notice
  6:24 81:17
  142:2
November
  70:6,8 71:7
number
  7:13 12:25
  26:5,14,22
  42:21 46:21
  52:22 56:3
  58:17,20
  59:5 60:20,
  21 63:19
  64:12 65:17,
  18,19 66:2
  77:7 82:22
  91:12
  123:22,23
  131:15
  136:19
  139:13
  141:23
  143:20
  144:17
  145:16 146:3
  147:7 151:4
  154:25
  166:1,17
numbered
  13:3

Gregory Busch
August 24, 2021

numbers
  59:23 65:24
numerous
  49:19 138:11
  149:23

                O

OAKLAND
  5:1
oath
  5:9
object
  78:11,14,17
  104:15
  115:11
  149:21
objected
  159:22
  160:3,12,16
objecting
  18:7 80:14
objection
  15:24 18:5,8
  28:8,22 29:1
  30:6 92:4,16
  94:19,24
  95:12,21
  96:14,15,19
  97:16,17
  99:4,5
  100:11,16
  101:22
  102:3,13,22
  103:2,11,20
  104:19 105:3
  106:19 107:8
  114:3 117:21
  124:17 125:7
  144:18,21
  147:10,25
  148:10,15
  152:10,20,22
  153:8,25
  154:8 157:16
objections
  160:11,17

objectionsto
  5:13
obligated
  97:14 98:14
  99:1,21
  106:18
obligation
  124:24
observation
  141:11
observe
  159:8
observed
  71:10,12,17
  132:3 141:7
obtain
  44:12 46:8
  79:3 81:5
  147:22
obtained
  24:18 34:11,
  12 89:16
  102:9 119:14
  147:14
obtaining
  39:16 42:7
obvious
  137:21
obviously
  43:23 72:12
  127:9 137:22
  161:22
  162:14
occasion
  169:22
Occasionally
  16:15
occasions
  7:8 98:10
  108:18 146:4
  170:13
occur
  35:3,19
  72:11 97:5,
  12
occurred
  134:25

oceanographer
  22:11
oceanography
  9:2,5
offer
  21:1 88:7
offered
  69:16 88:5
offers
  20:19,21
offhand
  127:19
  143:19
office
  29:15 31:7
  53:13
official
  27:18
officially
  61:12
Ohio
  56:12
Ojala
  69:24 70:3,
  13 71:6,24
  72:17 73:5
  74:24 116:8
  135:10
  138:14,21
  145:24
  158:13,16
  159:17,18
  160:7,17
Ojala's
  117:1 159:13
okay
  8:17 16:6
  18:12,16,19
  26:6,8
  29:10,23
  30:1 31:4
  34:9 35:6
  41:23 49:12
  50:6 51:23
  54:7 55:4
  61:13 63:10,
  21 64:6,9

65:24 66:5
67:3,10
74:25 89:24
90:22 93:4,
24 100:5
102:5,18
106:10
109:13
110:13
113:19
114:21
119:23
121:1,8,13,
16 123:2
124:8 126:8
130:16
137:11 138:3
142:18,23
143:20
149:6,9
150:16,18
151:6,24
152:2,16
154:17
155:23,24
156:23 157:9
159:15
161:17
162:14
163:1,13
164:6,10,16
165:15 166:7
167:1,8
168:10
170:13,20
171:8,14
173:20
174:20 175:7
176:11,23
177:17,24
on-charter
  120:7,11
  121:5,17,23,
  25 122:3,6
onboard
  17:2
once
  6:15 70:18

Gregory Busch
August 24, 2021

73:6 111:9
128:15
130:12,16
one
6:14 7:3,21
10:6 11:18,
20 12:9,24
13:9 14:20
15:10,11
20:22,23
23:13 26:6,
18 37:20
41:9,23,25
44:25 46:25
47:9,17,20
48:16 53:1,2
55:2 60:10,
18 70:12
71:4 73:25
74:4 76:16
84:6,15
85:9,20
90:18 91:11
93:5 97:3
104:25
105:23
108:20
114:14,17
118:19
128:12
133:3,7
134:17
135:10
139:13
142:16
150:24
151:1,8
157:4,9
160:5 162:1,
2 163:24,25
165:6 171:9
174:18 176:7
one-way
118:9,17
119:19
one-year
41:17 42:7
44:6,12,20

89:16,23
161:11
ones
33:20 35:25
61:4 88:17
133:9 135:9
142:9
open
40:7 115:9,
22 117:4
130:5 132:6
opening
156:2,15
operate
40:4 113:16
115:9,22
116:1,6
117:3,18
118:3 119:6,
14 128:6
135:23
136:23
137:17
operated
53:22 136:5,
8 140:15
141:12
operates
12:11 26:10
operating
17:8,10
129:2 141:12
operation
10:21 129:7
130:23
131:19
139:13
168:10
operations
18:1 117:13
operator
22:14 53:24
opinion
85:22 102:23
104:20
115:15 116:5

opinions
149:25
opportunity
7:13 139:23
143:8 176:20
opposed
22:6 176:2
option
41:8
order
95:10,19
97:14 103:8
147:10 148:6
177:22
ordinary
124:14 125:4
138:18
162:22
original
52:15 66:1
100:21
129:21
originally
25:9 32:9
34:23 35:7
36:6 37:13
39:3 93:21
outlets
175:21
outlines
44:1
outside
45:18 67:22
102:23
owned
13:5,6,14,
17,20 14:20
15:9,10,11
17:21 23:5,
8,15,16
42:19 43:16
44:5 56:5
73:9 75:14
143:24
owner
11:7 34:10
44:20 45:17

75:20 104:25
118:24
120:7,9,10
121:5,7
122:9,10,13
157:14,22
158:1 171:18
177:12
owner's
56:25 122:11
owners
11:9 171:6
ownership
105:10
145:18
153:16
157:23
owning
14:5 32:12

_____

P

p.m.
5:3 51:25
52:1 99:19
108:12,13
142:24,25
143:5,6
162:4,5
178:7
P224
56:3
P233
56:3
P252
26:14
package
60:14 71:23
pad
85:15
page
7:12 26:24
28:13 56:4,
7,11 57:12
58:13,24
59:7,10,22
62:3 63:16,

Gregory Busch
August 24, 2021

17,23 64:3,
9,15,19
65:6,10
66:15,19,20,
23 93:2,17,
18,19 94:7
98:20
112:10,11,
15,19 117:10
122:8 149:9
151:6,7
155:20
167:11
**pages**
57:8 60:19
62:24 88:23
93:1 142:6
149:23
155:19,23
**paid**
23:1 24:9
77:9,11
152:14,15
153:4 168:24
**paperwork**
24:12 25:10
41:11 100:3
107:18,21,23
**paragraph**
27:6 94:22
97:5,8 101:7
112:19
117:10
120:7,22
121:4 122:8,
9 124:1
135:17
136:20 139:6
140:1,14
141:2
**paraphrase**
173:23
**parents**
147:24
**parsing**
153:20,21
**part**
16:25 31:21

32:12 35:24,
25 42:15
43:18 45:3
52:4,25
60:14 71:11
72:19 94:4
98:3 123:3
127:2 131:2
139:22
**partially**
32:14
**participated**
147:13
**participating**
5:6
**particular**
10:21 16:1
17:8 22:5
37:19 44:11,
19 54:9
68:12
120:13,21
134:10 136:7
163:14
164:21
165:1,5
167:5 169:19
174:1
**parties**
5:12 94:12
97:2,7
**parts**
138:7
**party**
81:13
**passed**
129:24
**past**
20:25 54:23
71:3,4 90:8
159:14 160:7
**Pat**
7:3
**pathway**
16:6
**patient**
161:15

**Patrick**
5:18 6:13
**Paul**
23:17
**pay**
131:18 153:4
172:7
**payment**
155:5,10
**peaceful**
122:13
**peak**
33:20 35:16
42:14 90:9,
10
**penalty**
5:12 143:14
**people**
17:1 20:22
46:20 82:23
107:13
144:10
168:25
172:24
177:10
**percent**
22:18 54:16
88:11
**Perfect**
156:23
**perform**
17:3 168:18
**performed**
122:1 146:6,
12 171:3
**performing**
149:8
**performs**
40:18
**period**
20:10 43:8
123:1,12
131:18,25
158:12
170:25 176:6
177:1

**periodic**
162:8
**periodically**
53:22
131:21,24
**perjury**
5:12 143:14
**permanently**
12:22
**permission**
157:7 159:17
**permit**
122:11
**person**
5:10 13:15
45:16 70:10
82:2 88:1,3
168:13 169:1
**person's**
127:17
**personal**
74:19,23
167:3
**personally**
13:15,16
23:12 26:20
29:14 30:12
31:6 74:7
145:4
**personnel**
48:22 51:10
**persons**
69:17
143:21,25
**pertaining**
91:15 146:5,
6
**phenomenon**
162:21 163:2
**phone**
77:1 81:21,
24 134:22
137:12
160:14
**phonetic**
12:5 16:10
70:4,12

131:22
152:3,4
172:23

**photographs**
116:24

**phrase**
120:21

**physically**
5:7 174:11

**picked**
125:16
129:22

**picking**
83:11

**picture**
25:24 162:7

**piece**
136:4 167:5

**pieces**
51:2,6 93:3

**pilings**
38:15

**pilot**
128:10 141:3
144:15

**piloting**
141:8

**pipe**
16:22

**pipeline**
19:19 22:14

**piping**
34:11

**place**
30:3 38:9
82:4,10
109:9 134:4
167:15

**places**
20:3 30:25
162:16

**Plaintiff's**
90:23

**plan**
23:2 151:20

**plans**
139:17

**plate**
37:1 59:23
65:11 163:3,
14,25 164:6,
11 165:18
166:18,20,24

**plates**
34:19 165:20
166:8,9,12,
17,22

**platform**
19:6

**plating**
36:5,6,21
37:5,6,9,12
45:14 66:4,
6,12 123:15,
16 147:4

**play**
105:1,7

**pleading**
90:20 91:24
92:3,14
143:9

**pleadings**
92:17 172:16

**please**
5:15 6:9,15,
17,20 8:7,19
27:2 31:15
58:11 63:1
95:7 103:5
112:5 114:11
146:11 156:6
157:9 177:22

**pleasure**
159:24

**point**
15:1 20:15
21:3,4,7
22:16 23:23
24:6,8,18,24
32:7 34:25
37:4 50:24
68:5 77:15
92:23 101:13
111:13
120:20

128:25 129:4
130:12
134:20
156:18
164:25 172:8
173:10

**poorly**
14:23 134:17
166:8

**port**
33:18,21,24
34:2 37:7
38:17 59:2,
5,8 60:20
61:1,9,15,17
64:10,12
65:15 67:5,9

**portable**
109:1

**portion**
27:3 55:23
99:17

**portions**
38:23

**position**
100:9,19
110:11
119:4,12

**positive**
44:18

**possession**
105:22
113:16
117:17 120:9
121:6,24
122:12
124:24 158:8
161:9

**possibility**
87:1 113:5

**possible**
20:9 58:9
62:23 75:8
84:10 87:25
144:15

**possibly**
23:13 71:22

159:14 163:4

**Post**
15:17

**posted**
176:19

**posting**
176:1

**potential**
73:1 76:17
111:18
176:25 177:3

**potentially**
156:11

**Power**
38:11

**practicing**
73:25 74:4,
11,12

**preparation**
147:13

**prepared**
56:14 58:2
91:7,22
92:24 93:7,
22 96:4
114:14

**presence**
86:13 163:10

**present**
5:7,24 47:6
50:10,15,17,
19 51:9
55:10 67:19
71:6 82:8
84:21

**presented**
27:8 28:6

**presents**
6:1

**president**
70:11

**pressure**
50:22

**pretty**
12:16 71:25
77:13 129:10
133:15 160:1

161:23 168:9

**prevented**
170:9

**previous**
20:3 34:10
70:6 157:22

**previously**
14:3,18
15:3,7 26:14
32:7 49:17
71:3 106:25
130:14
155:24
159:10

**Primarily**
10:23

**prior**
16:14 19:21
20:6,8,14,19
21:12 23:15
44:7 47:4,24
63:23 70:6
75:25 81:22
103:17 104:5
105:15 120:8
121:6,24
124:22 127:6
144:19
158:20
160:21
176:17,23
177:3

**probably**
7:11 12:23
16:13 22:17
43:7,21
45:25 49:22
53:12 60:12
82:11 85:17
91:8,9
109:10
128:7,25
129:14 142:1
166:14

**probate**
24:15 147:14

**problem**
8:5,7 26:11

44:25 86:14
129:1,8
166:20

**problems**
41:7 86:15

**procedure**
6:25 44:2,3
53:25 55:9
61:2 121:21
163:20

**proceed**
6:10 23:2
42:2,4

**process**
34:13 35:13
164:3

**processing**
100:3

**produce**
27:22 30:22
79:15 121:22

**produced**
26:14,19
27:5 30:1,5
31:5 56:2,13
66:23 77:22
78:6,8,25
79:4,21,24
80:21,23
87:25 90:22
104:3,7,10
105:17,21,24
114:8
150:12,13
151:5 155:24

**production**
27:21 28:13,
17 30:10,19
167:11

**professional**
170:7

**project**
11:1 12:13,
17 16:25
17:6,11,13,
19 18:17,20,
22 19:19,21
20:5

**projects**
18:23

**properly**
101:9 128:2
140:15

**property**
172:21

**propose**
170:4

**proposed**
117:15
144:20
147:9,11

**protect**
113:11
157:25

**prove**
168:7

**provide**
8:17 106:15
124:10
141:24 167:2
174:11
175:8,10,11

**provided**
17:1 23:11
69:7 91:14
120:12
143:18
149:15
173:20

**providing**
17:10

**proviso**
143:17

**prudence**
122:14,19
123:4

**prudent**
132:10 136:5
158:4 170:11

**publication**
15:17

**pull**
30:10,13,18
41:22 101:25

**pulled**
24:12

**pulp**
16:10

**pumps**
34:10

**purchase**
22:23 69:13
72:8 73:2
75:8 144:20
170:2

**purchased**
23:17 24:9

**purchaser**
176:25 177:3

**purchasing**
151:11

**purpose**
35:14 83:15
85:23 119:20
162:14
173:25

**purposes**
136:12

**pursuant**
6:24 113:25
121:25
161:10

**pursue**
177:16

**pushed**
38:14

**pushing**
174:3

**put**
15:1,17 17:1
22:23 25:25
35:9 36:4,7,
9 55:18
112:8 119:19
135:12
142:15 149:1
166:24
174:2,9

**puts**
25:22

Gregory Busch
August 24, 2021

putting
22:6 34:6
141:15
150:25

_____

Q

qualification
74:6
qualifications
73:23 74:20
116:3
quantify
166:17,25
quarter
174:15
question
7:25 8:2,6,
7,8,11,12,
16,17 28:4,
20 30:16,18
39:6 40:22
43:18 49:4
52:7 61:13
62:19 71:11
74:25 89:9
92:2,10,11
94:5 95:4,7
96:1 98:12
99:9,11,12,
15 103:4
107:11
114:11
115:12
117:6,22
121:1,17
129:21 131:7
136:10
142:19
143:20 145:1
149:19
152:18 154:9
155:1 156:13
165:20 166:7
168:15
172:15

question's
7:24
questioning
80:13 149:22
questions
7:14,15 8:4
31:14 72:13
79:11 80:12
141:23,24
143:17
161:16,22
168:6
quick
162:1,2
quickly
155:19
quit
169:1
quite
29:21 37:9
51:7 160:13

_____

R

radio
127:15 128:7
radius
36:19 37:7
166:15
raise
22:19 160:17
raised
44:20
rake
33:21 35:7
53:3 54:10
65:17 90:9
127:8
ran
160:7 175:18
Randal
75:2 114:10,
14
random
59:10,23
60:19 64:19,
24 65:4,7,

11,20 66:5,
17 166:5
176:19
rate
129:10 141:3
re-depose
79:2
reached
172:18
read
59:16 63:25
91:18 99:14,
18 112:14
114:24 115:1
120:13,14,
18,21 121:14
122:16
124:12
142:12,13
143:8 167:11
168:2,3,7
173:23
readable
63:12
reading
54:9 55:11
60:11 121:15
137:2 142:21
153:21 154:6
164:8,10,22,
25 165:2,7
readings
48:1,9 52:3,
25 53:2,3,7,
19,21 54:3,
17,18,21
60:9,13,24
61:8,13,15
62:19 67:19
68:1 88:2,
13,14 89:1,3
90:14 91:17
147:1
164:13,18,
20,23 165:1,
6,16,18,19
166:1,3,6,9
168:8

readmitting
148:11
real
132:17
reason
8:14 67:10
83:7 85:3
117:5 171:11
rebuilt
35:15
recall
20:9 28:9
34:14 37:8
52:24 53:5
54:7 55:12,
17 56:18
57:24 58:9
71:25 72:12
76:20 87:11
89:24 90:5
91:9,11
109:13,15
114:17,18,25
115:3,6
116:16,17
132:2 155:25
167:6 169:15
173:12 177:7
receipt
155:17 156:4
receive
9:6 151:16
received
20:19 21:24
27:4,18,21
28:5 29:16
31:11 49:25
105:17
107:23 108:1
111:5 169:6
receiver
131:14
receiving
26:17 28:9
111:2
recent
100:1

Gregory Busch
August 24, 2021

recently
35:11 81:11
recertified
169:11,18
recess
51:16 108:12
162:4
recognize
62:13 111:17
128:13
149:2,16
recognized
61:12
recollection
27:14
recommended
34:14,15
116:20
record
5:16 6:22
24:21 27:10,
11 52:1
53:17 99:18
108:13
142:24,25
143:4,6
149:5 151:4
162:5
164:18,23
recorded
5:1 53:8
60:11,13
61:18 89:1
102:19
105:15 165:3
recording
27:9,20 28:7
records
105:8 173:20
Recovering
110:24
reduce
62:23 93:12
112:4
refer
143:18
154:12

reference
153:3
referred
16:20 45:4
153:18
156:11
159:25
referring
29:18 32:17
36:16 57:5
58:17 79:22
81:14 136:2
145:2
reflect
6:22
refresh
26:9 27:14
refused
172:20,21
regard
10:4 19:5
37:22 42:7
47:13 65:20
66:17 68:9
70:16 73:1
74:19 78:3
80:24 83:22
93:7 104:11
109:4 123:15
131:19
132:23 136:1
139:1 143:2
144:6
158:13,16
regarding
56:7 65:7
72:8 75:8
76:16 77:24
80:5 81:3
83:1 114:15
116:21
133:24
137:24
144:19
145:25
register
24:21

registered
24:23,24
31:11 101:20
102:19
103:7,16
104:3,8
106:5,11,16
regret
151:10
regulation
39:22 40:2
70:25
reinstated
169:4
rejected
25:1,10
relate
59:12
related
29:24 30:4
48:20 57:9
78:5,7
80:19,23
81:1 82:24
168:6
relating
124:2
relation
84:18 176:18
relationship
80:6,24
173:9
relative
172:2
release
108:5
147:14,22
releasing
104:4
relevant
30:22
relied
122:2
rely
168:13
relying
145:13

remember
15:11 20:2
26:17 37:2
44:8 55:1
67:8 73:7
106:6,8
116:19,24
133:6,10,12
154:20 156:3
159:12
160:14
remotely
5:1,8 168:4
remove
103:8
removed
34:10 127:1
renewal
89:13 158:7
renewals
158:10
renewed
40:25 46:10
118:5
rent
10:1
rented
172:25
repair
37:18 48:25
51:10 53:4
54:14 85:11
116:16,17
166:23
repaired
54:6 115:4
repairs
35:23 38:3,6
42:5,6
48:19,24
49:10 51:1
52:17,21
85:4,6,8,20
86:25
116:14,19,20
138:12

Gregory Busch
August 24, 2021

**repeat**
  25:7 65:1
  95:7 97:25
  99:10 130:25
**rephrase**
  8:8 76:2
  103:4
**replace**
  36:6 39:1
**replaced**
  35:24 37:6,
  8,9,21 38:24
  66:4,7,10,13
  123:11
  138:11
**replacement**
  37:18 163:5
**replacements**
  36:19 38:21
  138:12
**replated**
  36:21
**report**
  61:3,11,20
  67:12
  114:17,21,
  22,24,25
  115:7,19
  116:8 117:2
  121:22 133:3
  149:1 150:21
**reported**
  105:9
  145:18,21
**reporter**
  5:5,23 6:3,9
  7:16 10:15
  13:18 17:15
  18:6,10,14
  25:6,19
  31:20,24
  36:24 43:1,5
  54:12 61:22
  65:1 70:22
  74:1 75:17
  78:12,16
  86:18 95:1
  97:24 98:4

  99:14,18
  103:13 108:8
  117:25
  118:11,15,
  19,21 123:8
  125:24
  130:25 131:3
  148:12,17
  152:22
  155:14
  163:18
  165:23
  167:18,22
  171:15
  172:12
  174:24
  177:24
  178:3,6
**reporting**
  5:8,14
**reports**
  114:9,13
  133:2,24
  135:6,8
  138:1,3
  145:24
**representation**
  78:15,18,23,
  24 83:17,23
  84:1
**representations**
  84:4
**representative**
  56:25
**representatives**
  143:25
  144:1,2,13
**represents**
  6:14 7:4
**reputation**
  158:3
**request**
  44:22 78:20
  90:24 91:12

  158:7 171:6
**requested**
  27:6,25 31:5
  48:8 61:4
  78:25 79:4,
  23 99:17
  154:18 155:4
  178:8
**requesting**
  44:13,21
  155:2
**require**
  40:10
**required**
  39:11 40:4,
  7,21,22
  42:13 45:16
  46:13,15,17
  49:2,5 52:21
  99:2,23
  131:13 136:8
  162:12 165:5
  170:23
**requirement**
  39:19 46:21,
  25 61:2,5
**requires**
  48:4
**research**
  18:23 19:2
**reserve**
  79:2 80:1
**reserving**
  79:7
**residence**
  8:21
**resistance**
  46:19
**resources**
  16:18
**respect**
  92:9
**respond**
  100:20 110:6
**responded**
  78:21

**response**
  22:17 27:5
  38:7 110:9
  137:1 145:4
  148:16
  151:19,24
  156:14
  176:4,13
**responses**
  90:24 141:17
  143:10 145:6
**responsibility**
  125:3
**responsible**
  124:16,23
  158:5
**restate**
  146:11
**restating**
  148:15
**restrictions**
  119:19
**resubmitted**
  25:11
**result**
  38:4,19 40:3
  86:14 138:4,
  24
**results**
  44:18
**retain**
  68:10 133:23
**retirement**
  21:25
**return**
  34:14 75:21
  109:16,25
  112:23
  124:25
  151:20
  153:15
  154:19 155:5
**returned**
  153:11
**revert**
  24:1

Gregory Busch
August 24, 2021

**review**
   53:12 88:23
   91:22 96:6
   145:6,8
   150:2
**reviewed**
   91:5 115:7,
   19 138:1
   144:10
**reviews**
   44:15
**rig**
   35:10
**right**
   7:10 8:18
   10:25 14:13
   28:19 33:11
   38:3,6 39:8
   40:25 44:22
   47:8 52:19
   53:16 56:10
   58:16,23
   59:2 63:15
   64:2,15
   75:1,24
   79:1,2,7,13,
   18,22 80:1,
   4,12,17
   88:21 89:18,
   21 90:19
   93:17 94:22,
   23 97:8,11
   105:21
   108:10
   110:25
   112:2,8,19
   121:4,9
   122:12
   130:10
   135:11,15
   137:4,25
   138:23
   139:4,6
   140:25
   141:13,20
   142:11
   143:2,8
   144:6 146:16

149:5 150:7
   152:5,16
   156:4,25
   157:9 159:5,
   21 160:3
   161:1,14
   162:20
   163:7,11
   165:11 167:1
   168:14
   169:24
   170:11,17
   171:1 173:7,
   11 174:25
**rights**
   122:11
**river**
   5:19 6:15
   7:4 14:8
   19:13 24:13
   32:9 38:10,
   11 75:5
   76:5,12
   81:13,16
   83:10 90:24
   93:8 105:11
   128:19
   129:6,11,15
   130:3,4,12
   135:18
   139:19
   141:9,13
   151:11
**rivers**
   40:8
**riveted**
   163:24
**Road**
   8:22 9:23
**rocky**
   38:15
**role**
   67:22 105:1,
   7
**roll**
   175:4
**room**
   5:7

**rotate**
   62:24 63:6,
   23 64:2
**rough**
   142:1
**roughly**
   174:14
**routinely**
   170:21
**rudiment**
   38:16
**rule**
   52:19 163:21
**rules**
   6:24,25 7:11
   43:25 166:2
   168:20
**run**
   137:9 159:13
   174:16,17
**running**
   156:17
**Ruth**
   27:11 147:15

---

**S**

---

**safe**
   117:12
**safely**
   140:15
**Saginaw**
   38:10 130:9
   173:14
**sale**
   14:10 15:1
   20:16,18
   21:5 22:3,6
   23:1 24:3,4,
   13 69:5,17
   70:7,16
   76:11 77:8
   80:25 81:1
   82:24 91:14
   92:24 93:6,
   21,24 94:15,
   16 98:13

99:1,22
   100:10
   101:10
   104:12,24
   105:2,9
   106:3,6,8,
   16,18 107:19
   108:1,2,23
   109:12
   111:18
   112:21,22
   113:6 124:25
   147:9,12
   151:13
   153:12
   175:22
**sale-related**
   147:14
**sales**
   139:21
**Saluck**
   75:22
**sample**
   153:9 168:8
**satisfaction**
   24:18 27:8,
   15 28:6 31:9
   54:5 102:9,
   18 103:7
**satisfied**
   41:10
**satisfying**
   104:4
**save**
   23:4 80:8
**saying**
   18:11 30:24
   66:25 67:1
   136:22
   138:15
   149:20
**says**
   27:8,19 28:5
   56:4,11,19,
   24 58:13
   59:2,8,10
   63:18 64:10
   91:18 93:19

Gregory Busch
August 24, 2021

94:22 97:5,
10 101:7,12
112:19 114:7
117:11,16
120:7 121:4
122:9 124:7
139:6
140:18,20
147:10 149:7
151:10,23
154:14,21
155:7 157:5,
9 167:14
**Scale**
53:22
**scanned**
87:20 88:3
**scattered**
50:9 109:10
123:24
161:22
**schedule**
113:18
**school**
9:1
**science**
9:2,3 22:12
**screen**
26:2 142:16,
22 149:3
150:25
**scroll**
26:16 55:25
56:10 112:13
142:18
149:13
**scrolling**
58:10 63:21
**sea**
70:24 133:24
141:5
**Sealed**
44:1
**seaworthiness**
39:20,25
119:17

**seaworthy**
84:2 119:5,
15,18
122:15,20
139:15
144:22
145:12,23
162:17
**second**
56:11 84:18
85:3,13,19
87:9,14
90:19 93:17
97:5,9
**section**
164:11
**sectional**
12:10
**see**
12:9 26:5,
23,24 27:3,
12 55:18,22
58:13,15
59:3 62:2,5,
6,21,25 66:2
80:15 85:20
88:23 90:19
93:10 97:8
106:3 112:24
116:21
129:22
130:6,13,17,
22 135:18,24
138:2 141:18
148:20,25
149:3,4,11
151:1,2,14
155:20
175:17
**seeing**
26:2,4 63:17
93:3 116:16,
19 128:24
141:12
149:24
**seek**
44:6 89:19

**seeking**
44:20
**sees**
62:15,16
**segments**
26:23
**segues**
59:16
**selections**
163:15
**Self-employed**
9:11
**sell**
68:6 69:9
70:20,23
83:4 175:8,
18
**seller**
101:7
**selling**
15:15 21:2
22:18 175:9
177:15
**Seluck**
75:13,14
**send**
44:13 87:18
107:21
**sends**
131:14
**sense**
62:4 120:14
136:5 174:10
175:20
**sentence**
120:15 121:4
157:5,9
**separate**
9:12
**separately**
155:9
**September**
116:9,12,23
158:17
**serious**
176:10

**seriously**
177:16
**served**
143:9
**service**
117:15 171:4
**services**
15:18
**serving**
83:15 127:11
**set**
12:15 60:9
76:22 81:25
94:23 161:3,
5 175:3
**setting**
51:9 60:19
81:21 87:9
102:8
**setup**
51:5 98:2
**seven**
66:2,5
**several**
149:23
**severe**
41:6
**shallowness**
126:4
**shape**
119:23
**share**
139:16
**sheared**
38:16
**sheets**
85:11
**shell**
59:10 64:20,
25 65:7
174:14
**ship**
38:12,22
**Shipping**
39:23 40:16
56:13 144:2,
7

Gregory Busch
August 24, 2021

shipyard
  45:18 48:21,
  22,24 56:12,
  17 70:20
  168:24
shipyards
  46:20 168:23
shoot
  127:18
shop
  12:3 46:6
  126:10
  127:14
  170:1,2,14
shopping
  170:10
shore
  82:19 85:17
  87:4 126:23
  156:10,20,24
  171:20
shoreline
  126:18,25
  127:1,9
short
  51:13,16
  110:17
  130:14 176:6
shortened
  35:1,6,9
shortly
  139:2 156:5
show
  26:13 90:18
  102:20
  160:20 170:6
showed
  101:19
showing
  44:11 56:1
  93:1
shown
  59:13 66:21
shows
  59:17 104:3,
  8 105:14

shrink
  141:21
  148:25
shrugs
  7:18
sic
  11:11 68:18,
  21 102:20
  151:21
side
  33:17,18,24
  34:1,2 37:7,
  13 38:17
  47:23 58:18,
  21 59:5,10,
  17 60:3,25
  61:1 64:12,
  19,24 65:7
  67:4,5
  125:21
  174:14,19
sides
  34:16 47:22
  59:14 174:21
  175:5
sideways
  64:1
sight
  129:25
  130:11
sign
  107:20
  153:13
signature
  107:24
  112:11
  167:12 178:8
signatures
  25:2
signed
  93:7,9,22,24
  94:10,12
  96:6,8
  111:21
  112:17
  113:2,9,12
  142:2 143:13

significance
  79:17
signing
  75:7 106:6,
  8,10
silent
  71:25
similar
  49:6
simple
  53:25 167:25
simply
  20:25 37:22
  168:16
sir
  6:3 13:4,18
  17:16 25:6
  65:2 70:22
  97:24 123:8
  131:1 155:15
  163:19
  165:23
  167:19
  171:16
sit
  23:8 135:4
  137:15 139:3
  149:17
  150:6,20
site
  17:2 128:20
  129:24,25
sites
  133:7
sits
  150:6
sitting
  28:19
situation
  75:25
size
  12:19 19:8
  34:3 48:3
  62:23 63:11
  93:12 112:4
  164:4 166:21

sizes
  166:20
slash
  156:24
slightly
  54:24 146:15
slow
  62:18 100:3
  132:11
slowly
  58:11 63:21
  112:13
  149:13
small
  55:22 142:13
smaller
  142:12
sold
  15:3,7,12
sole
  9:16 11:7,11
  119:20
sort
  12:1 15:4
  19:10 32:11
  34:9 36:2
  44:11 45:12
  46:4 54:25
  57:12 71:9
  77:2 110:14,
  17 119:5
  134:21 162:7
  171:4
sorts
  16:1
source
  30:3 150:7
space
  156:12
span
  144:5
speaking
  7:22 16:3
  37:24
speaks
  94:24 97:16
  99:5 124:18

Gregory Busch
August 24, 2021

154:1
**special**
162:8 169:5
**specific**
19:4 20:2
54:1 78:19
80:14 86:24
131:23 142:9
**specifically**
16:24 29:17
30:10,14
36:16 38:6
45:11 48:8
52:24 53:6
54:8 78:24
84:7 86:12
89:24 90:5
91:10,11
121:10
122:22
123:20 127:3
131:18
133:5,11
140:24
**specificity**
147:8
**specified**
42:15
**specify**
42:6
**speed**
129:10,15
131:15 132:5
141:4
**speedsty**
12:4
**spell**
6:16,20
68:14 70:12
**spent**
82:15 85:15
**spite**
153:18
**spoke**
82:1
**spoken**
76:25 108:16

**spring**
76:7
**spuds**
38:16
**spurred**
98:9
**stability**
87:15
**stage**
20:25
**stamp**
27:19 63:16
**stamped**
31:10 93:2
102:7,8
105:14
106:4,11
**standard**
166:21
**standards**
136:15
**standing**
53:16
**stands**
47:8 102:3
**starboard**
33:17,21,23
34:1 58:14,
17,18,21,25
60:21,25
61:9,14,17
63:18,19
64:6 65:16
67:4,9 85:8
**start**
7:5 56:4
93:15 98:3
112:10 162:3
**started**
51:1
**starting**
56:7 122:8
**starts**
26:6
**state**
6:16 124:5,

120:4 133:19
10 144:22
166:2 173:13
**stated**
106:25
**statement**
79:23 136:18
153:2
**statements**
91:4
**states**
10:23 26:15
101:10
104:11
121:10 124:4
**stating**
5:15
**status**
171:22
172:19
**statute**
40:2
**statutory**
39:19
**staunches**
36:11
**stayed**
82:19 85:17
**STC**
17:25 20:15
32:23 48:5
49:18 50:1
**STC2004**
13:24 14:18
17:14,17
18:4,22
19:15 23:6
29:24 31:17
40:5 42:17
47:2 48:1,11
49:17 50:8
56:4 68:7
71:7 75:8
76:1,5,16
80:25 101:15
109:5 136:7
151:12 156:7
157:11

**steamship**
38:13
**steel**
36:5 39:7,8,
9,10,12,15
52:12 85:10
162:15
166:21
**steering**
126:20
**step**
80:9
**stern**
127:3,5
**stick**
166:5
**stipulate**
26:21 79:10
**stipulated**
49:10
**stold**
75:20
**stole**
75:15
**stone**
16:9 177:11
**stop**
80:13 149:13
**stopped**
70:18 158:11
**storage**
172:1,7
**story**
22:8 154:17
**strain**
174:6
**strands**
175:4
**strapping**
173:24 174:1
**straps**
174:8,10
175:2
**streak**
163:25
**streaks**
164:1 166:12

strength
174:8,9
stretch
130:6
stretching
163:3
strict
17:9
strictly
138:8
strike
13:12 14:16
19:12 20:14
40:12 47:5
57:15,17
72:1 73:11
84:14 87:7
125:12 155:2
structural
39:20
structurally
35:8
structure
174:12
Sturgeon
75:13
sub
19:7
Subchapter
70:24
subject
44:18 103:2
submarine
18:23 19:3
160:24
submersible
19:7,8
22:13,16
submission
147:17
submit
34:13 53:12
submitted
25:9 35:13
53:11 68:1
146:4 148:7
153:14

subsequent
20:4,7
substantial
37:3,9
substantially
16:5
sue
77:25 78:1
111:11
173:17
sued
110:19
suggested
83:19
suitability
139:8,10
140:4,9
suitable
117:12
139:15 141:4
summer
119:25
Sun
21:8,10,12,
13,15,17
22:22 68:17,
21,25 69:4,
6,7 76:17,
18,24 77:2,
23 78:7
80:5,6,20,23
81:4,10
94:3,7 96:5
107:3,14,19,
24 108:4,16,
22 109:1,4,
16,19,22,25
110:3,6,22
111:2,3,8
147:16 151:9
173:11,17,18
175:7,25
176:4,13,19
supervisors
144:11
support
22:15

supporting
174:12
supposed
42:1 47:11
107:9 131:16
139:11
sure
7:19 12:23
14:25 17:7
20:6 41:12
45:25 46:22
48:18 49:4
51:4,20
53:20 63:13
77:1 78:6
80:5 87:13
88:22 96:20
100:20 112:6
114:12
119:23
120:19,24
148:23
159:15 161:1
162:17
168:15
169:20
173:19
174:25
surprised
90:7 129:4
132:4 150:4
170:6
survey
41:25 43:14,
17,24 44:4,
7,18 45:1,4,
22 48:11,13
49:1,3,7
50:10 51:9
52:5,25
53:22 54:4,8
56:5,16
61:12 73:6,9
89:14,25
90:2 116:4,
25 117:1
120:8,11
121:6,18,22,

23 122:1,2,
3,4,5,6,23,
24 123:2
145:14
146:20 147:5
158:18,21
159:4,5,11,
15,19,22
160:2,3,8,18
161:11
162:10
168:19 171:1
177:14
surveyed
73:21 116:23
177:8
surveying
159:8
surveyor
41:21 42:3,8
43:22 47:6,
8,10,15,18
48:4,6,22,23
49:10,12
50:20,24
51:7 52:18,
22 53:15,19,
23,24 54:2
55:6 56:25
57:5 58:8
67:21 69:25
73:18 121:22
146:15 164:7
165:4 168:18
170:7
surveyors
43:22 73:17
75:1 146:16
164:21 166:4
surveys
10:14,16
43:9,20
45:12 48:17
49:17,21
50:6 67:21
90:15 114:9,
15 116:8
144:9 146:5,

Gregory Busch
August 24, 2021

6,10,12,19,
23 158:13,16
162:8
**swore**
173:3
**sworn**
6:6
**system**
34:11 35:15
131:8 132:3

———————

**T**

**take**
7:17,21 8:14
18:23 28:16
51:13,16,18,
22 54:3,8
55:20 60:10
65:21 78:22,
23 82:4,10
88:16 89:11
90:14 108:8,
10,11 113:16
120:24
163:13,25
164:17 165:6
166:1,15
167:15 178:4
**taken**
6:23 41:15
48:9 51:25
52:4 53:16,
19 54:22
56:11,19,24
58:6 60:24
61:8,14,15
62:19 67:6
89:1 91:17
108:12
110:22
147:23
148:21 162:4
163:9 165:3
**takes**
12:15 26:9
48:23 53:17

**taking**
7:16 45:6
57:23 117:17
121:24
127:24 147:1
164:25
**talk**
13:23 87:9
96:8 171:20
**talked**
23:5 60:20
68:5 87:6
128:7 138:3
**talking**
18:11 25:23
52:4 140:7
145:3
**talks**
124:1
**tank**
32:10,11,13,
16,18,20,24
33:1,13,14,
20 34:5,7
35:16 58:17,
20 59:5
60:21 63:19
64:6,12
**tanks**
33:13,23,24,
25 34:2
35:17 58:20
60:24,25
61:9,10,14,
15 62:20
65:16 67:4,5
86:1,2,3,8,
13 90:10,12
123:14,18
**target**
101:3
**Tawas**
17:24 18:3,
17,20,24
19:6 160:24
**tear**
12:16 125:4,
8

**technical**
143:4 168:25
**technological**
62:1
**technology**
26:25 62:14
**Ted**
133:19
144:15
**telephoned**
172:6
**tell**
12:18 15:15
16:6 27:22
28:13 29:17
33:7 39:1
41:5 42:5
43:13 58:12
61:19 62:7,8
68:20 71:9,
12,19 89:2
128:3 129:2
131:23
133:11
142:13,18
154:6 164:1
173:12
**telling**
28:25 100:25
159:7 163:13
164:10
**tells**
48:23
**temporary**
12:15
**ten**
51:22 60:1
65:13,24
66:2,5,17
108:11
138:10
165:18 177:3
**tend**
162:23
167:21
**term**
17:8 113:1

**Terminal**
156:10,20,24
**terms**
8:5 39:24
49:20 71:10
76:10 77:3
83:14 88:17
94:15,23
95:9,17,19
96:12 122:18
129:1,7
140:10
159:14
**Terrance**
11:22
**Terry**
69:23 76:7,
13,14,15,18,
21 81:21
82:8 86:6
87:6,9 89:11
93:8,25
97:22 98:5,7
100:6 107:1,
7,24 112:17
126:12
128:11
132:6,18,25
134:4,8
144:14
151:8,19
155:21,25
156:11,14
**Terry's**
98:17
**test**
18:25 19:2
**testified**
6:8 28:9
**testify**
6:6
**testimony**
5:11 18:9
79:11,19
104:20
164:16
169:21

Gregory Busch
August 24, 2021

testing
167:3
169:14,22
171:4
**Thank**
6:3,9 31:24
51:23,24
63:12 74:25
80:17
148:17,18
150:16
161:16,17
177:18,19
178:6
**thereof**
122:13 124:3
**thick**
36:6 174:15
175:6
**thickness**
37:12 45:10,
14 52:5
56:5,20 66:1
91:15,16
143:23 147:2
149:1,8
162:15
**thin**
162:23 163:5
**thing**
11:15 68:9
106:10
132:10 158:4
178:5
**things**
10:6 29:21
46:24 48:8
55:13 62:5
79:16,24
87:12 125:11
147:22
161:23 168:6
170:1
**think**
11:6 18:9
23:12 28:2,
8,15 31:12
35:4 36:1

37:7 40:22
43:24 45:1,4
46:22 47:4
49:13,22
62:3,21
63:2,10
67:8,12
68:5,15,19
70:4,18
72:12,14
73:6,10
76:6,21 77:7
79:6,8,19,24
81:11,24
87:16 88:9,
10 89:12
90:11 103:13
112:8 115:25
122:2
123:16,22,24
126:10
127:19
128:12 130:1
135:1 146:23
153:20
155:8,13
160:10,12,20
169:15,16
170:19 173:5
175:6,15
177:9
**thinking**
61:11 85:23
**thinning**
163:3
**third**
62:3 93:2
**third-party**
171:4
**thorough**
161:23
**thoroughly**
29:25
**thought**
85:2 93:15
156:23
173:6,23

**threatened**
172:4
**three**
7:9 12:9,10,
13,18 13:5
41:3 47:16
53:1 60:24,
25 61:3,4,9
66:9 84:20
85:10 90:11
93:1 94:12
109:1 128:25
129:19,23
130:7 137:12
155:23 166:5
168:1 169:4
176:23
**three-
quarters**
174:23 175:5
**thumb**
52:19
**tie**
126:10 155:9
**tied**
127:8
**time**
7:22 14:15
15:5,6 16:3
19:23 20:10
22:2,13
23:20,23
24:24 28:11,
15 32:7
35:21 36:1,
14 37:19,20,
23 38:24
42:18 43:8,
17,19 44:4
46:2,9,17
51:8,12,16,
19 55:10,15
63:2 69:16
72:18 73:7,
11,13,15
76:22 82:1,
17 84:14,18,
19 85:25

87:4,6 89:12
90:12,16
92:23 97:2
101:13 108:6
109:22 110:3
111:4 113:5,
19,21 114:21
116:23
120:15,25
122:15,20
123:1,12
127:6 129:17
130:14,21
131:18,25
132:16
134:1,8,25
138:5,17
139:24
143:23 144:5
150:2 152:2,
4,5,7,19
156:5
158:11,18
160:19
162:10,24
169:12,25
176:7 177:1,
3,18
**times**
20:2 36:20
37:17 45:24
46:1 49:19
51:7 62:4,
13,15 72:13
84:17 128:8
145:17
169:23
170:16,18
**tired**
167:21
**title**
23:19,24
24:17,22
101:7 102:21
103:9 106:15
**titled**
143:9

Gregory Busch
August 24, 2021

today
  13:23 14:3
  145:6,8
  149:17,24
  150:21
told
  74:8,14,17
  76:18,20
  79:16 83:4
  85:2 100:6
  127:25 132:7
  134:5,7,9,22
  159:8
Toledo
  49:13 56:11,
  12,17
tons
  19:11 40:6
Tony
  68:13,17
  108:16 109:4
  110:11
  111:3,7,11
  173:19
Tool
  9:19 11:4,
  11,13,14,17,
  24 12:2
  14:12
Tool's
  12:2
top
  66:2 149:6
  155:20
  173:24
  174:20,22
  175:1
topics
  82:22
total
  33:14 48:1
  65:13
tote
  28:1
touch
  142:14

tow
  139:14
towed
  75:14,19
  137:1,19
towing
  23:18 69:12
  70:5,11,16,
  19 71:2
  72:3,8,19,24
  73:1 137:5
  139:13
  176:17
trace
  86:10 90:13
trade
  117:13
Traditionally
  16:8
train
  167:16
trained
  22:10 168:24
training
  19:2 167:10,
  14,15
  168:10,12
transaction
  107:13
transcript
  177:23
transfer
  104:24
  105:10
transfers
  107:17
transmitter
  131:14
transpired
  85:1
transport
  17:2 32:7
transverse
  34:20
transverses
  36:10

traveling
  132:4 133:25
trouble
  14:13 129:5
trucking
  20:23 177:11
true
  84:13
  103:10,14
  136:3 143:15
  146:9
  162:12,24
truss
  123:23
truth
  6:6,7
truthful
  142:4
try
  8:1,8 18:12
  28:17 68:6,
  21 69:1,8
  112:13 149:7
  167:23
trying
  23:4 25:25
  49:13,22
  58:10 59:16
  62:3 63:25
  70:20,23
  85:6 113:18
  126:20,22
  128:1,12
  137:14
  147:22 150:6
  156:17
Tuesday
  5:2
tug
  12:9 17:1
  49:18 50:1
  71:14 72:23
  73:10 126:2,
  3,9,12,17,
  18,19,24
  127:24
  128:5,9,15
  129:6 133:20

  163:24
  170:18
  173:1,7
tugs
  10:2,4 12:18
  13:5 22:10
  70:25 71:5
turn
  6:18 25:19
  130:10
turned
  110:15
  155:15
twice
  71:5
two
  10:3 11:23
  15:7 20:19
  33:9,11,12,
  13,25 35:16
  41:9 45:25
  51:6 60:12,
  19 65:17,18
  79:24 82:16
  84:17,20
  85:10 87:8
  98:10 107:7
  110:18
  114:13,25
  128:13,23
  129:19,23
  130:6,7,8
  132:1 138:1,
  3 151:7
  156:21
  160:24
  167:14
  169:4,13
  170:19 176:6
two-page
  93:21
two-year
  16:17 17:23
  19:19
type
  22:19 39:12
  41:15 83:12

Gregory Busch
August 24, 2021

**typed**
59:18
**typed-out**
58:23 60:5
65:6
**types**
15:22 41:3,4
**typewritten**
59:7 64:16
66:16
**typically**
14:10 163:16

---

**U**

---

**uh-huhs**
7:18
**uh-uhs**
7:18
**ultimately**
32:5 163:4
**ultrasonic**
45:9 56:5,19
162:11
165:10
168:17
169:14,21
170:9 171:4
**ultrasound**
171:3
**underneath**
37:5
**underside**
36:18 37:19
84:11 147:4
**understand**
8:9 25:7,20
30:23 39:6
49:4 62:17
99:9 107:10
110:11 131:5
138:14
158:25
162:14,20
163:10,19
165:2,24
167:9,19

168:15
169:10
170:24
175:24
176:11,14
**understanding**
8:6 23:8,25
24:10 85:19
96:11,17
97:11,19
98:13,16,25
99:20 100:1,
7 101:1,3
102:6,21
103:9,19
104:18
106:14,25
107:12
113:4,20,24
115:8,20
117:17
120:11 123:9
124:13,21
125:2 152:18
153:6 158:24
175:20 176:3
**understood**
8:12 102:9
113:15
147:20 148:7
152:7
**undertook**
11:2
**underwent**
43:15
**unique**
168:17
**unit**
45:9
**United**
26:15 101:10
104:11 124:4
**University**
9:1
**unlawful**
117:19 118:3
**unlimited**
139:24

**unsafe**
114:1 115:8,
21 117:3
**unseaworthy**
114:19,23
115:2 116:11
**unusual**
86:16
**upside**
63:8
**usual**
54:24
**utility**
22:24 23:3
**utilized**
12:11 18:4,
21 19:5 33:1

---

**V**

---

**vague**
95:21
**vaguely**
128:6
**valid**
96:13
**various**
13:13 32:20
36:20 37:17
46:14 57:8
72:13 162:16
**vary**
166:20
**verbal**
7:15
**verbally**
5:10
**verification**
5:25
**verified**
6:2
**verify**
142:8
150:11,23
**version**
64:16 65:6
66:16 145:8

**versus**
41:2
**vessel**
17:8 21:21,
22 22:15,17,
19,24 23:3
32:6,18
36:16,18
38:2,16
39:21,25
41:7,12,13
42:6 44:16
45:2 48:3
50:5,22,25
53:9 64:23
73:9 83:5
101:8,14
102:10,21
103:19
104:24
105:10
119:8,10,18,
21,22
122:15,19
123:25
131:15,17
132:24 136:3
138:8 139:14
141:11,13
164:5 166:11
169:24
170:2,4,5
171:6 174:7,
8
**vessels**
12:6 13:11,
13 17:10
22:3,7 44:1
45:25 46:14,
16 131:13
136:11
162:21
170:10,14,16
171:5,7
**view**
62:22,23
92:21 120:12
139:18

Gregory Busch
August 24, 2021

152:14

**violation**
137:23

**visit**
84:15 85:3,
14,19 87:10,
13

**visits**
86:1,6 87:8

**visualized**
48:7

**voice**
131:4

—————————

W

—————————

**W-I-L-K-I-E**
75:2

**waive**
5:13

**waived**
79:8

**walk**
48:21

**walk-through**
85:13

**walked**
71:14 85:16
86:24

**walking**
85:20

**want**
28:14 30:17
39:6 51:21
68:14 82:20
93:4 102:1
103:1 135:15
142:11,20
156:16 162:7
167:9 169:20
174:24
177:25

**wanted**
22:11 25:18,
22 76:19
83:4 87:12,
14,16 97:23

98:7 110:13
171:10 172:8
176:9

**Ward**
49:15,16
50:17 54:3,
19 55:6 57:6
58:8 65:23
67:19,22
90:3 163:11
164:17

**warrants**
101:7 117:11
122:10

**warranty**
139:22

**wash**
50:22

**wastages**
164:24

**waste**
162:23

**watch**
129:19

**watched**
55:9 129:21
130:24
131:6,21

**watches**
47:8 53:25

**watching**
132:10

**water**
10:20 12:4
16:23 84:8,
10 86:1,4,7,
10,13 87:3
90:12,16
117:4 126:4,
6 130:5
132:6 135:2

**waters**
40:7 115:9,
22

**waves**
132:19 133:1
134:3,9,22

**way**
8:9 19:4
29:13 32:8
33:19,20,22
34:13 37:4
46:10 47:21
49:6 61:7
63:7 83:9
101:18 114:1
118:19
121:13
124:12 129:1
131:21
134:12,17
135:17
149:18
153:11,20
160:22 161:1
162:16
166:23,25
168:11 175:9

**ways**
19:24 142:20

**wear**
125:4,8

**weather**
132:8,11,13,
16,24 133:2,
24 137:2,6,
20 141:5

**website**
68:23 131:9
175:23,25
176:3

**weeks**
11:23 72:22
84:20 89:11

**weigh**
164:24

**weight**
19:10 33:13,
25 34:2

**weld**
51:6 123:23

**welded**
123:16
163:25
166:11

**welding**
51:3,5 164:3

**welds**
123:17

**went**
15:15 16:17
29:13,15,22
34:19 36:22
48:19 49:20
71:15 73:3
82:14 85:10
87:22 90:9,
10 107:13,19
110:18 132:5
133:7 135:9
160:13
165:16
171:13 176:5

**whatsoever**
82:25 83:17,
23 113:8

**wide**
19:9 31:19,
21,23 37:2
174:15 175:6

**widespread**
133:16,17

**width**
175:14

**Wilke**
75:2

**Wilkie**
114:10,14,17
115:19 116:1
135:10
138:15,21
145:24

**Wilkie's**
115:6 116:3
117:6

**wind**
133:17

**winds**
133:12

**windy**
132:17

wing
  33:12 35:16
wires
  128:4
Wisconsin
  75:13
witness
  5:10,22,23
  6:1,5 10:17
  13:20 17:17
  25:8 28:9
  30:8 31:2,22
  37:1 43:3
  45:16 51:20
  54:14 62:3
  63:8 65:3
  70:24 74:3
  75:19 78:23
  79:9 86:20
  96:20 98:2,6
  99:25 103:4
  107:9,12
  115:13,15
  118:1,17,20
  120:18 121:1
  123:10 125:8
  131:2,6
  142:8 161:17
  163:20
  165:25
  167:20,23
  171:17
  172:14 175:2
  177:19 178:8
witness'
  104:20
wood
  16:10
word
  7:15,20
wording
  39:24 40:1
  166:4
words
  7:19 40:25
  67:23 98:8
  101:1,6
  121:15 132:6

135:1
153:20,21
168:16
work
  9:20 12:14
  17:3 19:25
  39:1 79:25
  107:13
  123:20
  127:21
  156:7,11,25
  157:10
  170:14
  173:22,25
worked
  68:12,17
  71:3
worker
  45:18 168:24
working
  17:6 108:22
  128:9 162:22
works
  34:13 131:11
worried
  132:7
write
  60:18 145:4
  151:19
  165:14
writing
  76:24 77:17
  157:14,21
  165:12
written
  56:22 57:3
  61:5 63:22
  97:7,13
  100:10
  111:21 156:8
  157:6,7,11
wrong
  25:1,2 63:7
  91:20 92:14
  149:18,20
  150:8
wrote

153:6,21,22
154:11,18
155:2 156:5,
19

_____

Y

_____

yeah
  11:14 12:20
  13:9 15:7
  17:24 25:8,
  25 27:23
  29:5 31:22
  34:23 36:19
  37:1,25
  38:25 39:8
  41:6,25
  43:19 44:13
  45:7 46:6
  47:8,16,21
  48:25 49:13,
  16,18 51:18,
  21 52:8
  54:10 59:16
  61:11 63:1,8
  65:11 68:13
  70:3 71:14
  73:10 74:23
  76:3 80:11
  84:13 85:22
  87:11,23
  88:19 89:12
  90:7 93:3
  96:2,20
  97:10 98:6
  99:12 103:4
  107:10,12
  108:10 112:6
  120:20
  121:15
  123:10
  127:25
  128:19
  131:13
  132:17
  142:8,19
  146:12
  148:23

149:4,19
150:13
152:17 153:2
159:2,3,24
160:10,23
162:1 165:6,
25 167:20,22
170:24
171:17
175:13
year
  35:18 47:3
  61:7 81:12
  146:7,10,12,
  17 169:12
years
  12:14 16:4,5
  41:18 46:21,
  23 47:4 50:7
  71:4 73:8
  114:25
  127:18 132:1
  138:10,13
  168:21
  169:4,13
  176:23 177:3
yellow
  85:15
York
  21:16