UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BUSCH MARINE GROUP, INC.,
and GREGORY J. BUSCH,

                Plaintiffs/Counter-Defendants,

                                         Case No. 20-cv-11427

v.                                     Honorable Linda V. Parker

CALUMET RIVER FLEETING, INC.,

                Defendant/Counter-Plaintiff,

and

GREAT AMERICAN INSURANCE COMPANY,

                Defendant.
_____/

## <u>OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF NOS 41, 43)</u>

      This action arises from two contracts related to a barge.  The barge was owned by Plaintiff/Counter-Defendant Gregory Busch ("Busch") and insured by Plaintiff/Counter-Defendant Busch Marine, Inc. (hereafter collectively "Plaintiffs") through a policy with Defendant Great American Insurance Company ("Great American").  Defendant/Counter-Plaintiff Calumet River Fleeting, Inc. ("Calumet") entered into separate contracts with Gregory Busch to purchase and then charter the barge.

In a Complaint filed June 1, 2020, Plaintiffs allege four counts against Calumet and one count against Great American.  (Compl., ECF No. 1.)  As to Calumet, Plaintiffs assert: (I) breach of contract of sale; (II) breach of the charter agreement; (III) conversion; and (IV) negligence.  (*Id.*)  On October 28, 2021, a stipulated order was entered dismissing with prejudice Plaintiffs' claims against Great American.  (Order, ECF No. 46.)  Calumet filed a Counter-Complaint against Plaintiffs alleging fraudulent misrepresentation.  (Answer & Counter-Compl., ECF No. 10.)

The matter is presently before the Court on cross-motions for summary judgment filed by Plaintiffs and Calumet.  (ECF Nos. 41, 43.)  The motions have been fully briefed.  (ECF Nos. 48, 52, 54, and 55.)  The Court held a hearing with respect to the motions on July 13, 2022.

## **Standard of Review**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## Factual and Procedural Background

### The Sale

Gregory Busch owns Busch Marine, Inc., a company that operates and rents barges and tugboats with its principal place of business in Freeland, Michigan. (Busch Dep. at 9-10, ECF No. 41-1 at Pg ID 643-44.) In 2019, Busch owned "STC 2004" (the "Barge"), which Busch Marine insured under a policy issued by Great American. (*Id.* at 14, Pg ID 645; ECF No. 41 at Pg ID 614.) The Barge was

3

docked at Busch Marine's dock in Carrollton, Michigan.  (Busch Dep. at 82, ECF No. 41-1 at Pg ID 662.)  This location is on the Saginaw River approximately 14 nautical miles southwest of where the river joins Lake Huron in Bay City. *Seehttps://www.bednblue.com/sailing-distance-calculator*.

Terry Hoeckendorff is Calumet's president and former vice president of operations.  (Hoeckendorff Dep. at 5, ECF No. 41-2 at Pg ID 737.)  Calumet provides cargo transportation.  (*Id.* at 8, Pg ID 738.)  In March 2019, Hoeckendorff inquired about an advertisement for the sale of the Barge. (3/11/19 email, ECF No. 41-3 at Pg ID 793.)  He inspected the Barge in April 2019, while it was docked in the water at Busch Marine's dock.  (Hoeckendorff Dep. at 12, 16, ECF No. 41-2 at Pg ID 739-40.)

During his inspection, which lasted approximately four to five hours, Hoeckendorff investigated the Barge's walk-around and then crawled through each of its tanks.  (*Id.* at 12, 17, Pg ID 739-40.)  Busch did not deny Hoeckendorff access to any area of the Barge.  (*Id.* at 12, Pg ID 739.)  In almost all of the Barge's tanks, Hoeckendorff observed water, which he concluded, based on his conversations with Busch, was leaking through the top deck which had visible areas where it was caved in a little bit and had cracks.  (*Id.* at 13, Pg ID 739.)

While Hoeckendorff was at Busch Marine, Busch told him that the Barge had been previously damaged, requiring Busch to replace two-thirds of the hull in

4

2013.  (*Id.* at 16-17, Pg ID 740.)  As the Barge was in the water, Hoeckendorff was

not able to visibly inspect its underside.  (*Id.*)  Hoeckendorff acknowledged that

professional surveyors can inspect equipment before it is purchased; however, he

testified that "being in the business for as long as [he] ha[s] been, . . . you can look

at barges and tugs and . . . pretty much know the shape they're in."  (*Id.* at 17, Pg

ID 740.)

Subsequently, during the negotiations between Busch and Calumet,

Hoeckendorff requested maintenance records relating to the Barge.  (*Id.* at 18, Pg

ID 741.)  In response, Busch provided an American Bureau of Shipping ("ABS")

report from 2013, which contained gauge readings of the thickness of the hull steel.

(*Id.* at 14, 18, Pg ID 740-41; Busch Dep. at 87-89, ECF No. 41-1 at Pg ID 663.)

Calumet maintains that the gauge readings were not taken in the manner

represented by Busch (i.e., in the presence of ABS surveyor Jessica Ward).  (Resp.

Br. at 10-11, ECF No. 48 at 1657-58.)  Ward, however, initialed the pages of the

report and noted that they had been "reviewed."  (*See* Survey, ECF No. 48-17.)

Hoeckendorff subsequently made an offer to buy the Barge.  (*See* 4/12/19

Emails; ECF No. 41-4 at Pg ID 796.)  Busch rejected the offer as too low and

offered to perform some repairs on the Barge.  (*Id.*)  Hoeckendorff responded

negatively to that offer and, instead, asked Busch for his "bottom dollar [] on the

Barge."  (*Id.*)

The parties subsequently settled on a purchase price of $575,000.  On April 24, 2019, Busch and Calumet executed a contract pursuant to which Calumet agreed to purchase the Barge from Busch ("Sales Contract").  (Sales Contract, ECF No. 41-5 at Pg ID 801.)

Pursuant to the Sales Contract, Calumet agreed to pay $575,000 for the Barge, of which $50,000 was a nonrefundable deposit due when the agreement was signed.  (*Id.* ¶ 2, Pg ID 800.)  The balance was due at closing in May 2019.  (*Id.*)  The Sales Contract required Busch to deliver title to the Barge free of all liens and encumbrances, with a properly executed United States Coast Guard Bill of Sale.  (*Id.* ¶ 4, Pg ID 800.)  Calumet agreed to purchase the Barge "AS IS, WHERE IS" and stipulated that it had inspected the Barge.  (*Id.* at 1 & ¶ 6, Pg ID 800, 801.)  In that respect, the Sale Contract read:

> IT IS AGREED THAT THE VESSEL WILL BE SOLD "AS IS.  WHERE IS" AND NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IS MADE OR GIVEN TO BUYER AS TO THE SEAWORTHINESS, CONDITION, DESIGN, OPERATION CAPACITY, AGE OR MERCHANTABILITY OF THE VESSEL, AS TO MATERIAL, EQUIPMENT, SUBSTANCES OR WORKMANSHIP IN OR ON THE VESSEL, OR AS TO THE FITNESS OF THE VESSEL FOR ANY PARTICULAR TRADE, USE OR PURPOSE, NOR ANY OTHER WARRANTY OR REPRESENTATION WHATSOEVER, OTHER THAN THE WARRANTY OF TITLE SET FORTH IN PARAGRAPH 4.

6

(*Id.* ¶ 9, Pg ID 801 (capitalization in original).)  On May 10, 2019, the parties executed a Closing Date Extension Addendum, moving the Sales Contract's closing date to June 7, 2019.  (Addendum, ECF No. 41-6 at Pg ID 803.)

On May 20, 2019, Busch, as executor of his deceased mother's estate, signed a Satisfaction of Mortgage reflecting repayment of a $200,000 loan for which Busch's mother, Ruth Busch, received a mortgage on the Barge.  (Mortgage Satisfaction, ECF No. 41-11.)  On the same date, Busch signed a U.S. Coast Guard Bill of Sale reflecting his sale of the Barge to Calumet.  (Bill of Sale, ECF No. 41-9.)  In a June 24, 2019 letter from the Coast Guard to Busch, the Coast Guard indicated that "[t]he satisfaction of mortgage presented [by Busch] is not eligible for recording as the entity executing the instrument is not the mortgagee of record."  (6/24/19 Letter, ECF No. 43-6 at Pg ID 1023.)  As the Coast Guard explained further in the letter, both of Busch's deceased parents, Ruth and Edwin Busch, were recorded as holding the mortgage to the Barge but Busch executed the document only as executor of Ruth's estate.  (*Id.*)

In the interim, on June 6—more than two weeks before the date of the Coast Guard's letter—Hoeckendorff sent an email to the broker stating: "I do not want the documentation in Calumet River Fleeting's name [sic] call the USCG and stop the process."  (6/6/19 email, ECF No. 41-15 at Pg ID 867.)  The broker replied in part that both parties would need to sign a written agreement as the change of

ownership was already submitted to the United States Coast Guard. (*Id.*) No such written agreement was signed. (ECF No. 41 at Pg ID 618.)

Further, at 6:02 p.m. on June 7, 2019, Hoeckendorff sent an email to Busch indicating that Calumet would not be purchasing the Barge because it "ha[d] not received the documentation for said barge as of 1700 the 7th day of June 2019." (6/7/19 email, ECF No. 41-16 at Pg ID 869.)

<u>The Charter Agreement</u>

In the interim, and before the Sales Contract's closing date, Calumet needed a barge. (Hoeckendorff Dep. at 33, ECF No. 41-2 at Pg ID 744.) Therefore, on May 31, 2019, Busch and Calumet entered into a Barge Bareboat Charter Agreement (the "Charter Agreement"). (Charter Agreement, ECF No. 41-7.) The Charter Agreement provided that if the sale did not take place, Calumet would pay $25,000 to charter the Barge and return it, at Calumet's expense, to Busch Marine's dock in Carrollton, Michigan. (*Id.* ¶ 1(c), ECF No. 41-7 at Pg ID 805.) The Charter Agreement also provided that Calumet had inspected or waived inspection and that Busch provided the Barge "as is" with no representations of seaworthiness. (*Id.* ¶ 4, Pg ID 806.)

On June 1, 2019, Theodore Long, a captain for Calumet, took possession of the Barge at Busch Marine's dock in Carrollton. (Hoeckendorff Dep. at 56, ECF No. 41-2 at Pg ID 750; Long Dep. at 14, 31, 38, ECF No. 43-9 at Pg ID 1032,

8

1036, 1038.)  On June 3, just after coming out of the Soo Locks, which connects Lake Huron to Lake Superior, Long discovered that the Barge was taking on water. (Long Dep. at 19-21, 44, ECF No. 43-9 at Pg ID 1033, 1039.)  The crew pumped the water from the Barge's tanks and towed the Barge to Duluth, Minnesota (*id.* at 21, Pg ID 1033), where the Barge arrived on June 4 (*id.* at 51, Pg ID 1041).

In Duluth, the crew patched holes in the Barge's hull and, on June 5, proceeded with the Barge to a dry dock in Escanaba, Michigan, where a new barge was to be picked up to complete the job.  (*Id.* at 25, 54, Pg ID 1034, 1042; Hoeckendorff Dep. at 69, ECF No. 41-2 at Pg ID 753.)  The crew arrived in Escanaba at 10:40 p.m. on June 7, and left a couple of hours later with the new barge.  (Long Dep. at 54-55, ECF No. 43-9 at Pg ID 1042.)

On June 12, 2019, Busch sent an email to the office administrator at the dry dock in Escanaba, advising "that you are not authorized to do any work on barge STC2004 without my written authorization."  (6/12/19 email, ECF No. 43-11 at Pg ID 1078.)  The Barge sits in Escanaba today.  (ECF No. 41 at Pg ID 627.)

## Parties' Arguments

In their motion, Plaintiffs seek summary judgment with respect to their claims against Calumet and Calumet's counterclaim against Plaintiffs.  (Pls. Mot., ECF No. 41.)  Plaintiffs first contend that Busch performed all of his obligations under the Sales Contract and Charter Agreement and that Calumet breached both

9

contracts.  Plaintiffs argue that Calumet cannot escape liability by claiming that the

Barge was unseaworthy because there was no warranty or misrepresentation

regarding the Barge's seaworthiness and any damage to the Barge was due to

Calumet's negligence.  Plaintiffs further allege that Calumet's failure to return the

Barge amounted to a conversion.

      With respect to Calumet's defense and counterclaim alleging fraudulent

misrepresentation, Plaintiffs contend that both are not pled with sufficient

particularity and are, therefore, subject to dismissal under Federal Rule of Civil

Procedure 12(b)(6). [1]  Plaintiffs alternatively argue that Calumet fails to identify

any statement by Busch that misrepresented the Barge's condition.  Plaintiffs

further argue that Calumet cannot show that it reasonably relied on any alleged

misrepresentation.

      Calumet filed a cross-motion for summary judgment with respect to

Plaintiffs' claims against it.  (Def. Mot., ECF No. 43.)  In that motion, and in its

response to Plaintiffs' motion (Def. Resp., ECF No. 48), Calumet argues that

---

[1] A motion under Rule 12(b)(6) "must be made *before* pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b) (emphasis added).  However, Plaintiffs answered Calumet's counterclaim on October 13, 2020 (Answer, ECF No. 15), and did not challenge the pleading's sufficiency until filing its pending motion. Therefore, their current Rule 12(b)(6) motion is untimely.  However, even if Calumet's counterclaim was not pled with the particularity required under Rule 9(b), Calumet's response to Plaintiffs' summary judgment motion reflects that any defect in Calumet's pleading could have been remedied if Plaintiffs had filed a timely Rule 12(b)(6) motion.

Busch's documentation was deficient and therefore he did not live up to his end of the bargain in terms of the sale.  Calumet further argues that the damage to the Barge was due to ordinary wear and tear, for which Calumet was not contractually responsible under the Charter Agreement.  According to Calumet, it is relieved of liability due to the Barge's unseaworthiness, as well as due to two material misrepresentations that Busch made concerning the Barge when the parties negotiated the terms of the Sales Contract: (1) that two-thirds of the hull had been replaced in 2013, and (2) that the hull-thickness measurements reported on the ABS survey report were taken under Ward's direction.  Finally, Calumet argues that Plaintiffs' tort claims of conversion and negligence arise out of contractual duties and, therefore, are barred by the Economic Loss Rule.

## **Applicable Law & Analysis**

### Breach of the Sales Contract (Count I)

The parties agree that Michigan law governs Plaintiffs' claim alleging breach of the sales contract.  (Pls. Br. in Supp. of Mot. at 7, ECF No. 41 at Pg ID 620; Def. Br. in Supp. of Mot. at 12, ECF No. 43 at Pg ID 934).  To prove a breach of contract claim under Michigan law, the plaintiff must demonstrate that there was a contract between the parties requiring the performance of specific actions, one party breached the contract, and the breach caused injury to the other party.  *Bank*

*of Am., N.A. v. First Am. Title Ins.*, 878 N.W.2d 816, 829 (Mich. 2016); *see also*

*Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999).

In this action, the existence of a contract and its terms are not in dispute.

There is a dispute, however, as to which party breached the contract.  Plaintiffs

argue that Busch completed the contractual requirements for the sale, including the

necessary documentation, but Calumet breached the agreement by refusing to

close.  (Pls. Br. in Supp. of Mot. at 4, ECF No. 41 at Pg ID 617.)  Calumet argues

that Busch's documentation was deficient and therefore Busch did not live up to

his end of the bargain.  (Def. Br. in Supp. of Mot. at 2-3, ECF No. 43 at Pg ID 924-

25.)  For the reasons discussed below, the Court finds that there are no genuine

issues of material fact and that the record supports Plaintiffs' arguments.

As an initial matter, the Court finds no support for Calumet's argument that

Busch's obligations to deliver clear title and the Bill of Sale were conditions

precedent to Calumet's obligations under the Sales Contract.[2]  Michigan courts are

"not inclined to construe the provisions of a contract as conditions precedent unless

compelled to do so by the language of the contract."  *Star of Detroit Line, Inc. v.*

---

[2] "A 'condition precedent' is a fact or event that the parties intend must take place before there is a right to performance.  A condition precedent is distinguished from a promise in that it creates no right or duty in itself, but is merely a limiting or modifying factor."  *Real Estate One v. Heller*, 724 N.W.2d 738, 741 (Mich. Ct. App. 2006) (quoting *Mikonczyk v. Detroit Newspapers, Inc.*, 605 N.W.2d 360, 362 (Mich. Ct. App. 1999)) (additional citations omitted).

*Comerica Bank*, No. 198090, 1999 WL 33454888, at *2 (Mich. Ct. App. Feb. 16, 1999) (citing *Reed v. Citizens Ins. Co. of Am.*, 499 N.W.2d 22, 24 (Mich. Ct. App. 1993)); *see also Frenchtown Dev., LLC v. Oerther Bros.*, No. 256656, 2005 WL 3304012, at *3 (Mich. Ct. App. Dec. 6, 2005) (citing *Mikonczyk v. Detroit Newspapers, Inc.*, 605 N.W.2d 360, 362 (Mich. Ct. App. 1999)) ("Unless the language of a contract requires, courts will not construe provisions as conditions precedent.") ; *see also Aidamark, Inc. v. Roll Forming Corp.*, 580 F. App'x 408, 415 (6th Cir. 2014) (quoting *Real Estate One v. Heller*, 724 N.W.2d 738, 741 (Mich. Ct. App. 2006)). "The intent of the parties as expressed in the contract is the 'paramount consideration.'" *Star of Detroit Line*, 1999 WL 33454888, at *2 (citing *Cramer v. Metro. Savings & Loan Ass'n*, 258 N.W.2d 20, 24 (Mich. 1977)).

As the Michigan Court of Appeals explained in *Star of Detroit Line*, "conditions may be classified in at least two different ways." *Id.* (quotation marks and citation omitted). The first is based on the order of performance (i.e., conditions precedent, conditions concurrent, and conditions subsequent). *Id.* The second is based upon how the condition arises: "If the condition is placed in the contract by the parties, it is an express condition. If the condition is imposed by law to do justice, it is a constructive condition." *Id.* (citations omitted).

Nothing in the Sales Contract established a time for Busch to perform his obligations or made Calumet's performance contingent on receipt of Busch's

documentation.  Notably, the Sales Contract did not state a time when Busch's obligations were due.[3]  As such, Calumet committed the first breach of the Sales Contract when Hoeckendorff clearly expressed its unwillingness to perform in his June 6 and 7 emails.  But even if the circumstances indicated a contrary intention, the undisputed evidence reflects that Busch fully performed his obligations under the Sales Contract before Calumet repudiated the agreement.

The Sales Contract required Busch to deliver title to the Barge free of all liens and encumbrances and to properly execute a United States Coast Guard Bill of Sale.  (Sales Contract ¶ 4, ECF No. 41-5 at Pg ID 800.)  Busch executed a United States Coast Guard Bill of Sale on May 20, 2019.  (Bill of Sale, ECF No. 41-9.)  As the Coast Guard's June 24 letter reflects, it received the Bill of Sale on June 4.  (6/24/19 Letter, ECF No. 43-6 at Pg ID 1023.)  Calumet acknowledged Busch's performance when it emailed the Coast Guard and instructed it to "stop the process[] of putting the documentation for the Barge in Calumet's name.  (*See*

---

[3] "[T]ime is generally not regarded as of essence to a contract unless otherwise indicated by the parties or the circumstances[.]"  *Shelton v. All Claims Adjusting, Inc.*, No. 240501, 2003 WL 22162328, at *1 (Mich. Ct. App. Sept. 18, 2003) (citing *In re Day Estate*, 245 N.W.2d 582, 585 (Mich. Ct. App. 1976)).  "When a written contract is silent as to the time of performance, a reasonable time is to be presumed without reference to parol evidence.  What constitutes a 'reasonable time' under the terms and circumstances of a contract is a question of fact."  *Walter Toebe & Co. v. Dep't of State Highways*, 373 N.W.2d 233, 238 (Mich. Ct. App. 1985) (citations omitted).

6/6/19 email, ECF No. 41-15 at Pg ID 867.)  During his deposition in this matter, Hoeckendorff expressly acknowledged that the Bill of Sale had been submitted to the Coast Guard prior to June 6.  (Hoeckendorff Dep. at 64-65, ECF No. 52-2 at Pg ID 2194.)  The record further reflects that, in a May 28, 2019 email, the broker informed Calumet that the broker's documentation specialist was submitting the Release of Mortgage and Bill of Sale for the Barge to the United States Coast Guard.  (5/28/19 email, ECF No. 41-13 at Pg ID 862.)

Busch also delivered clear title to the Barge by successfully releasing the only lien prior to the scheduled closing.  While the Coast Guard's June 24 letter indicated that the satisfaction of mortgage as presented was not eligible for recording because the mortgagees of record were Ruth *and* Edwin Busch, Busch explained during his deposition—as his counsel pointed out at the motion hearing—that his father passed away before his mother and, at that time, complete title to the Barge reverted to his mother. [4]  (Busch Dep. at 23-24, ECF No. 52-1 at

---

[4] Plaintiffs point out that Calumet was not aware of the defect in Busch's attempt to clear title to the Barge until June 24, 2019—well after Calumet's performance was due.  The Michigan Court of Appeals, however, has found no support for the argument "that the first-breach rule does not apply when the prior breach was unknown at the time of the other party's subsequent breach."  *See Get Lifted, LLC v. On-Site Mgmt, Inc.*, No. 349345, 2020 WL 4551312, at *4 (Mich. Ct. App. Aug. 6, 2020); *see also* Restatement Contracts 2d, § 237 (1981) ("It follows that one party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties, under the rule stated in this Section, even though that other party does not know of the failure.").

Pg ID 2089.)  Even if there was a defect in the documentation Busch provided to the Coast Guard or some confusion as to the title, the record reflects that Busch could have cured any defect and/or cleared up any confusion, had he been afforded the opportunity to do so.[5]  *See Get Lifted, LLC v. On-Site Mgmt, Inc.*, No. 349345, 2020 WL 4551312, at *4 (Mich. Ct. App. Aug. 6, 2020) ("There is some support for [the plaintiff]'s argument that the breaching party should be given an opportunity to cure the first breach."); *see also* Restatement Contracts 2d, § 242 (1981)

For these reasons, the Court is inclined to grant summary judgment to Plaintiffs with respect to the claim alleging breach of the Sales Contract.  The Court would conclude otherwise, however, if Calumet is entitled to prevail on its defense and counterclaim alleging that Busch made material misrepresentations prior to the execution of the Sales Contract.  The Court therefore turns to that defense and claim.

Under Michigan law, to support its fraudulent misrepresentation claim and defense, Calumet must show:

---

[5] At the motion hearing, when the Court asked counsel for Calumet why Busch should not have been given the opportunity to cure any defect in performance, Calumet's counsel seemed to respond that time was of the essence as to Busch's completion of his obligations.  There is no support for this in the express language of the Sales Contract or elsewhere in the record, however.

> (1) [Busch] made a material representation; (2) the representation was false; (3) when [Busch] made the representation, [he] knew that it was false, or made the representation recklessly, without any knowledge of its truth, and as a positive assertion; (4) [Busch] made the representation with the intention that it should be acted on by [Calumet]; (5) [Calumet] acted in reliance on the representation; and (6) [Calumet] suffered injury due to [its] reliance on the representation.

*MacDonald v. Thomas M. Cooley Law School*, 742 F.3d 654, 662 (6th Cir. 2013)

(citing *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 546 (Mich. 2000)

(per curiam)).  Calumet's reliance on Busch's "alleged representation[s] must have

been reasonable."  *Id.* at 662-63 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599

N.W.2d 546, 553-54 (Mich. Ct. App. 1999); *Nieves v. Bell Indus., Inc.*, 517

N.W.2d 235, 238 (Mich. Ct. App. 1994)).  According to Plaintiffs, Calumet cannot

show that Busch made any misleading material statement or that Calumet

reasonably relied on any alleged misrepresentations.  (Pls. Br. in Supp. of Mot. at

21-22, ECF No. 41 at Pg ID 634-35.)

Specifically as to whether Calumet reasonably relied on the alleged

misrepresentations, Plaintiffs focus on the principle that a party may not

reasonably rely on prior oral statements that directly contradict the terms of a

written contract.  (*Id.* at 22, Pg ID 635); *see also Cook v. Little Caesar Enterprises,

Inc.*, 210 F.3d 653, 656 (6th Cir. 2000) (Explaining that "Michigan follows the

parol[] evidence rule which does not permit extrinsic evidence to be used to

contradict the terms of a written contract that was intended to be the final and complete expression of the parties' agreement."). Plaintiffs point out that the Sales Contract and Charter Agreement expressly disclaim any warranty or representation of seaworthiness and that in both, Calumet represented that it had the opportunity to inspect the Barge and found its condition "satisfactory for [its] purposes." For the same reasons, Plaintiffs assert that Calumet is estopped from claiming that the Barge was not seaworthy.

First, Calumet fails to show that Busch made materially false representations prior to the execution of the Sales Contract. Notwithstanding its assertion, Calumet does not identify any evidence reflecting that Busch told Hoeckendorff that Ward was present when the hull-gauge measurements were taken or that Busch made any other representations regarding the manner in which the measurements were taken. Hoeckendorff testified only that Busch gave him the ABS gauging report, not that Busch made any representations with respect to the report. (Hoeckendorff Dep. at 14, 18, ECF No. 41-2 at Pg ID 740.) While Busch testified during his deposition on August 24, 2021 that Ward was present when the measurements were taken and was directing where to take readings (*see* Busch Dep. at 54-57, ECF No. 41-1 at Pg ID 655), this does not establish that these same representations were made to Hoeckendorff *more than three years earlier*. Calumet cites no evidence reflecting that he did. Busch did not testify that he

conveyed this to Hoeckendorff.  Despite being asked to identify supporting

evidence at the motion hearing, Calumet still offers no evidence that such

statements were made before the Sales Contract was executed.

Hoeckendorff did testify that when he inspected the Barge in April 2019,

Busch conveyed that two-thirds of the Barge's hull had been replaced in 2013.

(Hoeckendorff Dep. at 16, 91, ECF No. 41-2 at Pg ID 740, 759.)  However,

Calumet does not show that this alleged statement was in fact false.  In any event,

Calumet fails to respond to Plaintiffs' argument that any reliance on the purported

false statements was unreasonable and that Calumet is estopped from claiming that

the Barge was not seaworthy based on the express provisions of the parties'

agreements.  Calumet therefore has forfeited this claim and defense.  *See Notredan,*

*LLC v Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013)

(failure to address an argument in response to a motion amounts to a forfeiture of

the claim); *Murray v. Geithner*, 763 F. Supp. 2d 860, 871-72 (E.D. Mich. 2011)

(citing *Humphrey v. U.S. Atty. General's Office*, 279 F. App'x 328, 331 (6th Cir.

2008)) ("When a party fails to respond to a motion or argument therein, the Sixth

Circuit has held that the lack of response is grounds for the district court to assume

opposition to the motion is waived.").

Moreover, as reflected earlier, the Sales Contract clearly and unambiguously

stated that the Barge was being sold "AS IS, WHERE IS" without any express *or*

*implied* warranties with the exception of the warranty of title.[6] As the Sixth Circuit has observed, "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying."[7] *Watkins & Son Pet Supplies v. The Iams Co.*, 254 F.3d 607, 614 (6th Cir. 2001) (quoting *Cook*, 210 F.3d at 659). Stated differently, "[r]eliance upon oral representations or prior documents, even if false, is unreasonable if the party enters into a subsequent agreement [with contrary terms]." *Cook*, 210 F.3d at 658. Calumet's fraudulent misrepresentation defense and claim therefore fail.

As such, the Court concludes that Plaintiffs establish entitlement to summary judgment with respect to the breach of the Sales Contract claim. The Court reaches the same conclusion with respect to the breach of the Charter Agreement claim.

---

[6] At the motion hearing, Calumet's counsel argued that the Charter Agreement made its acceptance of the Barge "as is" conditioned on Hoeckendorff's inspection and that the alleged misstatements were part of the inspection. (*See* Charter Agreement ¶ 4, ECF No. 52-7 at Pg ID 2248.) The Sales Contract, however, did not contain this or similar language. In any event, the Court does not read this language in the Charter Agreement as including warranties or representation made to Hoeckendorff during his inspection. In fact, the agreement expressly states that there are no such warranties or representations.

[7] While the parol evidence rule generally applies only where the parties intended the contract to be a complete expression of their agreement, *see Cook*, 210 F.3d at 658, in response to Plaintiffs' invocation of the rule, Calumet offers no argument that the Sales Contract was not intended to fully integrate the parties' agreement.

**Breach of the Charter Agreement - Failure to Return the Barge (Count II)**

The Charter Agreement provides that any "[c]ontroversy or claim arising out of or relating to this contract, or the breach thereof, shall be governed by the general maritime law of the United States, insofar as applicable, otherwise by the laws of the State of Florida." (Charter Agreement ¶ 16, ECF No. 41-7 at Pg ID 811). Like other contracts, maritime contracts "must be construed . . . by their terms and consistent with the intent of the parties." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004). However, a warranty of seaworthiness is inferred in all maritime contracts, regardless of whether such warranty is expressly made.[8] *See e.g., KAI Enter., LLC v. Boh Bros. Constr. Co., LLC*, 731 F. Supp. 2d 568, 573 (E.D. La. 2010) (citing *Cullen Fuel Co. v. Hedger*, 290 U.S. 82, 88 (1933); *Texaco, Inc. v. Universal Marine, Inc.*, 400 F. Supp. 311, 319 (E.D. La. 1975)); *see also Coca Cola Co. v. S.S. Norholt*, 333 F. Supp. 946, 948 (S.D.N.Y. 1971) (citing *Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422 (5th Cir. 1968), cert. denied, 394 U.S. 943 (1969)). Yet the implied warranty of seaworthiness may be negated by express contract. *KAI Enter.*, 731 F. Supp. 2d at 573 (citing *Cullen Fuel*, 290 U.S. at 88); *see also McAllister Lighterage Line v. Ins. Co.*, 244 F.2d 867, 871 (2d Cir.), *cert. denied*, 355 U.S. 871 (1957) (internal quotation marks and citation

---

[8] "Seaworthiness" means "fitness for the use anticipated." *Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 428 (5th Cir. 1968), *cert. denied*, 394 U.S. 943 (1969) (citation omitted).

omitted) ("The general rule is that a warranty of seaworthiness attaches to every

charter.  But the parties to a contract of private carriage are free to bargain as they

please, and the warranty will not be implied where it is waived . . . in plain and

unequivocal terms.").

The Charter Agreement reads, in relevant part:

> The delivery to [Calumet] of the barge shall
> establish conclusively that [Calumet] has inspected or has
> caused to be inspected or has elected to waive inspection
> of the barge.  Calumet acknowledges an opportunity to
> thoroughly inspect the barge and its machinery and
> appurtenances, or will make such an inspection before
> acceptance, and that he agrees to rely solely upon such
> inspection with respect to the condition of the barge or its
> suitability for the intended service, has found them fully
> satisfactory for his purposes, accepts them "as is," and
> acknowledges that there are no warranties or
> representations of seaworthiness of the barge or it's [sic]
> machinery or equipment, or of their fitness or suitability
> for any particular purpose.

(Charter Agreement ¶ 4, ECF No. 41-7 at Pg ID 806).  This language, in plain and

unequivocal terms, waived the implied warranty of seaworthiness.  "Such waivers

are construed strictly against the maker." *A. Kemp Fisheries, Inc. v. Castle &

Cooke, Inc.*, 852 F.2d 493, 498 (9th Cir. 1988) (citation omitted).  Calumet drafted

the Charter Agreement.  (Hoeckendorff Dep. at 58-59, ECF No. 41-2 at Pg ID

751.)

Under the terms of the Charter Agreement, if the sale was not completed,

Calumet agreed to return the Barge to Busch at Busch Marine's dock in Carrollton,

Michigan.  (Charter Agreement ¶ 1(c), ECF No. 41-7 at Pg ID 805.)  Busch argues

that Calumet therefore needed to return the Barge to Carrollton, not leave it in

Escanaba.  (Pls. Br. in Supp. of Mot. at 12-14, ECF No. 41 at Pg ID 625-27.)

Calumet argues that it was not able to return the Barge because it was not

seaworthy without repairs and that Calumet was not responsible for repairs from

ordinary wear and tear.  (Def. Br. in Supp. of Mot. at 7, ECF No. 43 at Pg ID 929.)

Calumet also argues that the Barge's Coast Guard Load Line Certificate expired on

June 13, 2019, making it unlawful for anyone to operate or transit the Barge.  (*Id.*

at 8, Pg ID 930.)  Essentially, Calumet maintains that these two conditions

rendered its duty to return the Barge under the terms of the Charter Agreement

impossible.[9]

The doctrine of impossibility of performance or frustration of purpose is

recognized under Florida and maritime law.  *Marathon Sunsets, Inc. v. Coldiron*,

189 So.3d 235, 236 (Fla. Dist. Ct. App. 2016) (Florida law); *Hellenic Lines, Ltd v.*

*United States*, 512 F.2d 1196, 1221 (2d Cir. 1975) (maritime law); *Stewart &*

*Stevenson Servs., Inc. v. Superior Boat Works, Inc.*, No. CIV.A. 94-2332, 1995 WL

608494, at *2 (E.D. La. Oct. 11, 1995) (same).  Under this doctrine, "a party is

---

[9] At the motion hearing, Calumet's counsel asserted that Calumet in fact was not
arguing impossibility as a defense.  In fact, however, Calumet is.  Calumet asserts
that it was impossible to return the Barge to Carrollton without violating other
terms of the Charter Agreement.  Whether classified as an impossibility defense or
something else, the defense fails for the reasons set forth herein.

discharged from performing a contractual obligation which is impossible to

perform and the party neither assumed the risk of impossibility nor could have

acted to prevent the event rendering the performance impossible." *Marathon*

*Sunsets, Inc.*, 189 So.3d at 236. No reasonable juror could find that the condition

of the Barge or the expiration of the Coast Guard Load Line Certificate rendered

Calumet's performance impossible.

As to the Barge's condition, the duty to repair the Barge is distinct from the

duty to return it to the location specified in the parties' agreement, and no

reasonable juror could conclude that Calumet was unable to return the unrepaired

Barge to Busch's dock after discovering that it was taking on water. As Busch

points out, Calumet towed the Barge over 1,000 miles to Duluth and then to

Escanaba, instead of the less than 250 miles back to Busch Marine's dock in

Carrolton.[10] (*See* Pls. Resp. Br. at 14, ECF No. 52 at Pg ID 2069; NOAA Distance

---

[10] Calumet argues in reply that while it discovered that the Barge was taking on water outside the Soo Locks, it did not know the nature of any damage until arriving in Duluth, at which time it "f[ou]nd holes in the hull which suggested the [B]arge might be unseaworthy[.]" (Def. Reply Br. at 4, ECF No. 55 at Pg ID 2468.) Even if Calumet only concluded that it could not use the Barge to transport the cargo after docking it in Duluth, the distance from Duluth to Escanaba (614 miles) as compared to Duluth to Bay City (627 miles) does not suggest that it was impossible to return the Barge to Busch. Calumet goes on to assert that it "could not know with certainty the [B]arge's overall condition without it being surveyed in dry dock[,]" with Escanaba being the closest of which Calumet was aware. (*Id.*) Calumet cites no evidence, however, suggesting that it planned to continue the job with the Barge after taking it to Escanaba. Instead, the record reflects that

24

Between U.S. Ports at Table 21, ECF No. 52-22 at Pg ID 2371.)  As to the Load

Line Certificate, Calumet had several days before it expired to return the Barge to

Busch's dock.

Because the task of returning the Barge was not impossible, it remained

Calumet's duty to return the Barge to Busch Marine's dock in Carrollton as

specified in the contract.  For that reason, the Court is granting summary judgment

to Busch as to Count II of the Complaint, as well.

### Negligence and Conversion (Counts III and IV, Respectively)

The parties disagree as to whether Michigan or maritime law applies to

Plaintiffs' negligence and conversion claims.  (*See* Def. Mot. ¶ 9, ECF No. 43 at

Pg ID 920-21; Pls. Resp. Br. at 20-21 n. 5, ECF No. 52 at Pg ID 2075-76.)

However, as Plaintiffs acknowledge (Pls. Resp. Br. at 20-21 n.5, ECF No. 52 at Pg

ID 2075-76), the result is the same as both jurisdictions recognize the economic

loss doctrine, *see Great Lakes Reinsurance (UK) PLC v. Sunset Harbour Marina,*

---

Escanaba was chosen because Calumet had contracted out another barge to
complete the job, which was there.  (Long Dep. at 27, ECF No. 52-8 at Pg ID
2267.)  Notably, Calumet repudiated the sales contract *before* the Barge reached
Escanaba.  Under the terms of the Charter Agreement, at that time the duty to
return the Barge to Busch arose.  While Calumet may have been unable to move
the Barge from Escanaba to Carrollton once surveyor Randal Wilke deemed it
unseaworthy on June 12 and the Load Line Certificate expired the following day,
this does not explain why the Barge could not have been returned to Busch after it
stopped in Duluth or after Calumet declared its intent not to close on the Sales
Contract.

*Inc.*, No. 10-24469-CIV, 2012 WL 13012738, at \*4 (S.D. Fla. Jan. 4, 2012) (citations omitted) (maritime law); *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 581 (6th Cir. 2016) (citing *Quest Diagnostics, Inc. v MCI WorldCom, Inc.*, 656 N.W.2d 858, 861 (Mich. Ct. App. 2002)) (Michigan law).  Under this doctrine, "a tort action may not lie where the basis for liability arises from a contract." *Meridian Bulk Carriers, Ltd. v. Kinder Morgan Bulk Terminals, Inc.*, No. 807-CV-1422-T-33TGW, 2009 WL 2180582, at \*9 (M.D. Fla. July 22, 2009); *DBI Investments, LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (citing *Ferrett v. Gen Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991) (explaining that "under Michigan law, a plaintiff 'may not maintain an action in tort for nonperformance of a contract.'")).

Plaintiffs' conversion claim is premised on Calumet's failure and refusal to return the Barge to Busch.  (*See* Compl. ¶¶ 70-71, ECF No. 1 at Pg ID 11.) Plaintiffs' negligence claim is based on Calumet's operation of the Barge, which Plaintiffs allege caused damage to it.  (*Id.* ¶¶ 78-84, Pg ID 12-13.)  Both claims stem from duties set forth in the Charter Agreement.  (*See* Agreement ¶¶ 1(c), 2, 3, 5, 7, ECF No. 41-7 at Pg ID 806-07).  As such, they are barred by the economic loss doctrine.

Calumet is therefore entitled to summary judgment with respect to Counts III and IV of the Complaint.

## <u>Conclusion</u>

For the reasons discussed above, the Court is granting summary judgment to Plaintiffs with respect to their claim that Calumet breached the Sales Contract (Count I) and Charter Agreement (Count II) and with respect to Calumet's counterclaim for fraudulent misrepresentation.  Summary judgment is granted to Calumet with respect to Plaintiffs' negligence and conversion claims (Counts III and IV).

Accordingly,

**IT IS ORDERED** that the motion for summary judgment filed by Busch Marine Group, Inc. and Gregory J. Busch (ECF No. 41) is **GRANTED**.

**IT IS FURTHER ORDERED** that Calumet River Fleeting, Inc.'s summary judgment motion (ECF No. 43) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: July 26, 2022

27